**IN THE UNITED STATES BANKRUPTCY COURT FOR**
**THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **POTTSTOWN MEDICAL SPECIALISTS, INC.,**[1] | : | **Case No. 26-13621 (DJB)** |
| | : | |
| **Debtor.** | : | |

# ORDER (A) APPROVING PROCEDURES IN CONNECTION WITH SALE OF ACQUIRED ASSETS; (B) SCHEDULING AUCTION AND HEARING TO CONSIDER APPROVAL OF SALE; (C) APPROVING PROCEDURES RELATED TO ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (D) APPROVING FORM AND MANNER OF NOTICES THEREOF; (E) APPROVING BREAKUP FEE AND EXPENSE REIMBURSEMENT; AND (F) GRANTING RELATED RELIEF

Upon the *Motion for Entry of Orders (I) (A) Approving Sale Procedures for the Sale of the Acquired Assets; (B) Scheduling Auction and Hearing to Consider Approval of Sale; (C) Approving Procedures Related to Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (D) Approving Form and Manner of Notices Thereof; (E) Approving Breakup Fee and Expense Reimbursement; and (II) (A) Approving the Sale of the Acquired Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* [Docket No. 50] (the "Motion")[2] filed by the above-captioned debtor and debtor-in-possession (collectively, the "Debtor"), which came before the Court on September 29, 2026 for approval of the sale procedures and related relief portion thereof ( (the "Sale Procedures Hearing"); and upon review of the Sale Procedures Motion, the *First Day Declaration* [Docket

[1] The last four digits of the Debtor's federal tax identification number are (7171). The Debtor has an address at 351 W. Schuylkill Road, Coventry Square Suite 13, Pottstown, PA 19465-7438.

[2] Capitalized terms used but not defined herein shall have the meanings given to them in, as applicable, in the Sale Procedures (attached hereto as **Annex 1**).

No. 14], the *Declaration of Timothy B. Rimmer in Support of the Motion for Entry of Orders (I) (A) Approving Sale Procedures for the Sale of the Acquired Assets; (B) Scheduling Auction and Hearing to Consider Approval of Sale; (C) Approving Procedures Related to Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (D) Approving Form and Manner of Notices Thereof; (E) Approving Breakup Fee and Expense Reimbursement; and (II) (A) Approving the Sale of the Acquired Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* [Docket No. 50-3] and the record in the above-captioned chapter 11 case (these "Chapter 11 Case"); and the Court having heard the statements of counsel and evidence adduced by the Debtor (including proffers admitted into evidence) at the Sale Procedures Hearing; and after due deliberation the Court having determined that the relief requested in the Sale Procedures Motion and granted herein is in the best interests of the Debtor, its estate, its creditors, and other stakeholders; and good and sufficient cause having been shown,

IT IS HEREBY FOUND AND DETERMINED THAT:

A. The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), as made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such. The Court's findings shall also include any oral findings of fact and conclusions of law made by the Court during or at the conclusion of the Sale Procedures Hearing.

B. The Court has jurisdiction over the Sale Procedures Motion and the transactions contemplated by that certain *Asset Purchase Agreement* dated as of August 30, 2026 (as amended, modified or supplemented, the "Asset Purchase Agreement") by and among the Debtor and Thomas Jefferson University (such transactions, the "Sale") pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (M), and (O). Venue in this district is proper under 28 U.S.C. §§ 1408 and 1409.

C. The statutory and rule-based predicates for relief requested in the Sale Procedures Motion are sections 105, 363, and 365 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (the "Bankruptcy Code"), and Bankruptcy Rules 2002(a)(2), 6004, 6006, and 9014.

D. Good and sufficient notice of the Sale Procedures Motion and the relief sought therein has been given, and no other or further notice is required except as set forth herein with respect to the Sale Hearing. A reasonable opportunity to object or be heard regarding the relief requested herein has been afforded to creditors, equity holders, and all other parties-in-interest.

E. The Debtor's proposed notice of the Sale Procedures, attached hereto as **Annex 1**, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Auction, the sale of the assets set forth in the Asset Purchase Agreement (the "Acquired Assets"), the opportunity to submit bids for any or all such assets, and the bidding procedures to be employed in connection therewith.

F. The Debtor has demonstrated that, under the circumstances of this Chapter 11 Case and in particular the circumstances surrounding the Acquired Assets, the Sale Procedures: (1) provide an appropriate process and timetable for the Debtor to utilize in pursuing a sale of the Acquired Assets; (2) will promote the Debtor's efforts to maximize the value of its estate; and (3) are in the best interests of the Debtor, its estates, creditors, and other stakeholders.

G. For the reasons set forth in the Motion and at the Sale Procedures Hearing, a prompt Sale of the Acquired Assets, on the timetable set forth herein, provides the best available process under the circumstances to maximize the value of the Debtor's estates and is in the best interests of its creditors and other stakeholders.

H. The Sale Procedures are reasonably designed to maximize the value to be obtained from the sale of the Acquired Assets.

I. The Debtor has articulated good and sufficient reasons for, and the best interests of its estate will be served by, this Court's granting the sale procedures and related relief portion of the relief requested in the Motion, including approval of: (1) the Sale Procedures; (2) the selection by the Debtor of Thomas Jefferson University to serve as the stalking horse purchaser (in such capacity, the "Stalking Horse Purchaser"); (3) the form and manner of serving the Sale Notice, in substantially the form attached hereto as **Annex 2**, and the Assignment Notice, in substantially the form attached hereto as **Annex 3**; (4) the Breakup Fee and Expense Reimbursement.

J. The Debtor has articulated good and sufficient reasons for, and the best interests of its estate will be served by, this Court scheduling the Sale Hearing to consider (among other things) final approval of a Sale of the applicable Acquired Assets to the Stalking Horse Purchaser or other Prevailing Bidder(s) at the Auction (as defined below), if any, free and clear of all liens, claims, encumbrances, and other interests pursuant to section 363(f) of the Bankruptcy Code and the assumption and assignment to the Stalking Horse Purchaser, or other Prevailing Bidder(s) at the Auction, of certain executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code.

K. The Stalking Horse Purchaser has provided a material benefit to the Debtor, its estate, and its creditors by increasing the likelihood that, given the circumstances, the best possible price for the Acquired Assets will be received.

L. The Debtor and the Stalking Horse Purchaser negotiated the Asset Purchase Agreement at arm's length and in good faith, without collusion. The Asset Purchase Agreement represents the highest or otherwise best offer for the Acquired Assets that the Debtor has received to date. Entry of this Order (the "Sale Procedures Order"), including authorization for the Debtor to enter into and perform under the Asset Purchase Agreement (subject to the solicitation of higher or otherwise better offers pursuant to the Sale Procedures and entry of the Sale Order) and approval of the Breakup Fee and Expense Reimbursement (each as defined in the Asset Purchase Agreement, and collectively referred to herein as the "Bid Protections") contemplated thereby, is in the best interests of the Debtor, its estate, its patients, creditors, and other stakeholders.

M. The Bid Protections, as set forth in the Asset Purchase Agreement, are: (1) commensurate to the real and substantial benefits conferred upon the Debtor's estate by the Stalking Horse Purchaser; (2) reasonable and appropriate in light of the size and nature of the proposed sale contemplated by the Asset Purchase Agreement, the commitments that have been made by the Stalking Horse Purchaser, and the efforts that have been and will be expended by the Stalking Horse Purchaser; and (3) necessary to induce the Stalking Horse Purchaser to continue to pursue such sale in accordance with the terms of, and continue to be bound by, the Asset Purchase Agreement.

N. Moreover, the Bid Protections are an essential inducement to, and condition of, the Stalking Horse Purchaser's entry into, and continuing obligations under, the Asset Purchase Agreement. Unless it is assured that the Bid Protections will be available, the Stalking Horse

Purchaser is unwilling to be bound under the Asset Purchase Agreement. The Bid Protections induced the Stalking Horse Purchaser to submit a bid that will serve as a minimum or floor bid for the Acquired Assets on which the Debtor, its estate, its creditors, and other bidders can rely. The Stalking Horse Purchaser has provided a material benefit to the Debtor, its estate, and its creditors by providing a baseline value, increasing the likelihood of competitive bidding at the Auction, and facilitating participation of other bidders in the sale process, thereby increasing the likelihood that the value of the Acquired Assets will be maximized through the Debtor's sale process.

O. Accordingly, the Bid Protections are (i) fair, reasonable and appropriate and designed to maximize value for the benefit of the Debtor's estate and (ii) actual and necessary costs and expenses of preserving the Debtor's estates within the meanings of sections 503(b) and 507(a) of the Bankruptcy Code.

P. The Sale Procedures and Auction, if held, is necessary to determine whether any entity other than the Stalking Horse Purchaser is willing to enter into a definitive agreement on terms and conditions more favorable to the Debtor and its estates than the Asset Purchase Agreement.

Q. The form and manner of service of the Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale, including: (i) the date, time, and place of the Auction (if one is held); (ii) the opportunity to submit competing bids for any or all of the assets that are subject to the Asset Purchase Agreement, and the Sale Procedures and certain dates and deadlines related thereto; (iii) the objection deadline for the Sale and the date, time, and place of the Sale Hearing; (iv) reasonably specific identification of the Acquired Assets for sale; (v) instructions for promptly obtaining a copy of the Asset Purchase Agreement; (vi) representations describing the Sale as being free and clear of liens, claims,

interests, and other encumbrances, with all such liens, claims, interests, and other encumbrances attaching with the same validity and priority to the sale proceeds subject to customary exceptions for permitted liens; and (vii) notice of the proposed assumption and assignment of the Potential Assumed Contracts (as defined below) to the Stalking Horse Purchaser (or to another Prevailing Bidder arising from the Auction, if any) and the right, procedures, and deadlines for objecting thereto, and no other or further notice of the Sale shall be required.

R. The Assignment Notice is reasonably calculated to provide counterparties to the Potential Assumed Contracts (as defined below) with proper notice of the intended assumption and assignment of their executory contracts, any Cure Amounts (as defined below) and the Contract Procedures (as defined below).

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1. The Sale Procedures and related relief portion of the Motion as set forth therein is GRANTED as set forth herein.

2. The form of the Asset Purchase Agreement, attached hereto as **Exhibit A**, is hereby approved.

3. The bid of Stalking Horse Purchaser will serve as a "stalking horse" bid, which shall be deemed a Qualified Bid under the Sale Procedures.

4. The Bid Protections are hereby approved; provided, however, that notwithstanding anything to the contrary in the Asset Purchase Agreement, (i) the Breakup Fee shall not exceed three percent (3.0%) of the Purchase Price ("Breakup Fee"), and (ii) the Expense Reimbursement shall not exceed $250,000.00 (the "Expense Reimbursement"), both of which shall be an administrative expense of the Debtor's estate under sections 503(b) and 507(a)(2) of the Bankruptcy Code, shall be paid to the Stalking Horse Purchaser from the sale proceeds, in cash, at

the closing of any Alternate Transaction (as defined in the Asset Purchase Agreement) as a condition to the occurrence of such closing, and shall be payable by the Debtor without further action or order by the Court.

5. The Sale Procedures, as set forth in **Annex 1** attached hereto and incorporated herein, are hereby approved in their entirety and shall govern all bids and other activities relating to sale of the Acquired Assets. The Debtor is authorized to take any and all actions necessary or appropriate to implement the Sale Procedures. The failure to specifically include or reference any particular provision of the Sale Procedures in this Sale Procedures Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Sale Procedures be authorized and approved in their entirety.

**SALE PROCEDURES TIMELINE**

6. As further described in the Sale Procedures, the deadline for submitting a Qualified Bid (as such term is defined in the Sale Procedures) for the Acquired Assets shall be **October 22, 2026 at 4:00 p.m., prevailing Eastern time** (the "Bid Deadline"). No Bid shall be deemed to be a Qualified Bid or otherwise considered for any purposes unless such Bid is determined by the Debtor, in the exercise of its fiduciary duties, to meet the requirements set forth in the Sale Procedures.

7. The Stalking Horse Purchaser, or its designee, shall be deemed a Qualified Bidder for all purposes under the Sale Procedures and this Sale Procedures Order, and the bid submitted by Stalking Horse Purchaser pursuant to the Asset Purchase Agreement shall be deemed to be a Qualified Bid for all purposes under the Sale Procedures and this Sale Procedures Order.

8. If more than one Qualified Bid (*i.e.*, any Qualified Bid other than the Qualified Bid of the Stalking Horse Purchaser) is received by the Debtor in accordance with the Sale Procedures,

the Auction shall take place on **October 23, 2026 at 10:00 a.m., prevailing Eastern time**, via ZOOM or other electronic means, or such other time or such other place and location as the Debtor shall notify all Qualified Bidders, the United States Trustee, and any official committee of unsecured creditors appointed in these Chapter 11 Cases (the "Committee"). The Auction shall be conducted in accordance with the Sale Procedures. Without limiting the generality of the foregoing, and notwithstanding anything to the contrary herein, the Stalking Horse Purchaser shall be entitled to credit bid each round at the Auction using the Breakup Fee, Expense Reimbursement, and the amount of all outstanding obligations under the DIP Facility as of the Closing Date, as a portion of any overbid by the Stalking Horse Purchaser; provided that, consistent with paragraph K of the DIP Order, any credit bid must provide for repayment in cash and in full of all then outstanding Prepetition Loan Obligations at closing.

9. If the Debtor does not receive any Qualified Bids, other than the Qualified Bid submitted by the Stalking Horse Purchaser, on or before the Bid Deadline, then the Auction will be canceled, and the Debtor shall proceed to seek final approval of the Asset Purchase Agreement at the Sale Hearing.

10. The Sale Hearing shall be held before the Court on **October 30, 2026, at 9:30 a.m., prevailing Eastern time** (or at such later date and time as may be scheduled by further Order of this Court upon motion or application by the Debtor), at which hearing the Court will consider: (a) approval of the Sale to the Stalking Horse Purchaser or the Prevailing Bidder and (b) objections, if any, to the proposed sale and the proposed assumption and assignment of the Potential Assumed Contracts solely to the extent such objections are premised on the Stalking Horse Purchaser's or other Prevailing Bidder's ability to provide adequate assurance of future performance thereunder.

The Sale Hearing may be adjourned or rescheduled without notice other than as stated on the record in Court or set forth in a filing, on the Debtor's main bankruptcy case docket.

11. To be timely and eligible for consideration by the Court, any objections to the Asset Purchase Agreement, the proposed Sale, and/or any component thereof (any such objection, a "Sale Objection")—other than any Cure/Assignment Objection (as defined herein)— must: (a) be in writing; (b) clearly specify the grounds for the objection; (c) conform to the Bankruptcy Rules and the Bankruptcy Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "Local Bankruptcy Rules"); and (d) be filed with the Court and served **so as to be received** by the following parties (collectively, the "Objection Notice Parties") by no later than **4:00 p.m., prevailing Eastern time, on October 22, 2026** (the "Sale Objection Deadline"): (a) the Debtor, 351 W. Schuylkill Road, Coventry Square Suite 13, Pottstown, Pennsylvania 19465, Attn: Timothy B. Rimmer (trimmer@pmsi.com); (b) counsel to the Debtor, Karalis PC, 1900 Spruce Street, Philadelphia, Pennsylvania 19103, Attn: Aris J. Karalis (akaralis@karalislaw.com); (c) counsel to the DIP Lender and Stalking Horse Purchaser, Klehr Harrison Harvey Branzburg LLP, 919 North Market Street, Suite 1000, Wilmington, Delaware 19801, Attn: Domenic E. Pacitti (dpacitti@klehr.com); (d) counsel for the Committee, if any; and (e) Office of the United States Trustee, 900 Market Street, Suite 320, Philadelphia, PA 19107, Attn: John Henry Schanne (John.Schanne@usdoj.gov).

12. Unless the Court orders otherwise, the failure of any objecting person or entity to timely file and serve a Sale Objection as set forth herein shall be a bar to the assertion of any objection to the consummation and performance of any Sale contemplated by the Asset Purchase Agreement or any alternative sale with a Prevailing Bidder, including the transfer, free and clear of all Liens asserted against each of the Acquired Assets, transferred as part of such sale.

**THE CONTRACT PROCEDURES**

13. The Contract Procedures are approved as set forth herein.

14. By **October 1, 2026** (the "Mailing Deadline"), the Debtor shall file and serve, by U.S. First Class Mail, the applicable Assignment Notice on each counterparty (the "Non-Debtor Counterparty") whose executory contract or unexpired lease potentially may be assumed and assigned to the Stalking Horse Purchaser or other Prevailing Bidder (the "Potential Assumed Contracts"). With respect to all Potential Assumed Contracts, the Assignment Notice shall be served by the Debtor on the notice party at the notice address each as set forth in the applicable Potential Assumed Contract as well as on any counsel who has entered an appearance in these cases on behalf of the non-debtor counterparty to such contract or lease. The Debtor shall attach to the Assignment Notice a list identifying the Non-Debtor Counterparties to the Potential Assumed Contracts and the proposed Cure Costs under the Potential Assumed Contracts as of the Petition Date. Additionally, the Assignment Notice shall: (a) notify each Non-Debtor Counterparty to a Potential Assumed Contract that such party's contract or lease may be assumed and assigned to the Stalking Horse Purchaser of the Assigned Assets or other Prevailing Bidder at the conclusion of the Sale Hearing; (b) state the date of the Sale Hearing and that objections to any Cure Amount or to assumption and assignment of any contract or lease will be heard at the Sale Hearing or at a later hearing, as determined by the Debtor; and (c) state a deadline by which objections to the Cure Amount or to the assumption and assignment of its contract or lease must be filed and served.

15. In the event that, after the Mailing Deadline, the Debtor elects to assume and assign additional Potential Assumed Contracts or any previously-stated Cure Amounts are modified, the Debtor shall promptly serve a supplemental cure notice (each, a "Supplemental Assignment

Notice") on each impacted Non-Debtor Counterparty. Each Supplemental Assignment Notice shall include the same information with respect to the applicable contract or lease as is required to be included in the Assignment Notice.

16. The Stalking Horse Purchaser's Adequate Assurance Information (the "Stalking Horse Adequate Assurance Information") shall be delivered to all counterparties to Potential Assumed Contracts that have made a written request to the Debtor for such information.

17. Objections, if any, to (i) the proposed Cure Amounts or (ii) objections relating to whether applicable law excuses the Non-Debtor Counterparty from accepting performance by, or rendering performance to, the Stalking Horse Purchaser or other Prevailing Bidder for purposes of section 365(c)(1) of the Bankruptcy Code (the "Cure/Assignment Objections"), must: (1)(a) be in writing; (b) state the basis for such objection; (c) comply with the Bankruptcy Code, Bankruptcy Rules and Local Bankruptcy Rules and (d) if such objection is to the Cure Amount, state with specificity what Cure Amount the Non-Debtor Counterparty believes is required (in all cases, with appropriate documentation in support thereof) and (2) and filed with this Court and served on the Objection Notice Parties **so as to be received** no later than **4:00 p.m., prevailing Eastern time on October 22, 2026** (the "Cure/Assignment Objection Deadline").

18. Objections, if any, to the Stalking Horse Adequate Assurance Information must: (1)(a) be in writing; (b) state the basis for such objection; (c) comply with the Bankruptcy Code, Bankruptcy Rules and Local Bankruptcy Rules and (2) and filed with this Court and served on the Objection Notice Parties **so as to be received** no later than **4:00 p.m., prevailing Eastern time on October 28, 2026** (the "Stalking Horse Adequate Assurance Objection Deadline").

19. The Debtor shall deliver Adequate Assurance Information for the Qualified Bidders (the "Non-Stalking Horse Adequate Assurance Information"), other than the Stalking Horse

Purchaser to the applicable counterparties that have made a written request for such information, within 24 hours after the Bid Deadline.

20. Adequate Assurance Information will be provided to affected counterparties on a strictly confidential basis. Counterparties shall not use any Adequate Assurance Information for any purpose other than to (1) evaluate whether adequate assurance requirements under section 365(f)(2) of the Bankruptcy Code and, if applicable, section 365(b)(3), have been satisfied; and (2) to support any Adequate Assurance Objection filed by the Counterparty; provided that any Adequate Assurance Objection that discloses confidential, non-public information included in the Adequate Assurance Information must be filed with the Court under seal unless disclosure of such confidential, non-public information is authorized by the Debtor, the applicable Qualified Bidder, and any known proposed assignee(s) of the relevant Contract or Lease (if different from the applicable Qualified Bidder), or ordered by the Court.

21. Objections, if any, to the Non-Stalking Horse Adequate Assurance Information must: (1)(a) be in writing; (b) state the basis for such objection; (c) comply with the Bankruptcy Code, Bankruptcy Rules and Local Bankruptcy Rules and (2) be filed with this Court and served on the Objection Notice Parties **so as to be received** no later than **4:00 p.m., prevailing Eastern time on October 28, 2026** (the "Non-Stalking Horse Adequate Assurance Objection Deadline," and together with the Stalking Horse Adequate Assurance Objection Deadline and the Cure/Assignment Objection Deadline, the "Contract Objection Deadlines").

22. Where a Non-Debtor Counterparty to a Potential Assumed Contract files a timely objection, objecting to the assumption by the Debtor and assignment to the Stalking Horse Purchaser or other Prevailing Bidder of such Potential Assumed Contract (each a "Disputed Assignment") and/or asserting a cure amount higher than the proposed Cure Amount with respect

to such Potential Assumed Contract listed on the Assignment Notice (each a "Disputed Cure Amount"), the Debtor and the Non-Debtor Counterparty shall meet and confer in good faith to attempt to resolve any such objection without Court intervention. If the Debtor and the Non-Debtor Counterparty determine that the objection cannot be resolved without judicial intervention, then the determination of the assumption and assignment of the Disputed Assignment and/or the amount to be paid under section 365 of the Bankruptcy Code with respect to the Disputed Cure Amount will be determined by the Court at the Sale Hearing, unless the Debtor, the Prevailing Bidder and the Non-Debtor Counterparty to the Potential Assumed Contract in dispute agree otherwise or the Court orders otherwise. If the Court determines at the Sale Hearing that the Potential Assumed Contract will not be assumed and assigned, then such executory contract or unexpired lease shall no longer be considered a Potential Assumed Contract.

23. Absent further order of the Court, any Non-Debtor Counterparty to a Potential Assumed Contract who fails to timely file an objection to the proposed Cure Amounts or the proposed assumption and assignment of a Potential Assumed Contract by the Contract Objection Deadlines, as applicable, is deemed to have consented to such Cure Amounts and the assumption and assignment of such Potential Assumed Contract by the Debtor and to the Prevailing Bidder, and such party shall be forever barred from objecting to the Cure Amounts and from asserting any additional cure or other amounts against the Debtor, its estate or the Prevailing Bidder provided, however, that a Non-Debtor Counterparty to a Potential Assumed Contract shall not be barred from seeking additional amounts on account of any defaults occurring between the service of the Assignment Notice and the assumption of the contract that remain unpaid and that are not otherwise payable from the DIP Loan.

24. If the Non-Debtor Counterparty to a Potential Assumed Contract fails to timely object to the assumption and assignment of a Potential Assumed Contract or the proposed Cure Amount relating thereto by the Contract Objection Deadlines, or upon the resolution of any timely objection by agreement of the parties or order of the Court approving an assumption and assignment, such Potential Assumed Contract shall be deemed to be assumed by the Debtor and assigned to the Stalking Horse Purchaser or other Prevailing Bidder and the proposed Cure Amount related to such Potential Assumed Contract shall be established and approved in all respects, subject to the conditions set forth in paragraph 26 below.

25. The Debtor's decision to assume and assign the Potential Assumed Contracts is subject to Court approval and consummation of a sale transaction with the Stalking Horse Purchaser or other Prevailing Bidder. The Stalking Horse Purchaser or other Prevailing Bidder shall have no rights in and to or obligations under a particular Potential Assumed Contract, and the Non-Debtor Counterparty shall have no rights against Stalking Horse Purchaser or other Prevailing Bidder, until such time as the particular Potential Assumed Contract is assumed and assigned by order of the Court.

26. Except as may otherwise be agreed to in the Asset Purchase Agreement or Alternative Agreement with a Prevailing Bidder or by the parties to a Potential Assumed Contract, the defaults under the Potential Assumed Contracts that must be cured in accordance with section 365(b) of the Bankruptcy Code shall be cured as follows: without any reduction of, or credit against, the amount of the Prevailing Bid, the Prevailing Bidder shall pay all Cure Amounts relating to an assumed executory contract or unexpired lease within ten days after the later of (i) the closing date specified in the Asset Purchase Agreement or Alternative Agreement with a

Prevailing Bidder or (ii) the date on which such executory contract or unexpired lease is deemed assumed and assigned in accordance with this Order or any subsequent order of the Court.

27. The inclusion of a contract or lease, or Cure Amount with respect thereto on the Assignment Notice (or any Supplemental Assignment Notice filed and served thereafter) shall not constitute or be deemed a determination or admission by the Debtor, the Stalking Horse Purchaser or any other party in interest that such contract or lease is an executory contract or unexpired lease of the Debtor within the meaning of the Bankruptcy Code. The Debtor's rights, claims and causes of action with respect to each contract and lease listed on the Assignment Notice (or any Supplemental Assignment Notice) are fully preserved. The Debtor's inclusion of any contract or lease on the Assignment Notice (or any Supplemental Assignment Notice) shall not be a guarantee that such contract or lease ultimately will be assumed or assumed and assigned.

**SALE NOTICE AND ASSIGNMENT NOTICE**

28. The form and manner of service of the Sale Notice attached hereto as **Annex 2** is hereby approved in all respects. By the Mailing Deadline, the Debtor shall serve a copy of this Order and the Sale Notice by U.S. mail upon:(a) all entities reasonably known by the Debtor to have expressed a bona fide interest in acquiring any of the Acquired Assets during the year preceding the date hereof; (b) all entities known to have asserted any claim, liens, interests, or encumbrances in or upon any of the Acquired Assets; (c) the U.S. Trustee; (d) counsel for the DIP Lender; (e) Fulton Bank, N.A.; (f) counsel for Meridian Bank, Berger Law Group, P.C., 919 Conestoga Road, Bldg. 3, Suite 114, Bryn Mawr, PA 19010, Attn: Phillip D. Berger; (g) the entities listed on the List of Creditors Holding the 20 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (h) all persons who have formally requested notice pursuant to Bankruptcy Rule 2002; (i) all creditors on the creditor matrix list; and (j) the following

governmental agencies having a regulatory or statutory interest in the Chapter 11 Case, (a) United States Attorney's Office for the Eastern District of Pennsylvania; (b) Securities and Exchange Commission, Attn: Bankruptcy Unit; (c) the Internal Revenue Service; (d) the Office of the attorney general of Pennsylvania; (e) the Commonwealth of Pennsylvania, Department of Labor and Industry; and (f) the Commonwealth of Pennsylvania, Department of Revenue.

29. The form and manner of service of the Assignment Notice attached hereto as **Annex 3** is hereby approved in all respects. By the Mailing Deadline, the Debtor shall serve a copy of this Order and the Assignment Notice by U.S. mail upon all Non-Debtor Counterparties to all Potential Assumed Contracts.

**RELATED RELIEF**

30. Notwithstanding anything to the contrary herein, the Debtor, in the exercise of its business judgment, shall retain the right under the Sale Procedures to make non-material modifications to the Sale Procedures, including, without limitation, extending, with the prior written consent of the DIP Lender, any deadlines thereunder, if such modification is determined by the Debtor in the reasonable exercise of its business judgment, in consultation with the DIP Lender, and upon notice to the United States Trustee, to be in the best interests of the estates and to enhance the likelihood of maximizing the sale value of the Acquired Assets. Any material modifications to the Sale Procedures must be addressed by separate motion prior to the Auction (if any). To the extent any of the deadlines set forth in the Sale Procedures Order or the Sale Procedures are extended, or any other provisions of the Sale Procedures are materially modified or cancelled, the Debtor shall file and serve a copy of such notice with the Court; provided, that nothing herein shall modify any notice requirements under the applicable Bankruptcy Rules and

the Local Bankruptcy Rules with respect to any motion to sell the Acquired Assets and any hearing on such motion.

31. In the event of any inconsistencies between this Sale Procedures Order and the Motion, this Sale Procedures Order shall govern in all respects. In the event of any inconsistencies between this Sale Procedures Order and the Sale Procedures, the Sale Procedures shall govern in all respects.

32. The stays provided for in Bankruptcy Rules 6004(h) and 6006(d) are waived and this Order shall be effective immediately upon its entry.

33. The requirements of Local Bankruptcy Rule 6004-1 are waived with respect to the Sale Procedures Motion to the extent applicable.

34. The Debtor is authorized and empowered to take such steps, expend such sums of money and do such other things as may be necessary or appropriate to implement the relief granted herein.

35. The Court shall retain jurisdiction over any matter or disputes arising from or relating to the interpretation, implementation or enforcement of this Sale Procedures Order.

36. The Debtor shall provide counsel for Fulton and Meridian with a proposed form of Sale Order on or before **October 19, 2026**, and file and serve the proposed form of Sale Order with the Court on or before **October 27, 2026**.

Dated: September 30, 2026

Honorable Derek J. Baker
United States Bankruptcy Court



20255283.v3

# ANNEX 1

## Sale Procedures

**IN THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **POTTSTOWN MEDICAL SPECIALISTS, INC.,**[1] | : | **Case No. 26-13621 (DJB)** |
| | : | |
| **Debtor.** | : | |

# SALE PROCEDURES

On September 30, 2026, the United Stated Bankruptcy Court for the Eastern District of Pennsylvania (the "Court") entered an order (the "Sale Procedures Order") that, among other things, authorized the above-captioned debtor and debtor-in-possession (the "Debtor") to (a) solicit bids ("Bids") for a sale of the Acquired Assets (as defined in the Asset Purchase Agreement) the ("Sale") pursuant to the process and procedures set forth below (the "Sale Procedures"); (b) select Thomas Jefferson University as the stalking horse purchaser in connection with such sale (the "Stalking Horse Purchaser"); and (c) enter into that that certain *Asset Purchase Agreement* dated as of August 30, 2026 (as amended, modified or supplemented, the "Asset Purchase Agreement") by and between the Debtor and Thomas Jefferson University. [2]

Pursuant to the Sale Procedures Order, the Debtor seeks authority to sell the Acquired Assets in a single transaction free and clear of liens, claims, encumbrances, and other interests (a) to the Stalking Horse Purchaser, if the Debtor does not receive any other timely Qualified Bids (as defined below) or (b) if the Debtor receive timely Qualified Bid(s), then to the Qualified Bidder (as defined below) that is determined to have made the highest or otherwise best offer for the Acquired Assets at a public auction (the "Auction"), in each case in accordance with the Sale Procedures set forth below (the "Prevailing Bidder"). In conjunction with the sale of the Acquired Assets, the process provides for the assumption by the Debtor and the assignment to the Prevailing Bidder of certain executory contracts and unexpired leases that the Prevailing Bidder and/or the Debtor may designate pursuant to the Sale Procedures Order.

**Copies of the Sale Procedures Order and any other documents in the Debtor's Chapter 11 Case are available at the Omni Agent Solutions, Inc. https://omniagentsolutions.com/PMSI or upon request to counsel for the Debtor.**

[1] The last four digits of the Debtor's federal tax identification number are (7171). The Debtor has an address at 351 W. Schuylkill Road, Coventry Square Suite 13, Pottstown, PA 19465-7438.

[2] Capitalized terms not otherwise defined in these Sale Procedures shall have the meanings ascribed to them in the Sale Procedures Order or the Asset Purchase Agreement, as applicable.

**Participation Requirements and Due Diligence**

(a) In order to participate in the bidding process and the Auction, a person interested in purchasing any or all of the Acquired Assets (a "Potential Bidder") must first deliver the following materials to the Debtor and its counsel:

(i) An executed confidentiality agreement in form and substance satisfactory to the Debtor and its counsel (the "Confidentiality Agreement"). Without limiting the foregoing sentence, the Confidentiality Agreement will provide that all non-public information about the Debtor received by a Potential Bidder, or if the bidder is qualified, a Qualified Bidder (as defined below), will be kept strictly confidential and used only in connection with analyzing a transaction for the Acquired Assets.

(ii) Written evidence that enables the Debtor and its advisors to determine whether a Potential Bidder has the financial and other ability to close the contemplated sale transaction and provide adequate assurance of future performance under all contracts to be assumed and assigned in connection therewith.

(iii) A written acknowledgement that: (a) in connection with submitting its Bid, it has not engaged in any collusion that would be subject to section 363(n) of the Bankruptcy Code with respect to any Bids or the Sale, specifying that it did not agree with any Potential Bidders or Qualified Bidders to control price; and (b) it agrees not to engage in any collusion that would be subject to section 363(n) of the Bankruptcy Code with respect to any Bids, the Auction, or the Sale.

(iv) The advisors to the Debtor shall provide these Sale Procedures, together with a copy of the form Asset Purchase Agreement to each Potential Bidder, provided, however, any Bid for all or substantially all of the Acquired Assets shall include a form of Asset Purchase Agreement marked against the Asset Purchase Agreement (the "Alternative Agreement") and shall be subject to the conditions and terms set forth in (e) below. All Potential Bidders, whether deemed Qualified Bidders (as defined below) or not, consent to the jurisdiction of the Court to determine matters concerning the sale, their Bid and otherwise with respect to the process and waive any right to any other venue.

(b) Any Potential Bidder wishing to conduct due diligence concerning a prospective acquisition transaction of the Acquired Assets, after execution of a Confidentiality Agreement, shall be granted access to all relevant information regarding the Acquired Assets and the business of the Debtor reasonably necessary to enable a Potential Bidder to evaluate the Acquired Assets and the prospective transaction. The Debtor shall make such access available to Potential Bidders during normal business hours as soon as reasonably practicable following execution of the Confidentiality Agreement. Potential Bidders interested in conducting due diligence should contact counsel for the Debtor, Karalis PC, 1900 Spruce Street, Philadelphia, Pennsylvania 19103, Attn: Aris J. Karalis (akaralis@karalislaw.com) and all discussions by any Potential Bidder with respect to due diligence information and all relevant information regarding the Acquired Assets and the business of the Debtor shall be solely with counsel for the Debtor and Timothy B. Rimmer (trimmer@pmsiforlife.com), and further, in order to avoid disrupting patient care, potential bidders shall not initiate contact with any physician without the consent of counsel for the Debtor.

(c) Notwithstanding the foregoing, the Debtor and its advisors shall not provide confidential or proprietary information to any person if the Debtor, and its advisors, believe that such disclosure would be detrimental to the interests of the Debtor's estate. All due diligence must be completed before the Bid Deadline (as defined below). No condition(s) allowing or regarding further due diligence will be accepted or authorized after the Bid Deadline. Potential Bidders are required to exercise their own discretion before relying on any information regarding the Acquired Assets provided by the Debtor. Neither the Debtor nor its representatives are responsible for, and will bear no liability with respect to, any information obtained by Potential Bidders pursuant hereto.

(d) The Debtor and its advisors shall: (i) receive and evaluate Bids from Potential Bidders; (ii) request information from Potential Bidders, engage in discussions with Potential Bidders, and take such other actions to determine whether any Bid constitutes or could lead to a Qualified Bid (as defined below); and (iii) take any other actions contemplated under these Sale Procedures.

**Submission of Bids**

(e) Any Potential Bidder interested in purchasing the Acquired Assets must submit a Bid, so as to be **actually received by counsel to the Debtor** on or prior to **4:00 p.m. prevailing Eastern time on October 22, 2026** (the "Bid Deadline"). The Debtor may, with the consent of the DIP Lender, extend the Bid Deadline and shall promptly notify all Potential Bidders of any such extension. In order for such Bid to be considered, however, it must be a "Qualified Bid." The Debtor and its advisors will determine if a Bid is a Qualified Bid based on the requirements herein. A Potential Bidder will be deemed to be a "Qualified Bidder" if the Debtor and its advisors, determine that such Potential Bidder submitted a Qualified Bid. Notwithstanding anything to the contrary herein, the Stalking Horse Purchaser (or its designee) shall be deemed a Qualified Bidder for all purposes under the Sale Procedures, and the Bid submitted by the Stalking Horse Purchaser pursuant to the Asset Purchase Agreement shall be deemed to be a Qualified Bid for all purposes under the Sale Procedures.

(f) A Bid will be considered a "Qualified Bid" only if the Bid is for the purchase of all or substantially all of the Acquired Assets and fulfills the following requirements prior to the Bid Deadline (capitalized terms used in this section are defined later in the Sale Procedures):

(i) Provides that the Qualified Bidder's Bid shall remain open and irrevocable until the earliest of (X) thirty (30) days following the date of entry of a Sale Order; (Y) the date of the closing of the sale of the Acquired Assets; or (Z) such date as the Debtor affirms in writing that they do not intend to pursue a sale transaction based on such Qualified Bidder's Bid (the "Bid Expiration Date");

(ii) Provides that the Qualified Bidder is obligated to perform as a Back-Up Bidder (as defined below) in the event such Qualified Bidder is not the Prevailing Bidder;

(iii) Is made by a person or entity that demonstrates evidence of fully committed and firm financing for each component of debt or equity in support of such Bid and other ability to consummate the proposed transaction, in each case acceptable to the Debtor;

(iv) Provides written evidence that the Qualified Bidder has obtained authorization and approval from its board of directors (or comparable governing body) with respect to the submission of its Bid and the execution of the Alternative Agreement, or a representation that no such authorization or approval is required;

(v) Provides written evidence that any necessary filings under applicable regulatory, antitrust, and other laws will be made in a timely manner and that payment of the fees associated therewith shall be made by the Qualified Bidder.

(vi) Provides that the purchase price will be paid in cash, cash equivalents, or other consideration (in excess of the cash consideration required under subsection (e)(vii)) acceptable to the Debtor, subject to all rights of the DIP Lender;

(vii) Provides that the Qualified Bidder in addition to payment of the Purchase Price which would be payable at a Closing effective as of January 1, 2027, shall concurrent with the entry of the Sale Order, provide and obtain entry of an Order approving a new DIP loan, that provides for a lump sum advance to the Debtor equal to the then unfunded amount available under the existing DIP Facility, upon terms substantially similar to the existing DIP Facility, except for the name of the DIP Lender, with liens, claims and priorities that shall be junior to all existing liens and claims, including those of the existing DIP Lender, so that the Debtor has cash availability (equal or more than the amount then available under the existing DIP Facility) to operate the Practice though December 31, 2026, and to consummate the closing on the sale of the Acquired Assets, effective January 1, 2027;

(viii) Specifies the amount of cash (of at least approximately $9,647,398) and other consideration offered (the "Purchase Price"), which Purchase Price must include an amount of cash consideration at closing that exceeds the aggregate sum of the following:

(1) the amount of all outstanding obligations under the DIP Facility as of the Closing Date (approximately $6,387,301) comprised of (a) $5,887,301 of principal, and (b) interest, fees and cost that are paid in kind and capitalized into the principal amount of the DIP Loans (approximately $500,000);

(2) the Fulton Obligations (as defined in the DIP Order) (approximately $1,885,838.89) as of the Closing Date;

(3) the Meridian Obligations (as defined in the DIP Order) (approximately $332,828.53) as of the Closing Date;

(4) the Unsecured Creditors Carveout (as defined in APA) (approximately $200,000);

(5) the amount of all Cure Costs for Assumed Contracts, not to exceed $150,000 (approximately $75,000);

(6) an amount sufficient to satisfy in full those trade accounts payable that arose after the Petition Date that are due and payable on or before the Closing Date and not otherwise an Assumed Liability paid or payable from the DIP Facility which shall not exceed an amount equal to $100,000 (approximately $.00);

(7) the amount agreed upon by the Debtor and the Stalking Horse Purchaser in the Asset Purchase Agreement or DIP Facility to fund the reasonably necessary post-Closing Date wind-down costs of the Chapter 11 Case, in no event to exceed $1,900,000 (the "Wind-Down Amount") (this amount is included in Submission of Bids (f)(viii)(1) above);

(8) a new DIP Loan that provides a lump sum advance to the Debtor equal to the then unfunded amount available under the existing DIP Facility upon terms substantially similar to the existing DIP Facility, except for the name of the DIP Lender, with liens, claims and priorities that shall be junior to all existing liens and claims, including those of the existing DIP Lender, so that the Debtor has cash availability (equal or more than the amount then available under the existing DIP Facility) to operate the Practice though December 31, 2026, and to consummate the closing on the sale of the Acquired Assets, effective January 1, 2027 (this amount is included in Submission of Bids (f)(viii)(1) above);

(9) the amount of the Breakup Fee (*3*% of the Purchase Price) (approximately $266,429) and Expense Reimbursement ($250,000); and

(10) the $250,000 minimum bid increment.

(ix) Provides by wire transfer of immediately available funds to the Debtor or an escrow agent selected by the Debtor before the Bid Deadline of an earnest money deposit equal to the greater of (X) 10% of the dollar amount of the purchase price of such Bid; or (Y) 10% of the value otherwise ascribed to such Bid (the "Deposit"), provided, however, that the Stalking Horse Purchaser shall not be required to submit a Deposit;

(x) Provides evidence satisfactory to the Debtor that the Qualified Bidder is reasonably likely to obtain prompt regulatory approval and any other consents, licenses, or permits, if any is required, to purchase the Acquired Assets;

(xi) Is submitted in a writing in the form of the Alternative Agreement with any proposed changes to the Asset Purchase Agreement set forth in an electronic form both clean and marked to reflect such changes signed by the Qualified Bidder, that:

(1) Identifies the Qualified Bidder and any members of its investor group, if applicable;

(2) Is not subject to conditions, representations or terms that the Debtor determines to be unacceptable;

(3) Specifies the consideration for the Acquired Assets such Qualified Bidder proposes to purchase pursuant to the Alternative Agreement;

(4) Is not conditioned upon the Court's approval of any Bid Protections, including any breakup fee, termination fee, expense reimbursement, working fee or similar type of payment;

(5) Does not contain any financing or due diligence contingencies to closing of the proposed transaction;

(6) Does not contain any condition to closing of the transaction relating to the receipt of any third-party approvals that are not otherwise set forth in the Asset Purchase Agreement (excluding required Court approval);

(7) Expressly disclaims any right to receive a fee analogous to a break-up fee, expense reimbursement (other than a Bid by the Stalking Horse Purchaser), "topping" or termination fee, or any other similar form of compensation. For the avoidance of doubt, no Qualified Bidder will be permitted to request, nor be granted by the Debtor, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement (other than a Bid by the Stalking Horse Purchaser), termination fee, or any other similar form of compensation, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

(8) Expressly acknowledges and represents that the Qualified Bidder: (A) has had an opportunity to conduct any and all due diligence regarding the Acquired Assets and the proposed transaction prior to making its Bid, (B) has relied solely upon its own independent review, investigation and/or inspection of any documents and the Acquired Assets in making its Bid or that of any of its legal, financial or other advisors, and (C) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the business of the Debtor or the Acquired Assets or the proposed transaction, or the completeness or accuracy of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the Asset Purchase Agreement or Alternative Agreement (as applicable) ultimately accepted and executed by the Debtor;

(9) Identifies each and every executory contract and unexpired lease that the Qualified Bidder desires the Debtor to assume and assign to the Qualified Bidder at the closing and provides evidence of such Qualified Bidder's ability to provide adequate assurance of future performance of such contracts or leases (as required by section 365(f)(2)(B) of the Bankruptcy Code) along with the Bid;

(10) Provides for payment in full in cash at closing of the Fulton Obligations and the Meridian Obligations;

(xii) Each Bid shall be accompanied by adequate assurance of future performance information (the "Adequate Assurance Information"), including (i) information about the Qualified Bidder's financial condition, a current financial statement and bank account statement, (ii) information demonstrating (in the Debtor's reasonable business judgement) that the Qualified Bidder has the financial capacity to consummate the proposed alternative transaction, (iii) the identity and exact name of the Qualified Bidder (including any equity holder or other financial backer if the Qualified Bidder is an entity formed for the purpose of consummating the proposed alternative transaction), and (iv) such additional information regarding the Qualified Bidder as the Qualified Bidder may elect to include. By submitting a Bid, the Qualified Bidders agree that the Debtor may disseminate their Adequate Assurance Information to the affected lease and contract counterparties;

(xiii) Fully discloses the identity of each entity participating in connection with such Bid, and the complete terms of any such participation; and

(xiv) Contains other information reasonably requested by the Debtor.

(g) A Qualified Bidder that desires to make a Bid must deliver written electronic copies of its Bid prior to the Bid Deadline to counsel for the Debtor: Karalis PC, 1900 Spruce Street, Philadelphia, Pennsylvania 19103, Attn: Aris J. Karalis (akaralis@karalislaw.com). On the date the Debtor receives each such Bid, the Debtor shall deliver a copy of each such Bid and accompanying documents and information to the Stalking Horse Purchaser; provided that the Debtor will not supply the Stalking Horse Purchaser with any Adequate Assurance Information or other information that is submitted in confidence.

(h) After the Bid Deadline, if Qualified Bids are timely received, the Debtor shall determine which Qualified Bid represents the then-highest or otherwise best bid (the "Initial Highest Bid"). Prior to or at the start of the Auction, each Qualified Bidder that timely submitted a Qualified Bid will be advised of such Initial Highest Bid. The Debtor shall distribute copies of the Initial Highest Bid and all other Qualified Bids to all Qualified Bidders prior to the Auction.

**Due Diligence From Potential Bidders or Qualified Bidders**

(i) Each Potential Bidder shall comply with all reasonable requests for additional information by the Debtor or its advisors regarding such Potential Bidder's financial wherewithal to consummate and perform obligations in connection with the acquisition of the Acquired Assets. Failure by a Potential Bidder to comply with requests for additional information may be a basis for the Debtor to determine that a Potential Bidder is not a Qualified Bidder. Similarly, each Qualified Bidder shall comply with all reasonable requests for additional information by the Debtor or its advisors regarding such Qualified Bidder's financial wherewithal to consummate and perform obligations in connection with the acquisition of the Acquired Assets as the Auction progresses. Failure by a Qualified Bidder to comply with requests for additional information may be a basis for the Debtor to determine that the Qualified Bidder may no longer participate in the Auction.

**“<u>As Is, Where Is</u>”**

(j) Any sale of the Acquired Assets shall be on an “as is, where is” basis and without representations or warranties of any kind, nature or description by the Debtor, its agents or estates or any other party, except to the extent set forth in the Asset Purchase Agreement or Alternative Agreement between the Debtor and the Prevailing Bidder. Except as otherwise provided in the Asset Purchase Agreement or Alternative Agreement between the Debtor and the Prevailing Bidder, all of the Debtor’s rights, title and interests in and to the Acquired Assets shall be sold free and clear of all liens, claims, interests, and encumbrances (collectively, the “<u>Claims</u>”) pursuant to section 363(f) of the Bankruptcy Code, such Claims to attach to the proceeds of the sale of the Acquired Assets, with the same validity and priority as existed immediately prior to such sale.

**<u>The Auction</u>**

(k) If more than one Qualified Bid (in addition to the Stalking Horse Purchaser) has been submitted for the Acquired Assets in accordance with these Sale Procedures (specifically including, but not limited to, the Bid Deadline), the Debtor will conduct the Auction on **October 23, 2026, at 10:00 a.m., prevailing Eastern time**, with respect to such Qualified Bids in order to determine the highest and best Bid (the “<u>Prevailing Bid</u>”) to submit for approval by the Court at the Sale Hearing (as defined below). The Auction shall be organized and conducted by the Debtor via ZOOM or other electronic means or location as may be announced prior to the Auction to all Qualified Bidders, the DIP Lender, the United States Trustee, and the Committee, if any. The Debtor shall maintain a written transcript of the Auction and of all Bids made and announced at the Auction.

(l) The only persons or entities who will be permitted to bid at the Auction are the authorized representatives of each Qualified Bidder (the “<u>Auction Participants</u>”). While only the Auction Participants may make Qualified Bids at the Auction, the Auction may be attended and viewed also by the Debtor, the Debtor’s advisors, the DIP Lender, and its advisors, the Committee, if any, the United States Trustee, and their respective counsel, financial advisors, and/or other authorized representatives. To the extent not designated as a Qualified Bidder, all creditors of the Debtor’s estate shall be permitted to attend; <u>provided</u>, <u>however</u>, that in order to attend the Auction, such creditors must advise the Debtor in writing no later than 48 hours prior to the Auction, <u>provided</u>, <u>further</u>, however, that the Debtor may seek relief from the Court in the event that they object to any such creditor’s attendance.

(m) The Debtor is authorized to conduct the Auction in accordance with these Sale Procedures and such reasonable procedures and requirements as may be established at the discretion of the Debtor, in consultation with the DIP Lender, which rules may include the determination of the amount of time between Qualified Bids, whether to adjourn the Auction at any time and from time to time, the conducting of multiple rounds of open bidding with notice only to the parties entitled to attend the Auction, the ability to request “best and final” bids at the Auction, and to declare that the Auction has ended when no further Bids are timely made or otherwise.

(n) The Qualified Bid that is deemed the Initial Highest Bid, determined as set forth above, shall be the first Qualified Bid to begin the Auction. The next Qualified Bid at the Auction

shall be an amount equal to or greater than the Initial Highest Bid *plus* the Minimum Bid Increment (as defined below). Thereafter, the Auction will continue in the manner determined by the Debtor above; provided, however, (i) additional Bids must be Qualified Bids (except that subsequent Qualified Bids made at the Auction, although received from a Qualified Bidder that made a Qualified Bid prior to the Bid Deadline, need not be received by the Bid Deadline) and (ii) additional Qualified Bids must be made in increments greater than the prior Qualified Bid *plus* the Breakup Fee *plus* the Expense Reimbursement *plus* $250,000.00 (the "Minimum Bid Increment").

(o) The Debtor shall determine, in its discretion and subject to final determination by the Court, whether a Qualified Bid by a Qualified Bidder at the Auction matches or is higher and better than the prior Qualified Bid.

(p) At the conclusion of the Auction: (i) the Debtor (and if the Stalking Horse Purchaser has dropped out of the bidding, in consultation with the DIP Lender), (X) shall select the Prevailing Bid(s) and (Y) may select a second highest or best offer for the Acquired Assets (the "Back-Up Bid"); (ii) the Debtor shall notify the Prevailing Bidder that such person's offer has been determined by the Debtor to be the Prevailing Bid and will be contingent only on Court approval, and shall notify the person that made the Back-Up Bid (the "Back-Up Bidder"), if any, that such person's offer has been determined by the Debtor to be a Back-Up Bid and will be contingent only on the failure of the Prevailing Bid to close as set forth below and Court approval; and (iii) the Debtor shall file a notice with the Court within twenty-four hours of the conclusion of the Auction announcing the Prevailing Bidder. Immediately following the conclusion of the Auction, the Prevailing Bidder shall complete and sign all agreements and documents as necessary to bind the Prevailing Bidder to all the terms and conditions contemplated by the Prevailing Bid.

(q) In making the determination of which Qualified Bid(s) constitutes the Prevailing Bid(s), the Debtor may (and, if the Stalking Horse Purchaser has dropped out of the bidding, in consultation with the DIP Lender) take into account any factors the Debtor reasonably deems relevant to the value of the Qualified Bid(s) to the Debtor's estate, including, but not limited to: (a) the number, type, and nature of any changes in the Alternative Agreement requested by the Qualified Bidder, including the type and amount of the assets sought and the liabilities of the Debtor to be assumed in the Bid; (b) the amount and nature of the total consideration, including the extent of assumed liabilities and the terms of the new DIP loan being made to replace the existing DIP Facility; (c) the likelihood of the Qualified Bidder's ability to close a transaction, the conditions thereto, and the timing thereof, including whether the Bidder has or can obtain all necessary consents, licenses, permits, or other regulatory approvals to operate the assets sought in the Bid; (d) any excluded assets, executory contracts, or unexpired leases; (e) any purchase price adjustments; (f) the net economic effect of any changes to the value to be received by the Debtor's estate from the transaction contemplated by the Bid; (g) whether the Bid is a bulk bid or a partial bid for only some of the Acquired Assets; and (h) the tax consequences of such Qualified Bid (collectively, the "Bid Assessment Criteria").[3]

[3] The Bid Assessment Criteria listed herein are not mandatory, not exhaustive, and are provided for illustrative purposes only. The Debtor, in its discretion in the exercise of its business judgment, may consider any criteria that the Debtor consider reasonably relevant to the value of any Qualified Bid.

(r) The Deposit of the Prevailing Bidder or the Back-Up Bidder, as the case may be, shall be applied by the Debtor against the purchase price to be paid by the Prevailing Bidder or the Back-Up Bidder, as applicable, at the closing of the relevant transaction approved by the Court. The Prevailing Bidder's Deposit shall be held by the Debtor and forfeited to the Debtor if the Prevailing Bidder breaches its obligations to close under the Alternative Agreement in accordance with the Prevailing Bid and such forfeited Deposit shall be subject to the final debtor-in-possession financing order entered in the Debtor's cases ("DIP Order").

(s) The Debtor shall not be deemed to have finally accepted any Qualified Bid unless and until such Qualified Bid and the Debtor's acceptance thereof have been authorized by order of the Court following the conclusion of the Sale Hearing.

**Timeline**

(t) Set forth below for convenience is a chart reflecting the various deadlines and dates set forth herein and the Sale Procedures Order:

| | |
|---|---|
| **Cure/Assignment Objection Deadline** | **October 22, 2026 at 4:00 p.m. prevailing Eastern time** |
| **Bid Deadline** | **October 22, 2026 at 4:00 p.m. prevailing Eastern time** |
| **Sale Objection Deadline** | **October 22, 2026 at 4:00 p.m. prevailing Eastern time** |
| **Auction** | **October 23, 2026 at 10:00 a.m. prevailing Eastern time** |
| **Stalking Horse Adequate Assurance Objection Deadline** | **October 28, 2026 at 4:00 p.m. prevailing Eastern time** |
| **Non-Stalking Horse Adequate Assurance Objection Deadline** | **October 28, 2026 at 4:00 p.m. prevailing Eastern time** |
| **Sale Hearing** | **October 30, 2026 at 9:30 a.m. prevailing Eastern time** |

**Back-Up Bidder**

(u) If for any reason the Prevailing Bidder fails to consummate the acquisition of the Acquired Assets in accordance with the Prevailing Bid, the Debtor is authorized to proceed with the sale of the applicable Assets to the Back-Up Bidder in accordance with the Back-Up Bid without further order of the Court so long as the Sale to the Back-Up Bidder is approved at the Sale Hearing, or upon further hearing and order of the Court; provided, however, solely with respect to any assumption and assignment of the Potential Assumed Contracts to the Back-Up Bidder, a hearing shall be held on no less than five (5) business days' notice, with objections due at least one (1) day prior to such hearing, unless otherwise ordered by the Court. For the avoidance of doubt, the scope of such hearing shall be limited to issues relating to the identity of the Back-Up Bidder such as adequate assurance of future performance, and the assumption and assignment of any Potential Assumed Contracts to the Back-Up Bidder. If for any reason the Back-Up Bidder fails to consummate the acquisition of the Assets in accordance with the Back-Up Bid, the Back-Up Bidder's Deposit shall be forfeited to the Debtor and such forfeited Deposit shall be subject to the DIP Order.

**Deposit**

(v) No later than the Bid Expiration Date, the Debtor shall return to each Qualified Bidder(s), other than the Prevailing Bidder and the Back-Up Bidder, their respective Deposit(s). No later than the seventh (7th) business day after the closing of the sale of the Acquired Assets to the Prevailing Bidder, the Debtor shall return the Back-Up Bidder's Deposit to the Back-Up Bidder.

**Modifications**

(w) The Debtor may (a) subject to the consent of the DIP Lender, extend the deadlines set forth in the Sale Procedures Order or the Sale Procedures, (b in consultation with the DIP Lender, adopt, implement, and/or waive such other, additional or existing procedures or requirements that in their discretion serves to further an orderly Auction and bid process, all without further notice except to those parties that would be entitled to attend the Auction or participate in the Auction, as appropriate; in each case (a) and (b), without limiting the rights of the DIP Lender (in its capacity as such or as Stalking Horse Purchaser or DIP Lender) under the DIP Order, the Stalking Horse Agreement, any other document or applicable law.

(x) The Debtor (and, if the Stalking Horse Purchaser has dropped out of the bidding, in consultation with the DIP Lender) may, in their discretion, (a) determine which Qualified Bid, if any, is the Prevailing Bid, and (b) reject at any time before entry of the Sale Order approving the Prevailing Bid, any Bid that, in the discretion of the Debtor (and, if the Stalking Horse Purchaser has dropped out of the bidding, in consultation with the DIP Lender) is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or the Sale Procedures, or (iii) contrary to the best interests of the Debtor's estate and its creditors; in each case (a)-(b), without limiting the rights of the DIP Lender (in its capacity as such or as Stalking Horse Purchaser) under the DIP Order, the Stalking Horse Agreement, any other document or applicable law.

**Right to Credit Bid**

(y) Subject to the rights of parties in interest to object, the Stalking Horse Purchaser (or its designee), in its capacity as DIP Lender (as defined in the DIP Order), shall be entitled to credit bid, subject to any limits in the Asset Purchase Agreement, all or a portion of the outstanding obligations under the DIP Credit Agreement (as defined in the DIP Order) in accordance with section 363(k) of the Bankruptcy Code and, as applicable, pursuant to the DIP Credit Agreement; provided that, consistent with paragraph K of the DIP Order, any credit bid must provide for repayment in cash and in full of all then outstanding Prepetition Loan Obligations at closing. The Stalking Horse Purchaser shall be deemed to be a Qualified Bidder for all purposes hereunder.

# <u>ANNEX 2</u>

## Sale Notice

**IN THE UNITED STATES BANKRUPTCY COURT FOR**
**THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **POTTSTOWN MEDICAL SPECIALISTS, INC.,** [1] | : | **Case No. 26-13621 (DJB)** |
| | : | |
| | : | |
| **Debtor.** | : | |
| | : | |

**NOTICE OF BID DEADLINE, AUCTION, AND SALE HEARING IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS**[2]

PLEASE TAKE NOTICE that, on September 3, 2026, the above-captioned debtor and debtor-in-possession (collectively, the "Debtor") filed the *Motion for Entry of Orders (I) (A) Approving Sale Procedures for the Sale of the Acquired Assets; (B) Scheduling Auction and Hearing to Consider Approval of Sale; (C) Approving Procedures Related to Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (D) Approving Form and Manner of Notices Thereof; (E) Approving Breakup Fee and Expense Reimbursement; and (II) (A) Approving the Sale of the Acquired Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* [Docket No. 50] (the "Motion") seeking approval of, among other things, the sale (the "Sale") of all or substantially all of the Debtor's assets (the "Assets") with the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "Court"), and seeking approval of, among other things, (i) sale procedures relating to the Sale (the "Sale Procedures"), (ii) procedures to determine cure amounts and deadlines for objections to certain contracts and leases that may be assumed and assigned (the "Contract Procedures"), and (iii) the date, time and place for a sale hearing, and for objections to the sale and related relief. On September 29, 2026, the Court held a hearing to consider the Sale Procedures and related relief portion of the Motion and entered an order approving the same [Docket No. ●] (the "Sale Procedures Order")[3]

---

1 The last four digits of the Debtor's federal tax identification number are (7171). The Debtor has an address at 351 W. Schuylkill Road, Coventry Square Suite 13, Pottstown, PA 19465-7438.

2 This Notice is subject to the full terms and conditions of the Sale Procedures Motion, the Sale Procedures Order, the Sale Procedures and the Contract Procedures, which shall control in the event of any conflict. The Debtor encourages parties in interest to review such documents in their entirety and consult an attorney if they have questions or want advice.

3 Capitalized terms not otherwise defined in this notice shall have the meanings ascribed to them in the Motion or the Sale Procedures Order, as applicable.

**PLEASE TAKE FURTHER NOTICE** that in connection with the Sale, the Debtor and the Stalking Horse Purchaser or other applicable Prevailing Bidder will seek entry of an order or orders from the Court approving the Sale of the Acquired Assets (the "Sale Order"). **The Sale Order will seek to sell the applicable Acquired Assets free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and other interests thereon to the maximum extent permitted by section 363 of the Bankruptcy Code. The specific terms of sale will be provided in the proposed Sale Order and the applicable definitive documentation governing the Sale proposed to be entered into among the Debtor and the Prevailing Bidder for the Acquired Assets.**

All interested parties are invited to submit a Qualified Bid and to make offers to purchase any or all of the Acquired Assets in accordance with the Sale Procedures and Sale Procedures Order. The deadline for submitting Qualified Bid, **so as to be received** by the Debtor's' counsel is **October 22, 2026 at 4:00 p.m., prevailing Eastern time** (the "Bid Deadline"). Interested bidders are encouraged to review these requirements carefully and, for further information, are invited to contact the Debtor's counsel, Karalis PC, 1900 Spruce Street, Philadelphia, Pennsylvania 19103, Attn: Aris J. Karalis and Robert M. Greenbaum (akaralis@karalislaw.com and rgreenbaum@karalislaw.com).

**FAILURE TO ABIDE BY THE BIDDING PROCEDURES, THE SALE PROCEDURES ORDER, OR ANY OTHER ORDER OF THE COURT IN THE CHAPTER 11 CASES MAY RESULT IN THE REJECTION OF YOUR BID.**

Consistent with the Sale Procedures Order, if a Qualified Bid is timely received an auction of the applicable Acquired Assets is scheduled to be conducted on **October 23, 2026 at 10:00 a.m., prevailing Eastern time** (the "Auction"). The Auction shall be organized and conducted via ZOOM or other electronic means or other location as may be announced prior to the Auction to all Qualified Bidders, the DIP Lender, the United States Trustee, and the Official Committee of Unsecured Creditors appointed in these Chapter 11 Cases, if any, (the "Committee"). Only Qualified Bidders, the Debtor, its advisors, the DIP Lender, the Committee, the United States Trustee, and their respective counsel, financial advisors, and/or authorized representatives are permitted to attend the Auction. To the extent not designated as Qualified Bidder, creditors of the Debtor's estate shall be permitted to attend; *provided*, *however*, that in order to attend the Auction, such creditors must advise the Debtor in writing no later than 48 hours prior to the Auction, *provided*, *further*, *however*, that the Debtor may seek relief from the Court in the event that they object to any such creditor's attendance. The time and place of the Auction may change with notice, subject to applicable orders of the Court.

The Sale Hearing to consider the relief requested in the Motion and to consider whether to approve the Stalking Horse Purchaser or other Prevailing Bid and the Back-Up Bid (the "Sale Hearing") shall be held before the Court on **October 30, 2026 at 9:30 a.m., prevailing Eastern time**. The Sale Hearing will be held before the Honorable Derek J. Baker, United States Bankruptcy Judge, in the United States Bankruptcy Court for the Eastern District of Pennsylvania, 900 Market Street, Philadelphia, Pennsylvania 19107. The Sale Hearing may be adjourned, from time to time, without further notice to creditors or parties in interest other than by announcement of the adjournment in open court or as set forth in a filing on the Debtor's bankruptcy case docket, in each case subject to applicable orders of the Court.

At the Sale Hearing, the Court may enter such orders as it deems appropriate under applicable law and as required by the circumstances and equities of this Chapter 11 Case, and the Debtor may seek entry of an order which provides, except with respect to any assumed liabilities, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade creditors, litigation claimants and other creditors, holding liens, claims, encumbrances or interests of any kind or nature whatsoever against or in all or any portion of the Acquired Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated or subordinated), arising under or out of, in connection with, or in any way related to the Debtor, the Acquired Assets or the operation of the Debtor's business prior to the closing date of the sale, are forever barred, estopped and permanently enjoined from asserting, against the Prevailing Bidder(s), their property or the applicable Acquired Assets, such person's or entities' liens, claims, encumbrances or other interests in and to the applicable Acquired Assets.

To be timely and otherwise eligible for consideration by the Court, objections to the approval of the sale of the Acquired Assets (other than any objections (i) to the Adequate Assurance Information of the Prevailing Bidder and any Back-Up Bidder who are not the Stalking Horse Purchaser and (ii) to any proposed Cure Amounts or concerning whether applicable law excuses the Non-Debtor Counterparty from accepting performance by, or rendering performance to, the Prevailing Bidder for purposes of section 365(c)(1) of the Bankruptcy Code), including, but not limited to, the sale of the Assets free and clear of Claims pursuant to section 363(f) of the Bankruptcy Code for all parties in interest must: (a) be in writing; (b) clearly specify the grounds for the objection; (c) conform to the Bankruptcy Rules and the Local Bankruptcy Rules; and (d) be filed with the Court and served **so as to be received** by the following parties (collectively, the "Objection Notice Parties") by no later than **4:00 p.m. prevailing Eastern time on October 22, 2026** (the "Sale Objection Deadline"): (a) the Debtor, 351 W. Schuylkill Road, Coventry Square Suite 13, Pottstown, Pennsylvania 19465 (Attn: Timothy B. Rimmer (trimmer@pmsiforlife.com); (b) counsel to the Debtor, Karalis PC, 1900 Spruce Street, Philadelphia, Pennsylvania 19103, Attn: Aris J. Karalis (akaralis@karalislaw.com); (c) counsel to the DIP Lender, Klehr Harrison Harvey Branzburg LLP, 919 North Market Street, Suite 1000, Wilmington, Delaware 19801, Attn: Domenic E. Pacitti (dpacitti@klehr.com); (d) counsel to the Committee, if any; and (e) Office of The United States Trustee, 900 Market Street, Suite 320, Philadelphia, PA 19107, Attn: John Henry Schanne (John.Schanne@usdoj.gov).

**ANY PARTY WHO FAILS TO MAKE A TIMELY OBJECTION ON OR BEFORE THE SALE OBJECTION DEADLINE IN ACCORDANCE WITH THE SALE PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY SALE OBJECTION, INCLUDING WITH RESPECT TO THE TRANSFER OF THE ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS.**

Set forth below for convenience are the various deadlines and dates set forth herein:

| | |
|---|---|
| **Cure/Assignment Objection Deadline** | **October 22, 2026 at 4:00 p.m. prevailing Eastern time** |
| **Bid Deadline** | **October 22, 2026 at 4:00 p.m. prevailing Eastern time** |
| **Sale Objection Deadline** | **October 22, 2026 at 4:00 p.m. prevailing Eastern time** |
| **Auction** | **October 23, 2026 at 10:00 a.m. prevailing Eastern time** |
| **Stalking Horse Adequate Assurance Objection Deadline** | **October 28, 2026 at 4:00 p.m. prevailing Eastern time** |
| **Non-Stalking Horse Adequate Assurance Objection Deadline** | **October 28, 2026 at 4:00 p.m. prevailing Eastern time** |
| **Sale Hearing** | **October 30, 2026 at 9:30 a.m. prevailing Eastern time** |

The Sale Order, if approved, may authorize the assumption by the Debtor and assignment to the Prevailing Bidder of various executory contracts and unexpired leases that are the property of the Debtor (collectively, the "Assumed Contracts"). The Court has approved certain procedures (the "Contract Procedures") that govern the assumption and assignment of Assumed Contracts. The Contract Procedures are set forth in detail in the Sale Procedures Motion and were approved pursuant to the Sale Procedures Order.

The Debtor reserves the right to modify the Sale Procedures as reasonably necessary and in accordance with the Sale Procedures Order, including, without limitation, any deadlines thereunder, if such modification is determined by the Debtor, in consultation with the DIP Lender, to be necessary or appropriate to maximize value for the Debtor's estates and creditors.

A copy of the Motion, Sale Procedures Order, the Asset Purchase Agreement, and related sale pleadings can be viewed on the Court's website at https://ecf.paeb.uscourts.gov, the noticing agent of the Debtor, Omni Agent Solutions, Inc. at https://omniagentsolutions.com/PMSI or obtained from counsel for the Debtor, Karalis PC, 1900 Spruce Street, Philadelphia, Pennsylvania 19103, Attn: Aris J. Karalis (akaralis@karalislaw.com).

Dated: [●][●], 2026

**KARALIS PC**

*/s/*

Aris J. Karalis
Robert M. Greenbaum
1900 Spruce Street
Philadelphia, Pennsylvania 19103
Telephone: (215) 546-4500
Facsimile: (215) 985-4175
Email: akaralis@karalislaw.com
rgreenbaum@karalislaw.com
*Counsel to the Debtor*

# ANNEX 3

## Assignment Notice

**IN THE UNITED STATES BANKRUPTCY COURT FOR**
**THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **POTTSTOWN MEDICAL SPECIALISTS, INC.,**[1] | : | **Case No. 26-13621 (DJB)** |
| | : | |
| **Debtor.** | : | |

## NOTICE OF POTENTIAL ASSUMPTION, SALE AND ASSIGNMENT OF CERTAIN UNEXPIRED LEASES AND EXECUTORY CONTRACTS AND SALE HEARING[2]

PLEASE TAKE NOTICE that, on September 3, 2026, the above-captioned debtor and debtor-in-possession (collectively, the "Debtor") filed the *Motion for Entry of Orders (I) (A) Approving Sale Procedures for the Sale of the Acquired Assets; (B) Scheduling Auction and Hearing to Consider Approval of Sale; (C) Approving Procedures Related to Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (D) Approving Form and Manner of Notices Thereof; (E) Approving Breakup Fee and Expense Reimbursement; and (II) (A) Approving the Sale of the Acquired Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* [Docket No. 50] (the "Motion") seeking approval of, among other things, the sale (the "Sale") of all or substantially all of the Debtor's assets (the "Acquired Assets") with the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "Court"), and seeking approval of, among other things, (i) bid procedures relating to the Sale (the "Sale Procedures"), (ii) procedures to determine cure amounts and deadlines for objections to certain contracts and leases that may be assumed and assigned (the "Contract Procedures"), and (iii) the date, time and place for a sale hearing, and for objections to the sale and related relief. On September 29, 2026, the Court held a hearing to consider the Sale Procedures and related relief portion of the Motion and entered an order approving the same [Docket No. ●] (the "Sale Procedures Order")[3]

**PLEASE TAKE FURTHER NOTICE** that the Debtor entered into that certain Asset Purchase Agreement by and between the Debtor and Thomas Jefferson University (together with its permitted successors, designees and assigns, the "Stalking Horse Purchaser"), dated as August 30, 2026 (the "Asset Purchase Agreement"), pursuant to which the Stalking Horse Purchaser seeks

---

[1] The last four digits of the Debtor's federal tax identification number are (7171). The Debtor has an address at 351 W. Schuylkill Road, Coventry Square Suite 13, Pottstown, PA 19465-7438.

[2] This Notice is subject to the full terms and conditions of the Sale Procedures Motion, the Sale Procedures Order, the Sale Procedures, the Contract Procedures and the Asset Purchase Agreement, which shall control in the event of any conflict. The Debtor encourages parties in interest to review such documents in their entirety and consult an attorney if they have questions or want advice.

[3] Capitalized terms not otherwise defined in this notice shall have the meanings ascribed to them in the Motion or the Sale Procedures Order, as applicable.

to purchase certain of the Acquired Assets, as more fully described in the Asset Purchase Agreement.

**PLEASE TAKE FURTHER NOTICE** that in connection with the Sale, the Debtor and the applicable Prevailing Bidder will seek entry of an order from the Court approving the Sale of the Acquired Assets (the "Sale Order"). The Sale Order will seek to sell the applicable Acquired Assets free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and other interests thereon to the maximum extent permitted by section 363 of the Bankruptcy Code.

**PLEASE TAKE FURTHER NOTICE** that at the Sale Hearing on **October 30, 2026 at 9:30 a.m. prevailing Eastern time**, or such other time as the Court shall determine, the Debtor intends to seek the Court's approval of the Sale of the Acquired Assets to the Stalking Horse Purchaser or other Prevailing Bidder. The Sale Hearing may be adjourned, from time to time, without further notice to creditors or parties in interest other than by announcement of the adjournment in open court or as set forth in a filing, including an agenda, on the Debtor's main bankruptcy case docket, in each case subject to applicable orders of the Court.

**PLEASE TAKE FURTHER NOTICE** that pursuant to the Motion, the Debtor may seek to assume, sell and assign certain of its unexpired leases and executory contracts (collectively, the "Potential Assumed Contracts") free and clear of all liens, claims, encumbrances, and interests upon satisfaction of the cure amounts required under section 365(b)(1)(A) of the Bankruptcy Code (the "Cure Amounts"). The Potential Assumed Contracts may be assumed and assigned to the Stalking Horse Purchaser at the conclusion of the Sale Hearing. The Potential Assumed Contracts and the corresponding Cure Amounts are listed on the attached **Exhibit A**.

**YOU ARE RECEIVING THIS NOTICE BECAUSE YOU HAVE BEEN IDENTIFIED AS A NON-DEBTOR COUNTERPARTY TO A CONTRACT OR LEASE THAT MAY BE ASSUMED AND ASSIGNED AS PART OF THE SALE.** Under the terms of the Contract Procedures, unless otherwise provided in the Asset Purchase Agreement, at any time before the date of closing of the Sale, the Debtor may (a) remove a contract or lease as no longer being a Potential Assumed Contracts or (b) modify the previously-stated Cure Amounts associated with any contract or lease. ***The presence of a contract or lease listed on Exhibit A attached hereto does not constitute an admission that such contract or lease is an executory contract or unexpired lease or that such contract or lease will be assumed and assigned as part of the Sale. The Debtor reserves all of its rights, claims and causes of action with respect to the contracts and leases listed on Exhibit A attached hereto.***

## Filing Objections

To be timely and otherwise eligible for consideration by the Court, objections, if any, to (i) the proposed Cure Amounts or (ii) objections relating to whether applicable law excuses the Non-Debtor Counterparty from accepting performance by, or rendering performance to, the Prevailing Bidder for purposes of section 365(c)(1) of the Bankruptcy Code (the "Cure/Assignment Objections") must be in writing and filed with this Court and served on the Objection Notice

Parties so as to be received no later than **4:00 p.m., prevailing Eastern time on October 22, 2026** (the "Cure/Assignment Objection Deadline").

Objections, if any, to the adequate assurance of future performance of the Stalking Horse Purchaser must be in writing and filed with this Court and served on the Objection Notice Parties so as to be received no later than **4:00 p.m., prevailing Eastern time on October 22, 2026** (the "Stalking Horse Adequate Assurance Objection Deadline,")

Objections, if any, to the adequate assurance of future performance of the Prevailing Bidder and any Back-Up Bidder, if not the Stalking Horse Purchaser, must be in writing and filed with this Court and served on the Objection Notice Parties so as to be received no later than **4:00 p.m., prevailing Eastern time on October 28, 2026** (the "Non-Stalking Horse Adequate Assurance Objection Deadline," and together with the Stalking Horse Adequate Assurance Objection Deadline and the Cure/Assignment Objection Deadline, the "Contract Objection Deadlines").

Objections as to any Cure Amount or to the assumption and assignment of any Potential Assumed Contract to the Stalking Horse Purchaser, or to the Prevailing Bidder and any Back-Up Bidder, if not the Stalking Horse Purchaser, will be heard at the Sale Hearing or at a later hearing, as determined by the Debtor.

The Contract Notice Parties are: (a) the Debtor, 351 W. Schuylkill Road, Coventry Square Suite 13, Pottstown, Pennsylvania 19465 Attn: Timothy B. Rimmer (trimmer@pmsiforlife); (b) counsel to the Debtor, Karalis PC, 1900 Spruce Street, Philadelphia, Pennsylvania 19103, Attn: Aris J. Karalis (akaralis@karalislaw.com); (c) counsel to the DIP Lender, Klehr Harrison Harvey Branzburg LLP, 919 North Market Street, Suite 1000, Wilmington, Delaware 19801, Attn: Domenic E. Pacitti (dpacitti@klehr.com); (d) counsel to the Committee, if any; and (e) Office of The United States Trustee, 900 Market Street, Suite 320, Philadelphia, PA 19107, Attn: John Henry Schanne (John.Schanne@usdoj.gov).

At any time prior to the Closing of any sale transaction for the Acquired Assets, (as applicable, the "Contract Assumption Deadline"), the Prevailing Bidder may direct the Debtor to serve a notice excluding any of the Potential Assumed Contracts on (i) the Non-Debtor Counterparty to such Potential Assumed Contracts and (ii) all Objection Notice Parties other than the Debtor, indicating, by reasonably specific information, which Potential Assumed Contracts have been excluded, and stating that the Prevailing Bidder has excluded such Potential Assumed Contracts. Upon consummation of the sale with the Prevailing Bidder and service of such notice, the executory contracts and/or unexpired leases referenced in such notice (x) shall no longer be considered Potential Assumed Contracts; (y) shall not be deemed to be, or to have been, assumed or assigned; and (z) shall remain subject to assumption, rejection or assignment by the Debtor. At any time prior to the Contract Assumption Deadline, the Prevailing Bidder may also direct the Debtor to serve a notice to designate a Potential Assumed Contract that had previously been excluded to be included and considered as a Potential Assumed Contract, and require the Debtor to give not less than five (5) Business Days' notice to the Non-Debtor Counterparty to such Potential Assumed Contracts of the Prevailing Bidder's proposed assumption and assignment thereof to the Prevailing Bidder.

If any Non-Debtor Counterparty to a Potential Assumed Contract files a timely objection meeting the requirements hereof, objecting to the assumption by the Debtor and assignment to the Prevailing Bidder of such Potential Assumed Contract (the "Disputed Assignment") and/or asserting a cure amount higher than the proposed Cure Amounts listed on the Assignment Notice (the "Disputed Cure Amounts"), the Debtor and the Non-Debtor Counterparty shall meet and confer in good faith to attempt to resolve any such objection without Court intervention. If the Debtor and the Non-Debtor Counterparty determine that the objection cannot be resolved without judicial intervention, then the determination of the assumption and assignment of the Disputed Designation and/or the amount to be paid under section 365 of the Bankruptcy Code with respect to the Disputed Cure Amounts will be determined by the Court at the Sale Hearing, unless the Debtor, the Prevailing Bidder and the Non-Debtor Counterparty to the Potential Assumed Contract in dispute agree otherwise. If the Court determines at the Sale Hearing that the Potential Assumed Contract will not be assumed and assigned, then such executory contract or unexpired lease shall no longer be considered a Potential Assumed Contract.

**Any Non-Debtor Counterparty to a Potential Assumed Contract who fails to timely file a Cure/Assignment Objection, absent further order of the Court, is deemed to have consented to such Cure Amounts, which shall be established and approved in all respects, and waived any other Cure/Assignment Objection with respect to such Potential Assumed Contract, and such party shall be forever barred from objecting to the Cure Amounts and from asserting any additional cure or other amounts against the Debtor, its estate or the Prevailing Bidder.**

**If the Non-Debtor Counterparty to a Potential Assumed Contract fails to timely object to the assumption and assignment of a Potential Assumed Contract by the Contract Objection Deadlines, as applicable, or upon the resolution of any timely objection by agreement of the parties or order of the Court approving an assumption and assignment, such Potential Assumed Contract shall be deemed to be assumed by the Debtor and assigned to the Prevailing Bidder, subject to the next paragraph.**

The Debtor's decision to assume and assign the Potential Assumed Contract is subject to Court approval and consummation of the Sale with a Prevailing Bidder. Upon entry of an order approving the Sale, the Debtor shall be deemed to have assumed and assigned each of the Potential Assumed Contracts selected by the Prevailing Bidder in accordance with the applicable asset purchase agreement, and absent such closing, each of the Potential Assumed Contracts shall neither be deemed assumed nor assigned and shall in all respects be subject to subsequent assumption or rejection by the Debtor under the Bankruptcy Code. Any inclusion of any document on the list of Potential Assumed Contracts shall not constitute or be deemed to be a determination or admission by the Debtor that such document is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code (all rights with respect thereto being expressly reserved). The Prevailing Bidder shall have no rights in and to or obligations under a particular Potential Assumed Contract, and the Non-Debtor Counterparty shall have no rights against a Prevailing Bidder, until such time as the particular Potential Assumed Contract is assumed and assigned by order of the Court in accordance with the procedures set forth herein.

Except as may otherwise be agreed to in an asset purchase agreement with a Prevailing Bidder or by the parties to a Potential Assumed Contract, the defaults under the Potential Assumed Contract that must be cured in accordance with section 365(b) of the Bankruptcy Code shall be cured as follows: without any reduction, or credit against, the amount of the Prevailing Bid, the Prevailing Bidder shall pay all Cure Costs relating to an assumed executory contract or unexpired lease within ten days after the later of (i) the closing date specified in the Asset Purchase Agreement or Alternative Agreement (as applicable) entered into with a Prevailing Bidder or (ii) the date on which such executory contract or unexpired lease is deemed assumed and assigned, in accordance with the Sale Procedures Order.

A copy of the Sale Procedures Motion, the Sale Motion, Sale Procedures Order, and related sale pleadings can be viewed on the Court's website at https://ecf.paeb.uscourts.gov, the noticing agent of the Debtor, Omni Agent Solutions, Inc. at https://omniagentsolutions.com/PMSI or obtained from or counsel for the Debtor, Karalis PC, 1900 Spruce Street, Philadelphia, Pennsylvania 19103, Attn: Aris J. Karalis (akaralis@karalislaw.com).

Dated: [●][●], 2026

**KARALIS PC**

*/s/*

Aris J. Karalis
Robert M. Greenbaum
1900 Spruce Street
Philadelphia, Pennsylvania 19103
Telephone: (215) 546-4500
Facsimile: (215) 985-4175
Email: akaralis@karalislaw.com
rgreenbaum@karalislaw.com
*Counsel to the Debtor*

## EXHIBIT A

| Debtor Party | Non-Debtor Counterparty | Potential Assumed Contract | Cure Amount |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

# <u>EXHIBIT A</u>

**to Sale Procedures Order**

**Asset Purchase Agreement**

# ASSET PURCHASE AGREEMENT

**BY AND AMONG**

**THOMAS JEFFERSON UNIVERSITY**

**AND**

**POTTSTOWN MEDICAL SPECIALISTS, INC.**

**AND**

**THE OWNERS**

---

**August 30, 2026**

## TABLE OF CONTENTS

**Page**


**1. Purchase of Assets and Other Agreements.... 12**

1.1. Assets .... 12
1.2. Excluded Assets .... 14
1.3. Assumed Liabilities. .... 15
1.4. Excluded Liabilities.. .... 15
1.5. Purchase Price .... 16
1.6. Repayment of Purchase Price. .... 17
1.7. Prorations .... 17
1.8. Assumed Contracts .... 17
1.9. Landlord Consents to Assignment of Leases / Occupancy Agreements .... 18
1.10. Bankruptcy Sale Provisions. .... 18

**2. Closing.... 19**

2.1. Closing .... 19
2.2. Actions of Seller Prior to Effective Date.: .... 20
2.3. Actions of Seller at Closing .... 20
2.4. Actions of Buyer at Closing.... 21

**3. Representations and Warranties of Seller .... 22**

3.1. Organization and Good Standing.... 22
3.2. Enforceability; Authority; No Conflict. .... 22
3.3. Capitalization .... 22
3.4. Financial Statements .... 22
3.5. Certain Post-Statement Date Results .... 23
3.6. No Undisclosed Liabilities.... 23
3.7. Governmental Authorizations .... 23
3.8. Legal and Regulatory Compliance.... 24
3.9. Physician Issues .... 25
3.10. Title to and Sufficiency of Assets; Encumbrances. .... 26
3.11. Condition of Assets..... 26
3.12. Real Property Leases.... 26
3.13. Environmental / Biohazardous Waste Laws .... 27
3.14. Taxes .... 28
3.15. Legal Requirements; Proceedings.... 28
3.16. Employee Benefit Plans .... 28

3.17. Labor Matters. 29
3.18. Contracts 30
3.19. Insurance 31
3.20. Intellectual Property; Software Licenses; Attestations 31
3.21. Brokers, Finders 31
3.22. COVID-19 Loan 32
3.23. Full Disclosure 32
3.24. No Other Representations and Warranties 32
3.25. Bankruptcy Representations. 32

**4. Representations and Warranties of Buyer 32**

4.1. Organization And Good Standing 33
4.2. Enforceability; Authority; No Conflict. 33
4.3. Certain Proceedings 33
4.4. Brokers or Finders 33
4.5. Full Disclosure 33
4.6. No Other Representations and Warranties 33

**5. Covenants of Seller Prior to Closing and Post-Closing 34**

5.1. Access and Investigation 34
5.2. Operation of the Business 36
5.3. Negative Covenant 36
5.4. Governmental Approvals 37
5.5. No-Shop Clause 37
5.6. Commercially Reasonable Efforts 37
5.7. Credentialing and Provider Enrollment. 37
5.8. Tail Insurance 37
5.9. Efforts to Obtain the Landlord Consents 38

**6. Covenants of Buyer Prior to Closing. 38**

6.1. Governmental Approvals 38
6.2. Commercially Reasonable Efforts 38

**7. Conditions Precedent to Seller's Obligation to Close. 38**

7.1. Representations/Warranties 38
7.2. Governmental Approvals 38
7.3. Proceedings 39
7.4. Closing Deliveries 39

**8. Conditions Precedent to Buyer's Obligation to Close. 39**

8.1. Representations/Warranties 39

8.2. Pre-Closing Confirmation ..... 39
8.3. Actions/Proceedings ..... 39
8.4. Assignment of the Leases ..... 40
8.5. Adverse Change ..... 40
8.6. Consents to Assignments ..... 40
8.7. Vesting/Recordation ..... 40
8.8. Due Diligence ..... 40
8.9. Lien Termination ..... 40
8.10. Closing Deliveries ..... 40
8.11. Sale Procedures Order ..... 40
8.12. Sale Order. ..... 40
8.13. Workforce in Force. ..... 41
**9. Covenant Not to Compete ..... 41**
9.1. Breach/Scope of Covenant Not to Compete ..... 41
**10. Additional Agreements. ..... 42**
10.1. Allocation of Purchase Price ..... 42
10.2. Termination Prior to Closing ..... 42
10.3. Post-Closing Access to Information ..... 42
10.4. Preservation and Access to Records After the Closing ..... 43
10.5. Reproduction of Documents ..... 43
10.6. Cooperation on Tax Matters ..... 44
10.7. Misdirected Payments, Etc ..... 44
10.8. Employee Matters. ..... 44
10.9. Payment of All Taxes Resulting From Sale of Assets by Seller ..... 44
10.10. Payment of Other Retained Liabilities ..... 45
10.11. Collection of Accounts Receivable ..... 45
10.12. Dissolution following Closing ..... 45
**11. Indemnification. ..... 45**
11.1. Indemnification by Buyer ..... 45
11.2. Indemnification by Seller ..... 45
11.3. Limitations ..... 46
11.4. Notice and Control of Litigation ..... 46
11.5. Notice of Claim ..... 46
11.6. Disputes as to Indemnification Claims ..... 47
11.7. Exclusive Remedy ..... 47
**12. Miscellaneous ..... 47**

12.1. Schedules and Other Instruments .......... 47
12.2. Additional Assurances .......... 48
12.3. Expenses .......... 48
12.4. Confidentiality .......... 48
12.5. Public Announcements .......... 49
12.6. Notices .......... 49
12.7. Enforcement of Agreement .......... 50
12.8. Waiver; Remedies Cumulative .......... 50
12.9. Survival .......... 51
12.10. Waiver of Jury Trial .......... 51
12.11. Entire Agreement and Modification .......... 51
12.12. Assignment, Successors and Third-Party Rights .......... 51
12.13. Severability .......... 52
12.14. Construction .......... 52
12.15. Time of Essence .......... 52
12.16. Governing Law .......... 52
12.17. Execution of Agreement .......... 52
12.18. Knowledge .......... 52
12.19. Owners' Obligations .......... 52
12.20. Affiliates .......... 52
12.21. Accounting Date .......... 53
12.22. Risk of Loss .......... 53

# EXHIBITS

**Exhibit A: Owners**

**Exhibit B: Bill of Sale and Assignment**

**Defined Terms**

"**Accessibility Laws**" has the meaning set forth in Section 3.12(g).

"**Alternate Transaction**" means a transaction or series of related transactions pursuant to which Seller, pursuant to the Sale Procedures Order, (a) accepts a Qualified Bid, other than that of Buyer, as the highest and best offer, or (b) sells, transfers, leases or otherwise disposes of, directly or indirectly, including through an asset sale, stock sale, merger, reorganization or other similar transaction (by Seller or otherwise), including pursuant to a plan or refinancing, all or substantially all of the Purchased Assets (or agrees to do any of the foregoing) in a transaction or series of transactions to a Person or Persons other than Buyer.

"**Applicable Environmental or Biohazardous Waste Law**" has the meaning set forth in Section 3.13.

"**Assumed Contracts**" has the meaning set forth in Section 1.1(g).

"**Assumed Liabilities**" has the meaning set forth in Section 1.3.

"**Avoidance Actions**" shall mean causes of action arising under Chapter 5 of the Bankruptcy Code.

"**Bankruptcy Code**" shall mean title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*.

"**Bankruptcy Court**" has the meaning set forth in Section 1.11(a).

"**Benefit Plans**" has the meaning set forth in Section 3.16.

"**Bidding Procedures**" has the meaning set forth in Section 5.2(a)(i).

"**Bill of Sale and Assignment and Assumption Agreement**" has the meaning set forth in Section 2.2(a).

"**Buyer's Closing Documents**" has the meaning set forth in Section 4.1(a).

"**Chapter 11 Case**" means the case commenced by Seller under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

"**Closing Date**" has the meaning set forth in Section 2.1.

"**Claim**" has the meaning set forth in Section 11.6.

"**Consents**" has the meaning set forth in Section 3.18(d).

"**Clinicians**" has the meaning set forth in Section 3.9.

"**Contemplated Transactions**" has the meaning set forth in Section 2.1.

"**Closing Statement**" has the meaning set forth in Section 2.3(j).

"**Cure Costs**" has the meaning set forth in Section 1.5.

"**Cure Notice**" has the meaning set forth in Section 5.2(j).

"**DIP Credit Agreement**" means the Subordinated Debtor-In-Possession Credit Agreement entered into by PMSI and Buyer.

"**Effective Time**" has the meaning set forth in Section 12.21.

"**Encumbrance"** or "**Encumbrances**" has the meaning set forth in Section 3.10(a).

"**ERISA**" has the meaning set forth in Section 3.16.

"**Excluded Liabilities**" has the meaning set forth in Section 1.4(a).

"**Financial Statements**" has the meaning set forth in Section 3.4.

"**Final Order**" has the meaning set forth in Section 1.11(c).

"**Financial Relationship**" has the meaning set forth in Section 9.1.

"**Governmental Authorizations**" has the meaning set forth in Section 3.7.

"**Governmental Body**" has the meaning set forth in Section 3.7.

"**Indemnified Party**" has the meaning set forth in Section 11.4.

"**Indemnifying Party**" has the meaning set forth in Section 11.4.

"**Health Care Laws**" means all applicable laws of any Governmental Body relating to the regulation, provision, marketing, promotion, administration of, management of, billing of, or payment for health care benefits, health care insurance coverage, and health care products, or services or any other aspect of health care, or relating to the access, use, disclosure, or exchange of health information or insurance claims, including the federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)), the Stark Law (42 U.S.C. § 1395nn), the Anti-Inducement Law (42 U.S.C. § 1320a-7a(a)(5)), the civil False Claims Act (31 U.S.C. § 3729 *et seq.*), the administrative False Claims Law (42 U.S.C. § 1320a-7b(a)), the exclusion laws (42 U.S.C. § 1320a-7), the civil monetary penalty laws (42 U.S.C. §§ 1320a-7a and 1320a-7b), the Health Insurance Portability and Accountability Act of 1996 (Pub. Law 104-191), and the regulations set forth at 45 C.F.R. Parts 160, 162 and 164, ("**HIPAA**"), as amended by Health Information Technology for Economic Clinical Health Act, Division A, Title XIII § 1301 et. seq. of the American Recovery and Reinvestment Act of 2009 ("**HITECH**"), 42 U.S.C. § 290dd-2 and the regulations set forth at 42 C.F.R. Part 2 (regarding substance use disorder patient records), Title XXX of the Public Health Service Act (42 U.S.C. § 300jj *et seq.*) and the regulations set forth at 45 C.F.R. Parts 170 and 171, the Medicare Prescription Drug, Improvement and Modernization Act of 2003, Medicare (Title XVIII of the Social Security Act), the Balanced Budget Act of 1997 (Pub. L.105-33), as amended, the Affordable Care Act, Medicaid (Title XIX of the Social Security Act), the Emergency Medical Treatment and Active Labor Act (42 U.S.C. § 1395dd), TRICARE (10 U.S.C.

§ 1071 *et seq.*), the Food, Drug and Cosmetic Act (21 U.S.C. § 301 *et seq.*), the Prescription Drug Marketing Act of 1987, the Deficit Reduction Act of 2005, the Controlled Substances Act (21 U.S.C. § 801 *et seq.*), Section 340B of the Public Health Services Act (42 U.S.C. § 256b), as amended, the Federal Educational Rights to Privacy Act, PATH Requirements, Clinical Laboratory Improvement Amendments, the regulations promulgated pursuant to such laws, and any other federal, state, or local law, regulation, guidance document (including subregulatory guidance), manual provision, program memorandum, opinion letter, or other issuance of any Governmental Body with legally binding effect that regulates coding, kickbacks, patient or program charges, workers' compensation, health insurance and managed care, clinically integrated and other provider networks, pharmacy or other health benefits management, recordkeeping, claims processing, health care-related documentation requirements, medical necessity, provider or patient inducements, referrals, licensure requirements, certificates of need, prohibitions on fee splitting and the corporate practice of medicine, medical loss ratio requirements, encounter data reporting requirements, requirements for treating facilities as free-standing or provider-based, the hiring of employees or acquisition of services, or supplies from those who have been excluded from government health care programs, quality, safety, privacy, security, pharmacy practice, drug rebates, licensure, accreditation, or any other preconditions required to be met by persons that furnish items and services for payment and reimbursement from government health care programs or commercial insurers, or any other aspect of providing or billing as payment for health care.

"**Hazardous Substances**" has the meaning set forth in Section 3.13.

"**Intellectual Property**" has the meaning set forth in Section 3.20.

"**Landlord Consents**" has the meaning set forth in Section 1.9(a).

"**Losses**" has the meaning set forth in Section 11.1.

"**Leased Real Property**" has the meaning set forth in Section 3.12(a).

"**Legal Requirement**" has the meaning set forth in Section 3.7.

"**Order**" has the meaning set forth in Section 3.15.

"**Permitted Encumbrances**" means only the following: (a) liens for current taxes, assessments, or other governmental charges not yet due and payable or being contested in good faith by appropriate proceedings and for which adequate reserves have been established in accordance with GAAP; (b) mechanics', carriers', workers', repairers', and other similar liens arising or incurred in the ordinary course of business relating to obligations that are not yet due and payable or being contested in good faith by appropriate proceedings; (c) zoning, entitlement, conservation restrictions, and other land use and environmental regulations imposed by Governmental Bodies that do not materially interfere with the present use of the affected Assets; and (d) such other minor imperfections of title, easements, rights-of-way, restrictions, and encumbrances that (i) do not materially detract from the value of or materially impair the use of the affected Assets, (ii) do not secure any monetary obligation, and (iii) have been disclosed to and approved in writing by Buyer prior to Closing. For the avoidance of doubt, "Permitted Encumbrances" shall not include any

Encumbrance securing indebtedness for borrowed money or any Encumbrance that would prevent or materially impair Buyer's ownership, operation, or use of any Asset following the Closing.

"**Proceeding**" means any action, arbitration, audit, hearing, investigation, litigation or suit, including malpractice actions, (whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private) commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body, court, arbitrator or mediator.

"**Real Property Leases"** has the meaning set forth in Section 1.9(a).

"**Repayment Period**" has the meaning set forth in Section 1.5.1.

"**Representative**" has the meaning set forth in Section 3.21.

"**Restricted Area**" has the meaning set forth in Section 9.1.

"**Restricted Contracts**" has the meaning set forth in Section 1.8(a).

"**Sale Hearing**" means the hearing conducted in the Bankruptcy Court to seek approval of the Sale Motion and the Contemplated Transactions.

"**Sale Motion**" means a motion filed with the Bankruptcy Court in connection with the Chapter 11 Case requesting the entry of the Sale Order.

"**Sale Order**" has the meaning set forth in Section 1.11(a)(ii).

"**Sale Order Deadline**" has the meaning set forth in Section 1.11(a)(ii).

"**Sale Procedures Motion**" means a combined motion filed by the Seller with the Bankruptcy Court in connection with the Chapter 11 Case requesting the entry of the Sale Procedures Order.

"**Sale Procedures Order**" has the meaning set forth in Section 5.2(c)(i).

"**Sale Procedures Order Deadline**" has the meaning set forth in Section 5.2(c)(i).

"**Seller's Closing Documents**" has the meaning set forth in Section 3.1(a).

"**Successful Bidder**" has the meaning set forth in Section 8.11(b).

"**Wind-Down Amount**" has the meaning set forth in Section 1.5.

# <u>ASSET PURCHASE AGREEMENT</u>

THIS ASSET PURCHASE AGREEMENT (this "**Agreement**") is made and entered into as of August 30, 2026 (the "**Effective Date**"), by and among, **Thomas Jefferson University**, a Pennsylvania nonprofit corporation, on behalf of itself and its controlled affiliates including Lehigh Valley Physician Group ("**Buyer**"), **Pottstown Medical Specialists, Inc.**, a Pennsylvania corporation ("**Seller**" or "**PMSI**") and those persons listed on <u>Exhibit A</u>, each a resident of the Commonwealth of Pennsylvania (collectively, the "**Owners**").

## R E C I T A L S:

Seller operates a business providing professional medical services including family medicine, pulmonology, sleep medicine and pain management in the Collegeville, Royersford, Stowe, Pottstown and Boyertown areas (collectively, the "**Practice**"). Owners own all of the issued and outstanding shares of stock in Seller. Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, substantially all of the assets of Seller which are directly or indirectly related to, necessary for, or used in connection with, the operation of the Practice, in accordance with the terms hereof.

NOW, THEREFORE, for and in consideration of the premises and the agreements, covenants, representations, and warranties hereinafter set forth herein and other good and valuable consideration, the receipt and adequacy of which are forever acknowledged and confessed, the parties hereto, intending to be legally bound hereby, agree as follows:

## 1. <u>Purchase of Assets and Other Agreements.</u>

**1.1.** ***Assets***. Subject to the terms and conditions of this Agreement, Seller agrees to sell, convey, transfer and deliver or assign to Buyer free and clear of all Encumbrances, and Buyer agrees to purchase or accept assignment of, all of the assets, other than the Excluded Assets, owned currently or leased by Seller and used or useable in connection with the operation of the Practice, which assets shall include, without limitation, the following (the assets used or usable in connection with the Practice are hereinafter referred to collectively as the "**Assets**"):

(a) all cash, cash equivalents, accounts receivable arising from the rendering of services to patients of the Practice, billed and unbilled, recorded or unrecorded, with collection agencies or otherwise, accrued and existing in respect of health care services provided prior to the Effective Time (not including any Excluded Asset);

(b) all tangible personal property, including, without limitation, all major or minor medical or other equipment, furniture and furnishings, trade fixtures, office supplies, and medical supplies, the current list and general location of which are set forth on <u>Schedule 1.1(a)</u> hereto;

(c) all medical supplies, including vaccines, office supplies and other inventory as regularly maintained by PMSI;

(d) all assumable deposits and prepaid expenses related to the Assets;

(e) all claims, causes of action other than Avoidance Actions, judgments and insurance proceeds in favor of Seller relating to the condition of the Assets and, to the extent assignable by Seller, all warranties (express or implied) and rights and claims assertable by (but not against) Seller related to the condition of the Assets;

(f) all records of Seller relating to the Assets (including, without limitation, all equipment records, maintenance records documents, catalogs, books, records, files and operating manuals);

(g) all rights and interests of Seller in the contracts, commitments, leases (including, but not limited to, the Real Property Leases (as defined below)) and agreements listed on Schedule 1.1(g) hereto (the "**Assumed Contracts**") that shall include but not be limited to, the occupancies of the properties listed below. Schedule 1.1(g) shall also include all Consents required in connection with the Buyer assuming the Assumed Contracts.

(h) to the extent transferable under applicable law, all current existing patient lists, patient credit information and histories, charts, files, medical records, X-rays, patient billing records and other documents generated in connection with the Practice, whether in paper or electronic form related to the Practice;

(i) all computer hardware and data processing equipment, systems, servers, firmware, middleware, telecom equipment, networks, data communication lines, routers, hubs, switches, all other information technology equipment, software, software licenses and all associated documentation located at the Practice and all rights in all warranties of any manufacturer or vendor with respect thereto;

(j) all telephone numbers, facsimile numbers, email addresses, uniform resource locators, and marketing and promotional materials that are used by the Practice;

(k) all Governmental Authorizations, to the extent assignable, held by Seller relating to the ownership, development, and operation of the Practice (including, without limitation, any pending or approved Governmental Authorizations);

(l) all legal or business names, trade names, trademarks, logos and service marks (or variations thereof), trade secrets, copyrights, patents and other intellectual property used in connection with or associated with the Practice, all goodwill associated therewith; and all applications and registrations associated therewith;

(m) all goodwill associated with the Practice and the Assets;

(n) any payments from Centers for Medicare and Medicaid Services and any state Medicaid agency pursuant to the Electronic Health Record Technology Incentive Program set forth at 45 C.F.R. Part 495, not already paid to the Practice as of the Effective Time;

(o) all other property, other than the Excluded Assets, of every kind, character or description, owned by Seller and used or held for use in the business of the Practice or the Assets, whether or not reflected on the Financial Statements, wherever located and whether or not similar to the items specifically set forth above;

(p) the interest of Seller in all property of the foregoing types, other than the Excluded Assets, arising or acquired in the ordinary course of the business of Seller in respect of the Practice between the date hereof and the Effective Time;

(q) all ACO payments due and payable to PMSI under the ACO Participation Agreement, dated July 22, 2024 (the "**Aledade ACO Participation Agreement**"); and

(r) the workforce in place as of the Effective Time, including all employees of PMSI engaged in the Practice, provided such workforce may be reduced by Buyer in its sole discretion.

Seller shall convey title to the Assets and all parts thereof to Buyer free and clear of all Encumbrances, other than the Assumed Liabilities.

**1.2.** ***Excluded Assets*****.** Those assets of Seller described below shall be retained by Seller (collectively, the "**Excluded Assets**"), shall not be included in the Assets and shall not be conveyed to Buyer:

(a) the Wind-Down Amount (as defined below);

(b) the sum of $200,000 to be held in a segregated DIP Account which funds will be distributed on a pro-rata basis to holders of allowed general unsecured claims under a bankruptcy plan confirmed by the Bankruptcy Court or further Order of the Bankruptcy Court (the "**Unsecured Creditors Carveout**");

(c) all rights and interests of Seller in the contracts, commitments, leases and agreements that are not Assumed Contracts;

(d) all Seller records relating to the Excluded Assets and the Excluded Liabilities to the extent that Buyer does not need the same in connection with the ongoing activities of the Practice, the Assets, or the Assumed Liabilities, as well as all minute books and corporate and stock records or the equivalent thereof (including any ownership interests of Seller held in treasury), tax returns and litigation files and all records which by law Seller is required to maintain in its possession;

(e) any reserved or prepaid expenses related to the Excluded Assets and the Excluded Liabilities (such as prepaid legal expenses, insurance premiums or security deposits related to any property leased by the Practice that is not listed in Section 1.1(g));

(f) tax refunds, litigation claims, or insurance policy proceeds arising from the operation of the Practice prior to the Effective Time; provided, however, that to the extent Buyer incurs any expense related to the subject matter of any such tax refund, litigation claim, or insurance claim, Buyer shall be entitled to retain the proceeds to the extent of such expense;

(g) all rights in connection with any real property leased by the Practice that is not listed in Section 1.1(g);

(h) all rights in connection with and the assets held by Seller's employee benefit plans;

(i) all Avoidance Actions;

(j) all insurance policies;

(k) the Aledade ACO Participation Agreement; and

(l) all consideration to be received by, and rights of the Seller under this Agreement including, without limitation, the Purchase Price and the Additional Purchase Price.

**1.3.** ***Assumed Liabilities***. In connection with the conveyance of the Assets to Buyer, at the Closing, Buyer shall assume and timely perform and discharge all executory obligations due to be performed after the Effective Time under the Assumed Contracts (the "**Assumed Liabilities**").

**1.4.** Excluded Liabilities. Except for the Assumed Liabilities, Buyer shall not assume and under no circumstances shall Buyer be obligated to pay or assume, and none of the assets of Buyer shall be or become liable for or subject to any liability of Seller of any kind, whether known or unknown, absolute or contingent, and whether accrued or unaccrued on the Financial Statements, including, without limitation, the following (collectively the "Excluded Liabilities"): (i) any indebtedness secured by the Assets (it being understood between the parties that any such indebtedness shall be retired on or before the Effective Time by Seller); (ii) any liability of Seller or the Owners relating to the Practice with respect to the operation thereof prior to the Effective Time other than those incurred pursuant to the Bankruptcy; (iii) any liability for taxes of the Seller or Owner(s) including any taxes that will arise as a result of the sale of the Assets pursuant to this Agreement; (iv) any liability to or with respect to Seller's employees including any liability of Seller under the Benefit Plans; (v) any liability of the Seller to the Owners; (vi) any liability associated with or arising out of or related to the operation of the Practice prior to the Effective Time, including, but not limited to, any judgment or settlement amount, attorneys' fees and/or any other monetary damages assessed against Practice and/or a Clinician providing services on behalf of the Practice in connection with a medical malpractice action; (vii) any liability arising under any theory of successor liability, including de facto merger, mere continuation, or substantial continuity doctrines; (viii) any liability for claims under the Worker Adjustment and Retraining Notification (WARN) Act or similar state laws arising prior to the Effective Time; (ix) any liability for Medicare or Medicaid overpayments, recoupments, or penalties arising from the operation of the Practice prior to the Effective Time; (x) any environmental liabilities relating to conditions existing prior to the Effective Time; (xi) any claims arising under ERISA or relating to any employee benefit plan of Seller; (xii) any penalties or fines arising from violations of the Stark Law, Anti-Kickback Statute, False Claims Act, or other healthcare fraud and abuse laws occurring prior to the Effective Time; (xiii) any liability arising from any HIPAA violation, data breach, or unauthorized disclosure of patient information occurring prior to the Effective Time; (xiv) any liability arising from any billing, coding, or claims submission practices occurring prior to the Effective Time; (xv) any liability arising from the termination of any contract or agreement by Seller prior to or in connection with the Closing, including any rejection damages under Section 365 of the Bankruptcy Code; and (xvi) any other

liabilities or claims of any kind, whether known or unknown, contingent or liquidated, arising from or related to the operation of the Practice or ownership of the Assets prior to the Effective Time, that are not cured or satisfied by the Buyer under the Purchase and/or pursuant to the Bankruptcy except for the Assumed Liabilities expressly set forth herein.***Purchase Price.*** The purchase price (the "**Purchase Price**") for the Assets is equal to: (i) the amount of all outstanding obligations of Seller owed to Fulton Bank, N.A. under that certain Business Loan Agreement, dated as of November 4, 2024, (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time) by and between the Seller and Fulton Bank, N.A. as of the Closing Date; *plus* (ii) the amount of all outstanding obligations of Seller owed to Meridian Bank under that certain Business Loan Agreement, dated as of September 8, 2025 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time) by and between the Seller and Meridian Bank as of the Closing Date; *plus* (iii) the Unsecured Creditors Carveout, as defined herein; *plus* (iv) a credit bid of outstanding amounts of the Seller's obligations under the DIP Credit Agreement as of the Closing Date pursuant to Section 363(k) of the Bankruptcy Code; *plus* (v) the amount to cure any monetary defaults under the Assumed Contracts up to the amount estimated by Seller plus ten percent (10%) provided, further, that in no event shall such amount exceed $150,000 in the aggregate (the "**Cure Costs**"); *plus* (vi) an amount sufficient to satisfy in full those trade accounts payable that arose after the Petition Date that are due and payable on or before the Closing Date and not otherwise an Assumed Liability paid or payable from the DIP Facility which shall not exceed an amount equal to $100,000; *plus* (vii) to the extent not otherwise paid or payable from the DIP Facility, an amount provided to support the wind-down of the Seller's bankruptcy estate and the closure of the Chapter 11 Case set forth on the Approved Budget under the DIP Facility or, provided that such amount may be increased only to the extent Seller incurs reasonable and necessary expenses prior to the Closing for operations and other expenses of Seller that become due and payable after Closing; provided, further, that in no event shall such amount exceed $1,900,000 minus the ending cash balance of Seller as of the Closing Date in the aggregate (such amount, the "**Wind-Down Amount**"). The Purchase Price is subject to: (i) the completion of due diligence satisfactory to Buyer in its sole discretion including, but not limited to, the Buyer's review of Seller's updated financial statements; (ii) the date of the consummation of the purchase of the Assets taking place on or before January 1, 2027; (iii) no Material Adverse Effect having occurred with respect to the Practice, the Assets, or the Assumed Liabilities between the date hereof and the Closing Date; (iv) receipt by Buyer of all consents and approvals required for the assignment of the Assumed Contracts in form and substance satisfactory to Buyer; (v) confirmation that the aggregate amount of Cure Costs does not exceed the cap set forth herein; (vi) receipt by Buyer of evidence satisfactory to Buyer that all Encumbrances on the Assets (other than Permitted Encumbrances) have been or will be released at or prior to Closing; and (vii) entry of the Sale Order in form and substance acceptable to Buyer. To the extent that the Buyer's post-Closing collection of (a) all payments under the Aledade ACO Participation Agreement paid in the 2027 fiscal year based on the 2026 performance year; and (b) the accounts receivable that are included in the Assets being sold to Buyer, net of the collection costs exceeds the Seller's Obligations to lender that arise under the DIP Credit Agreement as of the Closing Date, the Buyer shall pay to Seller the actual amounts collected as an increase of the Purchase Price (the "**Additional Purchase Price**"). The obligation to pay the Additional Purchase Price shall terminate as of the end of the Collection Period.

**1.6.** ***Repayment of Purchase Price.*** If, within the first twenty-four (24) months

following the Closing Date ("**Repayment Period**"), one or more of the Owners terminates his/her/their employment with Buyer for any reason other than (a) full retirement from the practice of medicine, permanent disability, or death, or (b) Buyer terminates the employment of an Owner without cause, then the terminating/terminated Owner shall be obligated to pay Buyer a prorated portion of the Purchase Price as determined by the methodology below ("**Purchase Price Repayment**"). For months one (1) through twelve (12) of the Repayment Period, Owner shall be obligated to pay Buyer a prorated portion of the Purchase Price, calculated by dividing the Purchase Price, by the number of Owners as of the Closing Date. For months thirteen (13) through twenty-four (24) of the Repayment Period, Owner shall be obligated to pay Buyer an amount equal to $100,000, prorated based on the number of full months remaining in such twelve (12) month period (e.g., if termination occurs in month eighteen (18), the repayment obligation shall be $50,000, representing six (6) of twelve (12) months remaining). The Purchase Price Repayment shall be made within thirty (30) days of termination of employment.

**1.7.** ***Prorations***. Except as otherwise provided herein or as settled at the Closing, within ninety (90) days after the Closing Date, Seller and Buyer shall prorate as of the Effective Time any amounts which become due and payable on or after the Effective Time with respect to (i) personal property taxes or any other tax assessed with respect to the ownership or operation of the Assets (which shall be prorated as of the Effective Time), (ii) all utilities servicing any of the Assets, including water, sewer, telephone, electricity and gas service, and (iii) any other costs or expenses of the Practice related to the period prior to the Effective Time. All prorated amounts allocated to the Seller shall be added in the Wind-Down Amount and subject to the dollar limitations in Section 1.5 hereof. Any such amounts which are not available within ninety (90) days after the Closing shall be similarly prorated as soon as practicable thereafter, allocated to the Seller, and added to the Wind-Down Amount.

**1.8.** ***Assumed Contracts***.

(a) With respect to Assumed Contracts identified on Schedule 1.1(g), as of the Effective Time, Buyer shall assume and agree to discharge all Cure Costs related to or arising out of the Assumed Contracts; provided that if there are any Consents listed or required to be listed on Schedule 1.1(g) that have not yet been obtained (or otherwise are not in full force and effect) as of the Closing Date, in the case of each Assumed Contract as to which such Consents were not obtained (or otherwise are not in full force and effect) (the "**Restricted Contracts**"), Buyer may waive the closing conditions as to any such Consent and either (i) elect to have Seller continue its commercially reasonable efforts to obtain the Consents, or (ii) elect to have Seller retain that Restricted Contract and all liabilities arising therefrom or relating thereto.

(b) If Buyer elects to have Seller continue its commercially reasonable efforts to obtain any Consents after the Closing Date occurs, notwithstanding Sections 1.1 and 1.3, neither this Agreement, the Assignment and Assumption Agreement, nor any other document related to the consummation of the Contemplated Transactions shall constitute a sale, assignment, assumption, transfer, conveyance or delivery or an attempted sale, assignment, assumption, transfer, conveyance or delivery of the Restricted Contracts, and following the Closing Date, the Seller, Owners and Buyer shall use commercially reasonable efforts, and cooperate with each other, to obtain the Consents relating to each Restricted Contract as quickly as practicable.

(c) Pending the obtaining of such Consents relating to any Restricted Contract, Seller, Owners and Buyer shall cooperate with each other in any reasonable and lawful arrangements designed to provide to Buyer the benefits of use of the Restricted Contract for its term (or any right or benefit arising thereunder, including the enforcement for the benefit of Buyer of any and all rights of Seller against a third party thereunder). Once a Consent for the sale, assignment, assumption, transfer, conveyance and delivery of a Restricted Contract is obtained, Seller shall promptly assign, transfer, convey and deliver such Restricted Contract to Buyer without further consideration therefore, and the Buyer shall assume the obligations under such Restricted Contract assigned to it from and after the date of assignment.

**1.9. *Landlord Consents to Assignment of Leases / Occupancy Agreements*.**

(a) The lease agreements related to the properties listed on Schedule 1.1(g) (collectively, the "**Real Property Leases**") shall be assumed by Seller and assigned to Buyer pursuant to Section 365 of the Bankruptcy Code. Any provision in such Real Property Leases requiring landlord consent to assignment or permitting termination upon a change in control or bankruptcy filing shall be deemed unenforceable pursuant to Section 365(f) of the Bankruptcy Code. Seller shall satisfy all Cure Costs required under Section 365(b) prior to or at Closing, paid solely from the Purchase Price, and Buyer shall provide adequate assurance of future performance as required under Section 365(b)(1)(C). To the extent any landlord objects to the assignment, Seller shall use commercially reasonable efforts to resolve such objection, and the assignment of such Real Property Leases shall be authorized by the Sale Order. All landlord or other consents necessary to assign the Leases shall be referred to as the "**Landlord Consents**".

(b) In the event that Buyer determines in its sole discretion that any Real Property Lease is not essential or exceeds the Cure Costs, Buyer may designate such Real Property Lease to be excluded from the Assumed Contracts at any time prior to the entry of the Sale Order.

**1.10. *Bankruptcy Sale Provisions.***

(a) Sale Order. The Closing is expressly conditioned upon entry by the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "**Bankruptcy Court**") of a final order (the "**Sale Order**"), in form and substance satisfactory to Buyer in its sole discretion, approving this Agreement and the Contemplated Transactions pursuant to Sections 363 and 365 of Title 11 of the United States Code (the "**Bankruptcy Code**"), authorizing the sale of the Assets free and clear of all Encumbrances, with such Encumbrances, to the extent not otherwise satisfied at Closing, to attach to the proceeds of the sale in the order of their priority, and findings that Buyer is a "good faith" purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code.

(b) Required Sale Order Provisions. The Sale Order shall contain findings and provisions that: (i) Buyer is a good faith purchaser within the meaning of Section 363(m) of the Bankruptcy Code and is entitled to all protections afforded thereby; (ii) the consideration to be paid by Buyer constitutes reasonably equivalent value and fair consideration for the Assets; (iii) the Agreement was negotiated, proposed, and entered into by the parties without collusion, in good faith, and from arm's length bargaining positions; (iv) Buyer shall not be deemed a successor to Seller by reason of any theory of law or equity, and Buyer shall not assume or

become liable for any liabilities or obligations of Seller except as expressly set forth herein; (v) Buyer is purchasing the Assets free and clear of all Encumbrances pursuant to Section 363(f) of the Bankruptcy Code; (vi) the automatic stay imposed by Section 362 of the Bankruptcy Code is modified to permit the transactions contemplated hereby; (vii) the Sale Order is binding upon and shall govern the acts of all entities, including any successors or trustees subsequently appointed in the bankruptcy case; (viii) all executory contracts and unexpired leases designated by Buyer are assumed and assigned to Buyer pursuant to Section 365 of the Bankruptcy Code; and (ix) any anti-assignment provisions in contracts or leases are unenforceable pursuant to Section 365(f) of the Bankruptcy Code.

(c) Final Order Requirement. The Sale Order shall not be stayed and shall be a Final Order. For purposes hereof, "**Final Order**" means an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction that has not been reversed, stayed, modified, or amended and as to which (i) the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and no appeal, petition for certiorari, or motion for reargument or rehearing is pending, or (ii) any appeal, petition for certiorari, or motion for reargument or rehearing has been finally determined and no further appeal, petition for certiorari, or motion for reargument or rehearing is permitted.

(d) Bidding Procedures. The Seller shall seek approval of bidding procedures and bid protections and entry of the Sale Procedures Order by the Sale Procedures Order Deadline that are reasonably acceptable to Buyer, including (i) designation of Buyer as the "stalking horse" bidder, (ii) approval of this Agreement as the "stalking horse agreement"; (iii) approval of the Break-Up Fee and Expense Reimbursement set forth in Section 5.2(c)(i), (iv) minimum overbid increments of not less than $250,000.00, (v) a deadline for submission of competing bids, and (vi) auction procedures that are fair and reasonable. Buyer shall have the right to credit bid any portion of the amounts of the Seller's obligations under the DIP Credit Agreement, the Break-Up Fee and Expense Reimbursement at any auction.

(e) Cure Costs. All Cure Costs required under Section 365(b) of the Bankruptcy Code in connection with the assumption and assignment of any Assumed Contracts or Real Property Leases to Buyer shall be the sole responsibility of Seller and shall be satisfied from the bankruptcy estate from the Purchase Price. Buyer shall have the right to exclude any Assumed Contract or Real Property Lease from the transaction if the cure cost for such contract or lease exceeds the amount of the Cure Costs.

## 2. Closing

**2.1.** ***Closing* .** Subject to the satisfaction or waiver by the appropriate party of all of the conditions precedent to closing specified in Sections 7 and 8 hereof, the consummation of the transactions contemplated by this Agreement (the "**Contemplated Transactions**") shall be effective on January 1, 2027 at 12:01am (the "**Effective Time**"), or on such other date as the parties may mutually designate in writing (the date of consummation is referred to herein as the "**Closing Date**").

**2.2.** ***Actions of Seller Prior to Effective Date.*** Prior to the Effective Date, Seller shall deliver to Buyer written evidence, in a form acceptable to Buyer, of the following:

(a) The release and waiver of all restrictive covenants in any agreements to which Seller or Clinician is bound unless Buyer, in its sole discretion, agrees to a restrictive covenant or any modification to a restrictive covenant on terms acceptable to Buyer in its sole discretion; and

(b) Copies of resolutions duly adopted by the Board of Directors, together with all other required approvals or consents, authorizing and approving its performance of the Contemplated Transactions and the execution and delivery of this Agreement and the documents described herein, certified as true, complete, and of full force and effect as of the Effective Date by the appropriate officers of Seller.

**2.3. *Actions of Seller at Closing*.** At the Closing, and unless otherwise waived in writing by Buyer, Seller shall deliver to Buyer the following:

(a) A bill of sale to Buyer, executed by Seller for all the Assets which effectively vests in Buyer title to the Assets, free and clear of all Encumbrances, and an assignment of all the Assumed Contracts, which assignment shall also contain, subject to Section 1.7, Buyer's undertaking and assumption of the Assumed Liabilities, if any in the form attached hereto as Exhibit B (the "**Bill of Sale and Assignment and Assumption Agreement**") executed by Seller;

(b) An employment agreement on a form reasonably acceptable to Buyer (the "**Employment Agreements**") with respect to each of the Clinicians identified in Schedule 2.3(b) ("**Transferring Clinicians**") each executed by the applicable Transferring Clinicians;

(c) Assignment of all Real Property Leases from Seller to Buyer on terms satisfactory to Buyer;

(d) With respect to all indebtedness of Seller, identified on Schedule 2.3(d) Seller shall have obtained from the applicable lender pay-off letters identifying the pay-off amount required to be paid as of the Closing Date in order to release all Encumbrances on the Assets and copies of UCC-3 Termination Statements terminating such Encumbrances;

(e) With respect to the indebtedness of Seller under Federal or State loans or grants as identified on Schedule 2.3(e) Seller shall have obtained from the applicable Federal or State entity, letters or other evidence identifying the remaining payment obligations and amounts forgiven;

(f) A copy of the extended reporting endorsements (tail coverage) policy as described in Section 5.8;

(g) A certificate of an authorized signatory of Seller, certifying that each covenant and agreement of Seller and Owners to be performed prior to or as of the Closing Date pursuant to this Agreement has been performed and that each representation and warranty of Seller and the Owners is true and correct on the Closing Date, as if made on and as of the Effective Time;

(h) Certificates of existence and good standing of Seller from the Commonwealth of Pennsylvania, dated the most recent practical date prior to the Closing Date;

(i) Fully executed copies of all Assumed Contracts, certificates of title and other documents evidencing any ownership interest conveyed as part of the Assets;

(j) The Closing Statements executed by Seller and Owners as to the payment and disbursement of funds hereunder in form and substance satisfactory to Buyer and its legal counsel;

(k) Subject to Seller's pre-closing obligations set forth in Section 2.2 above, all consents, waivers and estoppels of third parties that are necessary, in Buyer's reasonable discretion, to the consummation of the transactions contemplated in this Agreement; and

(l) Such other instruments and documents as Buyer reasonably deems necessary to effect the Contemplated Transactions.

**2.4.** ***Actions of Buyer at Closing***. At the Closing, and unless otherwise waived in writing by Seller or as set forth below, Buyer shall deliver to Seller the following:

(a) an amount equal to the Purchase Price in immediately available funds to be paid in accordance with the Closing Statement;

(b) the Bill of Sale executed by Buyer;

the Assignment and Assumption Agreement executed by Buyer;

(d) the Employment Agreements which shall be delivered only to each applicable Owner executed by Buyer;

(e) copies of resolutions duly adopted by the Board of Buyer, authorizing and approving its performance of the transactions contemplated hereby and the execution and delivery of this Agreement and the documents described herein, certified as true and of full force as of the Closing Date, by the appropriate officers of Buyer;

(f) the Closing Statements executed by Buyer as to the payment and disbursement of funds hereunder in form and substance satisfactory to Seller and its legal counsel; and

(g) such other instruments and documents as Seller reasonably deems necessary to effect the Contemplated Transactions.

**3.** **<u>Representations and Warranties of Seller</u>.** As of the date hereof, and, when read in light of any Schedules which have been updated in accordance with the provisions of <u>Section 12.1</u> hereof, as of the Effective Time, Seller represents and warrants to Buyer the following:

**3.1.** ***Organization and Good Standing***. Seller is a corporation, duly organized, validly existing and in good standing under the laws of the Commonwealth of Pennsylvania, with full corporate power and authority to conduct its business as it is now being conducted, to own or use the properties and assets that it purports to own or use.

**3.2.** ***Enforceability; Authority; No Conflict.***

(a) This Agreement constitutes the legal, valid and binding obligation of Seller and the Owners, enforceable against each of them in accordance with its terms. Upon the execution and delivery by Seller and/or Owners, as applicable, of each agreement to be executed or delivered by any or all of Seller and the Owners at the Closing Date (the "**Seller's Closing Documents**"), Seller's Closing Documents will constitute the legal, valid and binding obligation of Seller and/or the Owners, as applicable, enforceable against each of them in accordance with its terms. Seller has the absolute and unrestricted right, power and authority to execute and deliver this Agreement and the Seller's Closing Documents to which it is a party and to perform its obligations under this Agreement and the Seller's Closing Documents, and such action has been duly authorized by all necessary action by the Owners and Seller's governing board. Each Owner has all necessary legal capacity to enter into this Agreement and the Seller's Closing Documents to which the Owner is a party and to perform the Owner's obligations hereunder and thereunder.

(b) Neither the execution and delivery of this Agreement nor the consummation or performance of any of the Contemplated Transactions will give any person or entity the right to prevent, delay or otherwise interfere with any of the Contemplated Transactions pursuant to: (i) any provision of any of Seller's governing documents; (ii) any resolution adopted by Seller's governing board and the Owners; (iii) any Legal Requirement or Order to which Seller or the Owners, or any of the Assets, may be subject; (iv) any Contract to which Seller is a party or by which Seller is bound; or (v) any Contract to which any Owner is a party or by which any Owner is bound, including any shareholder agreement.

**3.3.** ***Capitalization.*** The current owners are and will be on the Closing Date the record and beneficial owners and holders of all of the issued and outstanding shares of stock in the Seller as described on Schedule 3.3, free and clear of all Encumbrances.

**3.4.** ***Financial Statements.*** Seller has previously provided to Buyer copies of (i) a draft balance sheet and income statement as of December 31, 2025 (the "**Statement Date**") prepared on a cash basis of accounting and complete and accurate in all respects, along with corresponding accountants' review report and footnotes all prepared by Seller's accountant based on generally accepted accounting principles (GAAP), (ii) a copy of Seller's filed federal income tax return for its most recent tax year prepared on the cash basis of accounting and (iii) internally prepared balance sheet and income statements prepared on a modified cash basis (collectively, the "**Financial Statements**"). The Financial Statements (i) are true, accurate and complete in all material respects, and (ii) have been prepared from, and are consistent with, the books and records of Seller. With respect to the Financial Statements in all material respects, the balance sheets present fairly the financial condition of the Practice as of the dates indicated thereon, and the income statements present fairly the results of operations of the Practice for the periods indicated thereon. The Financial Statements are set forth on Schedule 3.4.

**3.5.** ***Certain Post-Statement Date Results.*** Except as set forth in Schedule 3.5 hereto, since the Statement Date there has not been any:

(a) material damage, destruction, or loss (whether or not covered by

insurance) affecting the Practice or the Assets;

(b) material adverse changes in the condition, financial or otherwise, of the Assets, the business or prospects of, or in the results of operations of, the Practice, other than the Contemplated Transactions, including the contemplated bankruptcy of PMSI;

(c) sale, assignment, transfer, or disposition of any item of property, plant or equipment included in the Assets having a value in excess of One Thousand Dollars ($1,000) (other than supplies), except in the ordinary course of business with comparable replacement thereof;

(d) increases in the compensation payable by Seller to any of its employees or independent contractors, except in the ordinary course of business and consistent with past practices, or any increase in, or institution of, any bonus, insurance, pension, profit-sharing or other employee benefit plan, remuneration or arrangements made to, for or with such employees;

(e) dividends, distributions or extraordinary payments by Seller, except normal distributions (both as to timing and amount) in the ordinary course of business consistent with past practices or distributions related to payment of taxes;

(f) changes in the rates charged by the Practice for its services, other than those made in the ordinary course of business;

(g) changes in the accounting methods or practices employed by Seller or changes in depreciation or amortization policies; or

(h) transactions pertaining to the Practice by Seller outside the ordinary course of business, other than the Contemplated Transactions.

**3.6.** ***No Undisclosed Liabilities .*** To Seller's Knowledge, Seller has no material liability except for liabilities reflected or reserved against in Seller's balance sheet as of the Statement Date previously provided to Buyer and current liabilities incurred in the ordinary course of business of Seller since the Statement Date.

**3.7.** ***Governmental Authorizations.*** Seller has all consents, licenses, registrations, or permits granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Legal Requirements (the "**Governmental Authorizations**") which are needed or required by law to operate the Practice as it is currently being operated. All such Governmental Authorizations owned or held by Seller relating to the ownership, development, or operation of the Practice or the Assets, all of which are now and as of the Effective Time shall be in good standing. As used in this Agreement, "**Governmental Body**" means any: (i) federal, state, local, municipal, foreign or other government; (ii) governmental or quasi-governmental authority of any nature (including any agency, branch, department, board, commission, court, tribunal or other entity exercising governmental or quasi-governmental powers); or (iii) official of any of the foregoing. As used in this Agreement, "**Legal Requirement**" means any federal, state, local, municipal, foreign, international, multinational or other

constitution, law, ordinance, principle of common law, code, regulation, statute, treaty, licenses, policies, guidelines, and agreements with or of federal, state, and local governmental and regulatory authorities including any Health Care Laws and any order, writ, injunction or decree issued by any court, arbitrator or governmental agency or in connection with any Proceeding.

**3.8.** ***Legal and Regulatory Compliance.***

(a) The conduct and operations of PMSI is, and for the past six (6) years has and have been, in compliance in all material respects with all applicable Legal Requirements, including all Health Care Laws and applicable Legal Requirements of any Governmental Body having jurisdiction over PMSI.

(b) PMSI has conducted its operations during the past six (6) years in accordance with the compliance program in all material respects. Any and all material issues with respect to PMSI's compliance with such programs that were brought to the attention of PMSI or PMSI's compliance officer during the past six (6) years have been investigated and corrective action plans have been implemented, as applicable, in material compliance with applicable Health Care Laws and the compliance program. PMSI: (i) is not a party to a corporate integrity agreement with HHS OIG; (ii) does not have any compliance-related reporting obligations pursuant to any settlement agreement entered into with any Governmental Body; or (iii) has failed to pay any duly required civil monetary penalty.

(c) PMSI (including any of its officers, directors, trustees, or employees acting in such roles) have not engaged at any time in the past six (6) years in any activities in violation of any Health Care Laws in any material respect. PMSI (including any of its officers, directors, trustees, or employees acting in such roles) have not, within the past six (6) years, (i) been convicted of, formally charged with or investigated for any crime or violation of any Legal Requirement or engaged in any conduct for which such person would reasonably be expected to be excluded, suspended, or debarred from participating, or would be otherwise ineligible to participate, in Medicare, Medicaid, or CHAMPUS/TRICARE program ("**Government Programs**") or have their billing privileges revoked or suspended; (ii) to the Knowledge of Seller engaged in any conduct that would reasonably be expected to subject such person or entity to a civil monetary penalty or criminal penalty under Sections 1128A or 1128B of the Social Security Act or any similar law; (iii) been convicted of or formally charged with, or to the Knowledge of Seller, has been investigated for, any violation of Legal Requirements related to fraud, theft, embezzlement, breach of fiduciary responsibility, financial misconduct, or obstruction of an investigation; (iv) been or is currently excluded, debarred, or otherwise been deemed ineligible to participate in any Government Programs including, but not limited to, being listed on the General Services Administration's System for Award Management's list of parties excluded from federal procurement programs and non-procurement programs, on the Office of Inspector General of the U.S. Department of Health and Human Services ("**HHS OIG**") List of Excluded Individuals and Entities, or subject to a contract termination in connection with alleged contractual breach, health care-related fraud, theft, or other financial misconduct by any insurance company, health maintenance organization, managed care organization, or other private or governmental third-party payor; (v) has made an untrue statement of material fact or a fraudulent statement to any Governmental Body, or failed to disclose a material fact required to be disclosed to any Governmental Body; (vi) has made a voluntary disclosure of potential or actual non-compliance

to any Governmental Body, including a voluntary disclosure pursuant to HHS OIG's self-disclosure protocol or the U.S. Centers for Medicare and Medicaid Services ("**CMS**") self-referral disclosure protocol; (vii) to the Knowledge of Seller, has been the subject of any investigation conducted by any Government Program or other federal or state enforcement agency; (viii) has been a defendant in any unsealed qui tam/False Claims Act litigation; or (ix) has been served with or received, any search warrant, subpoena, criminal investigative demand, or civil investigative demand by or from any federal or state enforcement agency (except in connection with unrelated third parties who may be defendants or the subject of investigation into conduct unrelated to the conduct of PMSI).

(d) For the past six (6) years, no written notice has been received by PMSI and no actions are pending against PMSI, or, to the Knowledge of Seller, threatened against PMSI, alleging any, or relating to any, alleged breach or violation of, noncompliance with, or default under, any Legal Requirement (including any Health Care Law) in any material respect by PMSI.

**3.9.** ***Clinician Issues.*** Each physician, nurse practitioner, physician assistant, and other licensed clinical professional providing services on behalf of Seller (collectively, the "**Clinicians**") is duly licensed and qualified to practice in his or her respective profession in the Commonwealth of Pennsylvania. To the Knowledge of Seller, all services provided or arranged by Seller have been provided by duly licensed, certified or otherwise authorized professional personnel in accordance with (a) the generally accepted practices and standards prevailing in the applicable professional community at the time of treatment, (b) the provisions of the applicable payer contract, (c) all applicable Legal Requirements, and (d) the standards of applicable accreditation organizations. No Clinician has had his or her license to practice in any jurisdiction denied, surrendered, limited, suspended, revoked or subject to probationary conditions nor is his or her license subject to any pending proceedings regarding any of the foregoing. No Clinician has had his or her federal or state Drug Enforcement Agency controlled substance authorization denied, revoked, suspended, reduced or not renewed nor has been subject to institution of, or is subject to any pending, proceedings regarding any of the foregoing. No Clinician has had his or her membership in any local, state or national professional society or organization revoked, suspended or not renewed nor is subject to any pending proceedings regarding any of the foregoing. No Clinician has been the subject of administrative sanctions or been suspended from or lost eligibility for participating in Medicare, Medicaid or other governmental or non-governmental medical insurance programs, nor is subject to any pending proceedings regarding any of the foregoing. Seller has no contracts or arrangements with any Clinician that includes an incentive program in violation of any Legal Requirements.

**3.10.** ***Title to and Sufficiency of Assets; Encumbrances.***

(a) Seller owns good and transferable title to all of the Assets free and clear of any Encumbrances. At the time of the Closing Date, all the Assets shall be free and clear of all Encumbrances other than Permitted Encumbrances. As used in this Agreement, "**Encumbrance**" or "**Encumbrances**" means any successor liability claim, charge, claim, community or other marital property interest, condition, equitable interest, lien, option, pledge, security interest, interest, right of first option, right of first refusal or similar restriction, including any restriction on use, transfer, receipt of income or exercise of any other attribute of ownership

in each case whether arising under federal, state, or common law, or any liabilities of any kind or nature whatsoever. Encumbrances shall not include any Permitted Encumbrances or Assumed Liabilities pursuant to Section 363(f) of the Bankruptcy Code as authorized by the Sale Order.

(b) To Seller's Knowledge, the Assets together with the Excluded Assets constitute all of the assets, tangible and intangible, of any nature whatsoever, necessary to operate the Practice in the manner presently operated by Seller and include all of the operating assets of Seller.

**3.11.** ***Condition of Assets.***

(a) Each item of tangible personal property is in good repair and good operating condition, ordinary wear and tear excepted. No item of tangible personal property is in need of repair or replacement other than as part of routine maintenance in the ordinary course of business. All tangible personal property used in the Practice is in the possession of Seller.

(b) The inventory is (i) useable and saleable in the ordinary course of business of Seller, and (ii) was purchased in the ordinary course of business of Seller at a cost not exceeding market prices prevailing at the time of purchase. The quantities of inventory are not excessive but are reasonable in the present circumstances of Seller and Seller has not allowed the levels of inventory to vary materially from the levels customarily maintained over the past twelve (12) months.

**3.12.** ***Real Property Leases*** **.**

(a) Seller owns good leasehold title to the real property that is the subject of each of the Real Property Leases (the "**Leased Real Property**") more particularly described in, and subject to the terms and conditions of, the Real Property Leases free and clear of any and all Encumbrances except Permitted Encumbrances. Except as set forth on Schedule 3.12(a), none of the Leased Real Property is owned or leased from (i) any of the Owners or any Affiliate of Seller, or (ii) to the Knowledge of Seller, any person or entity that is in a position to refer, recommend or otherwise generate business for Seller under any state or federal healthcare programs. The Leased Real Property is all the real property used in the operation of the Practice. With respect to the Real Property Leases:

(b) Seller has not received any notice that any of the Leased Real Property and Seller's operations thereon are not in material compliance with all Legal Requirements or Real Property Leases terms which noncompliance remains uncorrected, and to Seller's Knowledge, the consummation of the transactions contemplated herein will not result in a violation of any Legal Requirement or Real Property Leases terms, or the termination of any applicable variance from Legal Requirements or Real Property Leases terms now existing.

(c) To Seller's Knowledge, the Leased Real Property is in good condition and state of repair, ordinary wear and tear excepted, and all material maintenance, repairs and replacements required to be made by either tenant or the landlords under each of the Real Property Leases as of the date hereof have been performed in all material respects as of the date hereof.

(d) Neither Seller nor any Owner is a sublandlord under any Real Property Leases. There are no tenants, subtenants or other persons or entities occupying any of the Leased Real Property. No improvement credit or other tenant allowance of any nature is owed to Seller as of the date hereof, nor is any material uncompleted landlord improvement work required to be performed by any of the landlords in any of the Leased Real Property as of the date hereof.

(e) Seller has not received any notice of any existing, proposed or contemplated eminent domain Proceeding that would result in the taking of all or any part of the Leased Real Property that would materially and adversely affect Seller's current use of any part of the Leased Real Property.

(f) To Seller's Knowledge, except for the Permitted Encumbrances, none of the Real Property Leases are subject to any easements, restrictions, ordinances, or such other limitations on title so as to make such Leased Real Property unusable by Seller for its current use or which otherwise materially restrict or impair Seller's use of any Leased Real Property or the marketability or insurability of Seller's interest in and to any of the Leases.

(g) To the Knowledge of Seller, Seller has not received notice from any Governmental Body that any Leased Real Property is not in compliance in all material respects with the applicable provisions of the Rehabilitation Act of 1973, Title III of the Americans with Disabilities Act, or with the provisions of any comparable state statute relative to accessibility (these laws are referred to, collectively, as the "**Accessibility Laws**"), which noncompliance remains uncorrected, and there is no pending, or to the Knowledge of Seller, threatened Proceeding (whether from a Governmental Body or from any person or group) relating to compliance of any Leased Real Property with the Accessibility Laws.

**3.13.** ***Environmental / Biohazardous Waste Laws.*** Except as set forth in any phase one site assessment or other report that may be commissioned or obtained by Buyer prior to the Closing Date, there is no past or present action, activity, event, condition or circumstance that, to Seller's Knowledge, could reasonably be expected to give rise to any material liability by Seller under any Applicable Environmental or Biohazardous Waste Law, any other statute relating to the environment or medical waste, or any common law liability relating to the environment or medical waste, including, without limitation, liability related to the presence of any Hazardous Substances or Biohazardous Waste on, in or under the Real Property Leases or Owned Property or improvements now or heretofore owned, leased, used or controlled by Seller at concentrations exceeding those permissible for property used for the purposes used by Seller, and also including liability related to the use, handling, storage, generation, production, manufacture, treatment, release, disposal or arranging for disposal of any Hazardous Substances or Biohazardous Waste by or on behalf of Seller which results in concentrations in the environment exceeding those permissible for property used for the purposes used by Seller. As used in this Agreement, "**Applicable Environmental or Biohazardous Waste Law**" means any Legal Requirement pertaining to environmental or biohazardous waste matters at the time of the action, activity or event in question, or when any subject condition or circumstance first arose, and the term "**Hazardous Substances"** means polychlorinated biphenyls, asbestos, radioactive materials and any substances, materials, constituents, wastes, or other elements which are included under or regulated by Applicable Environmental or Biohazardous Waste Laws or any Legal Requirement

pertaining to environmental regulation, medical waste regulation, contamination, clean up, or disclosure in effect as of Closing.

**3.14.** ***Taxes.*** Solely as it relates to the Assets and the Practice, (i) Seller and Owners have duly paid or made provision for the payment of all taxes which are due and payable to the appropriate Governmental Body; (ii) Seller has withheld proper and accurate amounts from its employees' compensation in full and complete compliance with all withholding and similar provisions of the Code, including employee withholding and social security taxes, and any and all other Legal Requirements; and (iii) no deficiencies for any taxes have been asserted in writing or, to Seller's Knowledge, threatened, and no audit on any such returns is currently under way or, to Seller's Knowledge, threatened. There are no tax liens on any of the Assets other than liens for taxes not yet due and payable and, to the Knowledge of Seller, no basis exists for the imposition of any such liens.

**3.15.** ***Legal Requirements; Proceedings.*** Seller has operated the Practice in material compliance with all applicable Legal Requirements. Except as set forth on Schedule 3.15, there are no pending or, to Seller's Knowledge, threatened Proceedings: (i) by or against Seller or any of the Owners or Physicians; or (ii) that challenges, or that may have the effect of preventing, delaying, making illegal or otherwise interfering with, any of the Contemplated Transactions. To the Knowledge of Seller, no event has occurred or circumstance exists that is reasonably likely to give rise to or serve as a basis for the commencement of any such Proceeding. Seller is in compliance with all of the terms and requirements of each order, injunction, judgment, decree, ruling, assessment or arbitration award of any Governmental Body, court or arbitrator ("**Order**") to which it or any of the Assets is or has been subject. Seller has not received, at any time in the last year any written notice or other communication from any Governmental Body or any other person or entity regarding any actual, alleged, possible or potential violation of, or failure to comply with, any term or requirement of any Legal Requirement or any Order to which Seller or any of the Assets is or has been subject.

**3.16.** ***Employee Benefit Plans.*** Seller has or participates in the employee benefit plans set forth on Schedule 3.16. Except as set forth on Schedule 3.16 hereto, (i) Seller does not presently have, nor has it had within the last five (5) years, any other pension, profit sharing, deferred compensation, or other employee pension or welfare benefit plan or arrangement in which employees of the Practice participate or have participated; and (ii) all employee pension benefit plans and employee health and welfare benefits plans relating to employees of the Practice (collectively "**Benefit Plans**") have been administered in material compliance with all Legal Requirements including, without limitation, the applicable provisions of the Internal Revenue Code of 1986, as amended (the "**Code**"), and the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"). There are no unpaid "accumulated funding deficiencies" within the meaning of the Code with respect to the Benefit Plans. No reportable events (within the meaning of ERISA) or prohibited transactions (within the meaning of the Code) have occurred with respect to the Benefit Plans. There are no pending or, to Seller's Knowledge, threatened claims by or on behalf of the Benefit Plans or by any employee of Seller alleging a breach or breaches of fiduciary duties or violations of Legal Requirements which could result in liability on the part of either Seller or the Benefit Plans. Nor to Seller's Knowledge is there any reasonable basis for such a claim. All returns, reports, disclosure statements, and premium payments required to be made under the Code or ERISA with respect to the Benefit Plans have been timely filed or

delivered. The Benefit Plans have not been subject to a Proceeding by any Governmental Body within the last five (5) years, and there are no outstanding issues with reference to the Benefit Plans pending before any Governmental Body.

**3.17.** ***Labor Matters***.

(a) All employees of the Practice are employees of Seller. Schedule 3.17(a) sets forth a list of all such employees, current position, current compensation, date of last change in compensation, date of hire and any paid time off (holiday, vacation and sick time) that is accrued or credited but unused or unpaid for each such employee. All employees of Seller are employees at will and may be terminated without penalty. Seller has no cash payment arrangements with any of its employees. All employees are paid through Seller's payroll system and receive only the payments disclosed by such system. All necessary visa or work authorization petitions have been timely and properly filed on behalf of any employees requiring a visa stamp, 1-94 status document, employment authorization document, or any other immigration document to legally work in the United States. All paperwork retention requirements with respect to such applications and petitions have been met. No employees have ever worked without employment authorization from the Department of Homeland Security or any other government agency that must authorize such employment. 1-9 Forms have been timely and properly completed for all employees. 1-9 Forms have been lawfully retained and re-verified. There are no claims, lawsuits, actions, arbitrations, administrative or other proceedings, governmental investigations or inquiries pending or, threatened against Seller relating to Seller's compliance with immigration regulations, including, but not limited to, compliance with any immigration laws. Seller has not received any letters from the Social Security Administration ("**SSA**") regarding the failure of an employee's Social Security number to match their name in the SSA database.

(b) No union representation question exists respecting any employees of Seller. No collective bargaining agreement exists or is currently being negotiated by Seller, no written demand has been received for recognition by a labor organization by or with respect to any employees of Seller, no union organizing activities by or with respect to any employees of Seller are, to the Knowledge of Seller, taking place, and none of the employees of Seller are represented by any labor union or organization. There is no written unfair practice claim against Seller before the National Labor Relations Board, nor any strike, dispute, slowdown, or stoppage pending or threatened against or involving the Practice, and none has occurred within the last three (3) years. To the Knowledge of Seller, there is no threatened employee strike, work stoppage, or labor dispute pertaining to the Practice.

(c) Seller has complied in all material respects with all Legal Requirements relating to employment, employment practices, terms and conditions of employment, equal employment opportunity, nondiscrimination, immigration, wages, hours, benefits, payment of employment, social security, and similar taxes, occupational safety and health, and plant closing. Seller is not liable for the payment of any compensation, damages, taxes, fines, penalties, interest, or other amounts, however designated, for failure to comply with any of the foregoing Legal Requirements.

(d) There are no pending or, to the Knowledge of Seller, threatened claims or other Proceedings before the Equal Employment Opportunity Commission (or any

comparable state civil or human rights commission or other entity), complaints before the Occupational Safety and Health Administration (or any comparable state safety or health administration or other entity), wage and hour claims, or the like.

**3.18.** ***Contracts.*** Schedule 3.18 contains an accurate list of all material commitments, contracts, leases and agreements, written or oral, which affect or relate to the Practice or the Assets (the "**Contracts**"). For purposes of this Section 3.18 only, a material Contract is a Contract that provides for annual payment in excess of Ten Thousand Dollars ($10,000) or that is material to the operation of the Practice. Seller will give, the agents, employees and representatives of Buyer access to the Contracts, to the extent possessed by Seller. Seller represents and warrants with respect to the Contracts that:

(a) The Contracts constitute valid and legally binding obligations of Seller and are enforceable against Seller in accordance with their respective terms;

(b) Each Contract constitutes the entire agreement by and between the respective parties thereto with respect to the subject matter thereof;

(c) All obligations required to be performed by Seller under the terms of the Contracts have been performed, no act or omission by Seller has occurred or failed to occur which, with the giving of notice, the lapse of time or both would constitute a default under the Contracts, and each Contract is now and will be upon and after the Closing Date in full force and effect without default on the part of Seller;

(d) Except as expressly set forth on Schedule 1.1(g) none of the Assumed Contracts requires consent, waiver or estoppel (the "**Consents**") to the assignment and assumption of the Assumed Contracts by Buyer; and

(e) Except as expressly set forth on Schedule 1.1(g), the assignment of the Assumed Contracts to, and assumption of the Assumed Contracts by, Buyer will not result in any penalty or premium, or variation of the rights, remedies, benefits or obligations of any party thereunder.

**3.19.** ***Insurance.*** Schedule 3.19 summarizes the professional and general liability insurance policies covering the operations of the Practice and the practice of medicine by the Clinicians and the property insurance policies covering the Assets, including the policies' numbers, terms, identity of insurers, amounts, and coverage. All of such policies are in full force and effect with no premium arrearage and shall remain in full force and effect through the Closing Date. Seller has given in a timely manner to its insurers all notices required to be given under its insurance policies with respect to all of the claims and actions covered by insurance, and no insurer has denied coverage of any such claims or actions. Seller has not (i) received any notice or other communication from any such insurance company canceling or materially amending any of such insurance policies, and no such cancellation or amendment is threatened, or (ii) failed to give any required notice or present any claim which is still outstanding under any of such policies with respect to the Practice or any of the Assets. Seller has never filed a written application for any insurance coverage, and no Clinician has ever filed a written application for professional liability insurance coverage, which has been denied by an insurance agency or carrier and Seller and each

Clinician have been continuously insured for professional malpractice claims for at least the past seven years. Schedule 3.19 also sets forth a list of all claims for any insured loss in excess of Five Thousand Dollars ($5,000) per occurrence, either (i) filed by Seller during the three-year period immediately preceding the Closing, including, but not limited to, worker's compensation, general liability, environmental liability and professional malpractice liability claims, (ii) filed by any Clinician during the three-year period immediately preceding the Closing with respect to a professional liability claim, or (iii) made by a third party against Seller (or any Clinician with respect to professional malpractice) for which no claim for insured loss was filed by Seller or any Clinician.

**3.20.** ***Intellectual Property; Software Licenses; Attestations.*** All trademarks and trade names (whether registered or common law) currently owned or used by Seller or used in the operation of the Practice are listed and described in Schedule 3.20 (collectively, the "**Intellectual Property**"). No Proceedings have been instituted or are pending or, to Seller's Knowledge threatened which challenge the validity of the ownership by Seller of such Intellectual Property, and Seller knows of no basis therefore. Seller has not licensed anyone to use such Intellectual Property and Seller has no Knowledge of the use or the infringement of any such Intellectual Property by any other person or entity. Seller owns (or possesses adequate and enforceable licenses or other rights to use) all computer software programs and similar systems used in the conduct of the Practice. With respect to attestations made by Seller and/or the Clinician(s) of the Practice to qualify for Medicare and Medicaid incentives available under HITECH: (i) to Seller's Knowledge, the software used to create and update the electronic medical records of the Practice and all versions of such software satisfy all requirements of HITECH and (ii) Seller and/or the Clinician(s) have taken all such additional measures required by HITECH (including, without limitation, documentation requirements, screen shots with respect to attestations, security plans, security risk assessments), which measures would reasonably be expected to withstand an audit and avoid any incentive repayment claims or associated reductions in reimbursements.

**3.21.** ***Brokers, Finders.*** Neither Seller nor the Owners nor their respective Representatives have incurred any obligation or liability, contingent or otherwise, for any broker's or finder's fee or any other commission or similar fee, directly or indirectly, in connection with the Contemplated Transactions. As used in this Agreement, "**Representative**" means, with respect to a particular person or entity, any director, officer, manager, employee, agent, consultant, advisor, accountant, financial advisor, legal counsel or other representative of that person or entity.

**3.22.** ***COVID-19 Loan.*** Seller represents and warrants that Seller does not have any outstanding obligations under any Small Business Administration Paycheck Protection Program loan or any other loan or grant program established under the Coronavirus Aid, Relief, and Economic Security Act (the "**CARES Act**") or any similar federal, state, or local COVID-19 relief program. Notwithstanding the foregoing, to the extent any such loan, grant, or obligation exists, Seller shall be solely responsible for the repayment of all amounts due thereunder, and Seller shall indemnify and hold harmless Buyer from and against any and all losses, claims, liabilities, damages, costs, and expenses (including reasonable attorneys' fees) arising from or related to any such loan, grant, or program obligation.

**3.23.** ***Full Disclosure.*** This Agreement and the Schedules hereto and the Seller Closing Documents to be furnished to Buyer and their Representatives by Seller or the Owners do

not and will not include any untrue statement of a material fact or omit to state any material fact necessary to make the statements made and to be made not misleading. Copies of all documents referred to in any Schedule to be provided by Seller or the Owners pursuant to this Agreement have been delivered or made available to Buyer and constitute true, correct and complete copies thereof and include all amendments, exhibits, schedules, appendices, supplements or modifications thereto or waivers thereunder.

**3.24.** ***No Other Representations and Warranties*** **.** Except for the representations and warranties contained in this Agreement (including the Disclosure Schedules), neither Seller nor any other person or entity has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller, as to the future revenue, profitability or success of the Practice.

**3.25.** ***Bankruptcy Representations.***

(a) Seller has the authority under the Bankruptcy Code to assume and assign the Assumed Contracts and Real Property Leases and to sell the Assets free and clear of all Encumbrances pursuant to Section 363(f) of the Bankruptcy Code.

(b) To Seller's Knowledge, no event has occurred or condition exists that would prevent the Bankruptcy Court from entering the Sale Order in accordance with Sections 363 and 365 of the Bankruptcy Code.

(c) Seller has disclosed to Buyer all material liabilities and claims asserted or, to Seller's Knowledge, threatened against Seller in the bankruptcy case, and Schedule 3.25(c) sets forth a complete and accurate list of all cure costs required under Section 365 of the Bankruptcy Code for each Assumed Contract and Lease. If such list is not provided by the Effective Date then the Seller shall provide such list within 14 business days of the Effective Date.

(d) Seller has timely filed all schedules, statements, and reports required under the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure, and such filings are complete and accurate in all material respects.

**4. Representations and Warranties of Buyer.** As of the date hereof, and, when read in light of any Schedules which have been updated in accordance with the provisions of Section 12.1 hereof, as of the Effective Time, Buyer represents and warrants to Seller the following:

**4.1.** ***Organization And Good Standing.*** Buyer is a tax-exempt corporation, duly organized, validly existing and in good standing under the laws of the Commonwealth of Pennsylvania, with full corporate power and authority to conduct their respective businesses as they are now conducted.

**4.2.** ***Enforceability; Authority; No Conflict.***

(a) This Agreement constitutes the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms. Upon the execution and delivery by Buyer of each other agreement to be executed or delivered by Buyer at the Closing Date (the "**Buyer's Closing Documents**"), each of the Buyer's Closing Documents will constitute the legal,

valid and binding obligation of Buyer, enforceable against Buyer in accordance with its respective terms. Buyer has the absolute and unrestricted right, power and authority to execute and deliver this Agreement and the Buyer's Closing Documents and to perform its obligations under this Agreement and the Buyer's Closing Documents, and such action has been duly authorized by all necessary corporate action.

(b) Neither the execution and delivery of this Agreement by Buyer nor the consummation or performance of any of the Contemplated Transactions by Buyer will give any person or entity the right to prevent, delay or otherwise interfere with any of the Contemplated Transactions pursuant to: (i) any provision of Buyer's governing documents; (ii) any resolution adopted by the Buyer's governing board; (iii) any Legal Requirement or Order to which Buyer may be subject; or (iv) any contract to which Buyer is a party or by which Buyer may be bound.

**4.3.** ***Certain Proceedings.*** There is no pending Proceeding that has been commenced against Buyer that challenges, or may have the effect of preventing, delaying, making illegal or otherwise interfering with, any of the Contemplated Transactions. To Buyer's Knowledge, no such Proceeding has been threatened.

**4.4.** ***Brokers or Finders.*** Neither Buyer nor its Representatives have incurred any obligation or liability, contingent or otherwise, for any broker's or finder's fee or any other commission or similar fee, directly or indirectly, in connection with the Contemplated Transactions.

**4.5.** ***Full Disclosure.*** This Agreement and the Schedules hereto and Buyers' Closing Documents to be furnished to Seller or the Owners and their respective Representatives by Buyer pursuant hereto do not and will not include any untrue statement of a material fact or omit to state any material fact necessary to make the statements made and to be made not misleading. Copies of all documents referred to in any Schedule to be provided by Buyer pursuant to this Agreement have been delivered or made available to Seller or the Owners and constitute true, correct and complete copies thereof and include all amendments, exhibits, schedules, appendices, supplements or modifications thereto or waivers thereunder.

**4.6.** ***No Other Representations and Warranties.*** Buyer acknowledges that neither Seller nor any other person or entity has made any representation or warranty as to Seller, the Practice, the Assets or this Agreement, except as expressly set forth in this Agreement (including the Disclosure Schedules).

**5. Covenants of Seller Prior to Closing and Post-Closing.** Seller hereby covenants to Buyer and agrees as follows:

**5.1.** ***Access and Investigation.*** Between the date of this Agreement and the Closing Date, Seller shall (i) afford Buyer and its Representatives full and complete access to Seller's personnel, properties, Contracts, Governmental Authorizations, books and records and other documents and data, such rights of access to be exercised in a manner that does not unreasonably interfere with the operations of Seller; (ii) furnish Buyer with copies of all such Contracts, Governmental Authorizations, books and records and other existing documents and data as Buyer may reasonably request; (iii) furnish Buyer with such additional financial, operating and

other relevant data and information as Buyer may reasonably request without regard to where such information shall be located; and (iv) otherwise cooperate and assist, to the extent reasonably requested by Buyer, with Buyer's investigation of the properties, assets and financial condition related to Seller. Buyer agrees that no inspections shall take place and no employees or other personnel of the Seller or the Practice shall be contacted by Buyer without Buyer first providing reasonable notice to Seller and coordinating such inspection or contact with Seller.

**5.2** ***Bankruptcy Actions***.

(a) Seller will commence the Chapter 11 Cases on or before August 31, 2026.

(b) Seller shall file a motion contemporaneously with the commencement of the Chapter 11 Case, which motion shall seek the Bankruptcy Court's entry of an order authorizing the Debtor to enter into the DIP Credit Agreement to obtain post-petition financing, granting liens, authorizing the use of cash collateral, granting adequate of adequate protection, and granting related relief (the "**Financing Motion**").

(c) The Seller shall file the Sale Motion and Sale Procedures Motion contemporaneously with the commencement of the Chapter 11 Case, but in no event later than one business day after the Petition Date, which motions shall seek the Bankruptcy Court's:

(i) entry of an order on or before the Sale Procedures Order Deadline in form and substance satisfactory to Buyer, as amended, modified or supplemented with the prior written consent of Buyer (the "**Sale Procedures Order**"), among other things, (A) establishing bidding procedures governing the sale of the Assets, as amended, modified or supplemented with the prior written consent of Buyer (the "**Bidding Procedures**") (B) approving payment of the Break-Up Fee in an amount equal to 3% of the Purchase Price (the "**Break-Up Fee**") and the Expense Reimbursement in the amount of $250,000.00 (the "**Expense Reimbursement**"), to the extent payable by the terms of this Agreement or the Sale Procedures Order, (C) providing that the Break-Up Fee and the Expense Reimbursement shall constitute administrative expenses of the Seller with priority over any and all pre-petition creditors and administrative expenses of the kind specified in Section 503(b) of the Bankruptcy Code until paid, and (D) providing minimum overbid increments of not less than $250,000.00. The Bankruptcy Court must enter the Sale Procedures Order no later than thirty (30) days after the Petition Date (the "**Sale Procedures Order Deadline**"); and

(ii) entry of an order on or before the Sale Order Deadline in form and substance satisfactory to Buyer in its sole and absolute discretion, as amended, modified or supplemented with the prior written consent of Buyer, authorizing and approving, inter alia, (A) the sale of the Purchased Assets to Buyer on the terms and conditions set forth herein, free and clear of all Liens and Claims (to the extent set forth therein), and (B) the assignment and assumption by Buyer of each Assumed Contract (the "**Sale Order**"). The Sale Order shall, among other things: (I) approve the sale of the Purchased Assets to the Buyer free and clear of all Liens, Claims, and encumbrances, pursuant to (among other provisions) sections 105, 363, and 365 of the Bankruptcy Code, in each case to the extent set forth in this Agreement; (II) approve the assumption and assignment to the Buyer of the Assumed Contracts pursuant to section 365 of the

Bankruptcy Code; (III) contain findings of fact and conclusions of law that the Buyer is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code and is not a successor to Seller; (IV) contain such other terms that are otherwise acceptable to Buyer, in its sole discretion; and (V) the Sale Order shall have become a Final Order.

(d) Seller shall provide Buyer with a reasonable opportunity to review and comment upon all motions, applications, and supporting papers relating to the transactions contemplated by this Agreement prepared by Seller (including forms of orders and notices to interested parties) prior to the filing thereof in the Chapter 11 Case. All motions, applications, and supporting papers prepared by and relating to the transactions contemplated by this Agreement to be filed on behalf of Seller after the date hereof must be reasonably satisfactory in form and substance to Buyer.

(e) If the Sale Procedures Order, Sale Order or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacatur, stay, rehearing or reargument shall be filed with respect to the Sale Order, Sale Procedures Order or other such order), and this Agreement has not otherwise been terminated pursuant to Section 10.2, the Seller shall use its commercially reasonable efforts to diligently defend such appeal, petition or motion and shall use its commercially reasonable efforts to obtain an expedited resolution of any such appeal, petition or motion.

(f) Seller shall promptly provide Buyer and its counsel with copies of all notices, filings and orders of the Bankruptcy Court that such Seller has in its possession (or receives) pertaining to the Contemplated Transaction, the Sale Order, Sale Procedures Order, or any other order related to any of the transactions contemplated by this Agreement, but only to the extent such papers are not publicly available on the docket of the Bankruptcy Court or otherwise made available to Buyer and its counsel. No Seller shall seek any modification to the Bidding Procedures, Sale Procedures Order or Sale Order by the Bankruptcy Court or any other Governmental Body of competent jurisdiction to which a decision relating to the Chapter 11 Case has been appealed, in each case, without the prior written consent of Buyer.

(g) Seller shall continue to act in good faith and without any improper conduct, including collusion or fraud of any kind.

(h) Seller will promptly take such actions as are reasonably requested by Buyer to assist in obtaining entry of the Sale Order and the Sale Procedures Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of providing necessary assurances of performance by Seller of its obligations under this Agreement and the related agreements and demonstrating that Buyer is a good faith buyer under section 363(m) of the Bankruptcy Code.

(i) Pursuant to the terms of the Bidding Procedures and the proposed Sale Procedures Order, Seller may solicit bids from other prospective purchasers for the sale of all or substantially all of the Assets on terms and conditions substantially the same in all respects to this Agreement (or more favorable terms to) in accordance with the procedures set forth in the proposed Sale Procedures Order.

(j) Seller shall use commercially reasonable efforts to provide appropriate notice of the hearings on the Sale Motion to all Persons entitled to notice, including, but not limited to, all Persons that have asserted Liens on the Assets, all parties to the Assumed Contracts and all Taxing authorities in jurisdictions applicable to and as otherwise required by the Bankruptcy Code and bankruptcy rules.

(k) Seller shall file with the Bankruptcy Court and serve a cure notice (the "**Cure Notice**") by first class mail on all non-debtor counterparties to all Non-Real Property Contracts and Leases as required by the Sale Procedures Order and provide a copy of the same to Buyer.

**5.2.** ***Operation of the Business.*** Between the date of this Agreement and the Effective Time, Seller shall and Owners shall require Seller to: (i) operate the Practice in the ordinary course of business; (ii) except as otherwise approved by Buyer in writing, and without making any commitment on Buyer's behalf, preserve intact its current business organization, keep available the services of its officers, employees and agents and maintain its relations and good will with suppliers, customers, landlords, creditors, employees, agents and others having business relationships with it; (iii) confer with Buyer prior to implementing operational decisions of a material nature; (iv) make no material changes in management personnel without prior consultation with Buyer; (v) maintain the Assets in a state of repair and condition that complies with Legal Requirements and is consistent with the requirements and normal conduct of the Practice; (vi) comply with all Legal Requirements and Contracts applicable to the Practice; and (vii) continue in full force and effect the insurance coverage under the policies set forth in Schedule 3.19 or substantially equivalent policies.

**5.3.** ***Negative Covenant.*** Except as otherwise expressly permitted herein, between the date of this Agreement and the Effective Time, Seller shall not, and the Owners shall not permit Seller to, without the prior written Consent of Buyer, (i) take any affirmative action, or fail to take any reasonable action within its control, as a result of which any of the changes or events listed in Section 3.5 would be likely to occur; (ii) make any modification to any material Assumed Contract, Real Property Lease, or Governmental Authorization; (ii) allow the levels of inventory to vary materially from the levels customarily maintained; or (iii) enter into any compromise or settlement of any Proceeding relating to the Assets, the business of Seller, the Clinicians' practice of medicine or the Assumed Liabilities.

**5.4.** ***Governmental Approvals.*** Seller shall (i) use all reasonable efforts to obtain all Governmental Authorizations (or exemptions therefrom) necessary or required to allow Seller to perform its obligations under this Agreement; (ii) reasonably assist and cooperate with Buyer and its Representatives in obtaining all Governmental Authorizations which Buyer deems necessary or appropriate in the preparation of any document or other material which may be required by any Governmental Body as a predicate to or as a result of the Contemplated Transactions; and (iii) reasonably assist and cooperate with Buyer and its Representatives to obtain any and all Governmental Authorizations or assignment to Buyer of any Governmental Authorizations necessary to consummate the Contemplated Transactions, including but not limited to those Governmental Authorizations set forth on Schedule 3.7.

**5.5.** ***No-Shop Clause***. Unless this Agreement is terminated pursuant to Section

10.2 hereof, and except as specifically provided in Section 1.10 with respect to bankruptcy sale procedures, Seller will not, without the prior written consent of Buyer: (i) offer for sale or lease all or any material portion of the Assets or any ownership interest in any entity owning any of the Assets, (ii) solicit offers to buy all or any material portion of the Assets or any ownership interest in any entity owning any of the Assets, (iii) initiate, encourage or provide any documents or information to any third party in connection with, discuss or negotiate with any person or entity regarding any inquires, proposals or offers relating to any disposition of all or any material portion of the Assets or a merger or consolidation of any entity owning any of the Assets, or (iv) enter into any agreement or discussions with any party (other than Buyer) with respect to the sale, assignment, or other disposition of all or any material portion of the Assets or any ownership interest in any entity owning any of the Assets or with respect to a merger or consolidation of any entity owning any of the Assets or the employment or engagement of any of the Clinicians. Seller will promptly communicate to Buyer the substance of any inquiry or proposal concerning any such transaction.

**5.6.** ***Commercially Reasonable Efforts.*** Seller shall use its commercially reasonable efforts to cause the conditions in Section 8 to be satisfied and to obtain all Consents described on Schedule 1.1(g).

**5.7.** ***Credentialing and Provider Enrollment***. Seller and Owners shall cooperate with Buyer in good faith to facilitate the credentialing and enrollment of Buyer and its affiliated providers with all required payors, including Medicare, Medicaid, and commercial health insurance companies. Such cooperation shall include (a) providing all documentation reasonably requested by payors or Buyer in connection with credentialing applications, (b) executing any assignments, authorizations, or other documents required to transfer provider numbers or enrollment status, (c) providing reasonable access to credentialing files and personnel records for all Transferring Clinicians and other healthcare providers, and (d) using commercially reasonable efforts to obtain any consents or approvals from payors that are required. Seller shall not take any action that would reasonably be expected to adversely affect the credentialing or enrollment status of any Transferring Clinician with any payor.

**5.8.** ***Tail Insurance.*** To the extent the professional liability insurance, general liability insurance and directors and officers liability insurance policy or policies covering Seller, the Clinicians, and Seller's other providers are "claims made" policies, Seller shall, at its own cost and expense, obtain or cause to be obtained extended reporting endorsements (commonly known as tail coverage) for such policies covering the acts or omissions of Seller and the Clinicians and Seller's other providers on or prior to the Effective Time in the amounts set forth in said policies on terms acceptable to Buyer, and will provide proof of such coverage to Buyer upon request. Such insurance shall be effective as of the Closing Date and continue thereafter covering any and all pending or future claims made against Seller, Owners, Clinicians, mid-level providers and any other professional employees and agents of Seller.

**5.9.** ***Efforts to Obtain the Landlord Consents.*** Seller represents and warrants that it will use its commercially reasonable efforts to obtain the Landlord Consents.

**6. Covenants of Buyer Prior to Closing.**

**6.1.** ***Governmental Approvals.*** Buyer shall (i) use all reasonable efforts to obtain all Governmental Authorizations (or exemptions therefrom) necessary or required to allow Buyer to perform its obligations under this Agreement; (ii) reasonably assist and cooperate with Seller and its Representatives in obtaining all Governmental Authorizations which Seller deems necessary or appropriate in the preparation of any document or other material which may be required by any Governmental Body as a predicate to or as a result of the Contemplated Transactions; and (iii) reasonably assist and cooperate with Seller and its Representatives to obtain any and all Governmental Authorizations or assignment to Buyer of any Governmental Authorizations necessary to consummate the Contemplated Transactions, including but not limited to those Governmental Authorizations set forth on Schedule 3.7.

**6.2.** ***Commercially Reasonable Efforts.*** Buyer shall use its commercially reasonable efforts to cause the conditions in Section 7 to be satisfied and shall cooperate with Seller in obtaining all Consents identified on Schedule 1.1(g).

## 7. Conditions Precedent to Seller's Obligation to Close.

Seller's and the Owners' obligation to sell the Assets and Seller's and the Owners' obligation to take the other actions required to be taken by Seller and the Owners at the Closing Date is subject to the satisfaction, at or prior to such Closing Date, of each of the following conditions (any of which may be waived by Seller and the Owners in whole or in part):

**7.1.** ***Representations/Warranties.*** The representations and warranties of Buyer contained in this Agreement shall be true when made and, when read in light of any Schedules which have been updated in accordance with the provisions of Section 12.1 hereof, as of the Effective Time as though such representations and warranties had been made on and as of the Effective Time. Each and all of the terms, covenants, and conditions of this Agreement to be complied with or performed by Buyer on or before the Effective Time pursuant to the terms hereof shall have been duly complied with and performed.

**7.2.** ***Governmental Approvals.*** All Governmental Authorizations required in connection with the execution, delivery and performance of this Agreement shall have been obtained or made by Buyer, when so required, except for any documents required to be filed, or required to be issued, after the Effective Time.

**7.3.** ***Proceedings.*** No Proceeding shall have been instituted or threatened to restrain or prohibit the Contemplated Transactions, and no Governmental Body shall have taken any other action or made any request of any party hereto as a result of which Seller reasonably and in good faith deems it inadvisable to proceed with the Contemplated Transactions.

**7.4.** ***Closing Deliveries.*** Buyer shall have made the deliveries required to be made by it under Section 2.4 hereof.

**8. Conditions Precedent to Buyer's Obligation to Close.** Buyer's obligation to purchase the Assets and to take the other actions required to be taken by Buyer at the Closing Date are subject to the satisfaction, at or prior to such Closing Date, of each of the following conditions (any of which may be waived by Buyer, in whole or in part):

**8.1.** ***Representations/Warranties.*** The representations and warranties of Seller contained in this Agreement shall be true when made and, when read in light of any Schedules which have been updated in accordance with the provisions of Section 12.1 hereof, as of the Effective Time as though such representations and warranties had been made on and as of the Effective Time. Each and all of the terms, covenants, and conditions of this Agreement to be complied with or performed by Seller on or before the Effective Time pursuant to the terms hereof shall have been duly complied with and performed.

**8.2.** ***Pre-Closing Confirmation.*** Buyer shall have obtained documentation or other evidence satisfactory to Buyer in its reasonable discretion that Buyer has:

(a) Received approval from all Governmental Bodies whose approval is required for the Contemplated Transactions;

(b) Received written confirmation from all applicable Governmental Bodies that at the Effective Time all Governmental Authorizations required by any Legal Requirement to operate the Practice as currently operated will be transferred to, or issued or reissued in the name of Buyer;

(c) Obtained reasonable assurances that Buyer may participate in and receive reimbursement from the Medicare and Medicaid programs resulting from Buyer's operation of the Practice as of the Effective Time;

(d) Received reasonable assurances that the Transferring Clinicians have been credentialed with the private payors of Buyer and that Buyer may receive reimbursement from such payors effective as of the Effective Time; and

(e) Obtained such other consents and approvals as may be legally or contractually required for the consummation of the Contemplated Transactions.

**8.3.** ***Actions/Proceedings.*** No Proceeding shall have been instituted or threatened to restrain or prohibit the Contemplated Transactions, and no Governmental Body shall have taken any other action or made any request of any party hereto as a result of which Buyer reasonably and in good faith deems it inadvisable to proceed with the Contemplated Transactions.

**8.4.** ***Assignment of the Leases.*** Seller, Buyer and the applicable sublandlord or landlord shall have entered into an assignment of the Leases to Buyer on terms satisfactory to Buyer, including those terms set forth in Section 8.6 below.

**8.5.** ***Adverse Change.*** No material adverse change in the results of operations, financial condition, business or prospects of the Practice shall have occurred other than pursuant to the Bankruptcy, and Seller shall not have suffered any material change, loss or damage to the Assets, whether or not covered by insurance.

**8.6.** ***Consents to Assignments.*** All Consents of third parties which are reasonably necessary, in the opinion of Buyer, to complete effectively the Contemplated Transactions shall have been obtained and are in form and substance reasonably satisfactory to Buyer.

**8.7. *Vesting/Recordation.*** Seller shall have furnished to Buyer, in form and substance satisfactory to Buyer, assignments or other instruments of transfer and the Consents, necessary or appropriate to transfer to and effectively vest in Buyer all right, indefeasible, marketable and merchantable, title, and interest in and to the Assets, free and clear of any Encumbrances in proper statutory form for recording if such recording is necessary or appropriate.

**8.8. *Due Diligence.*** Buyer shall have completed its own due diligence investigation of the operation of the Practice, the results of which shall have been deemed satisfactory in the sole discretion of Buyer and its Representatives.

**8.9. *Lien Termination.*** Seller shall have obtained from the applicable lenders identified in Schedules 2.3(d)-(e), pay-off letters identifying the pay-off amounts required to be paid as of the Closing Date to satisfy such indebtedness and release all Encumbrances on the Assets including applicable UCC-3 termination statements.

**8.10. *Closing Deliveries.*** Seller shall have made the deliveries required to be made by it under Sections 1.1 and 2.3 hereof.

**8.11. *Sale Procedures Order.*** The Bankruptcy Court shall have entered the Sale Procedures Order in form and substance satisfactory to Buyer in its sole discretion, containing all of the findings and provisions set forth in Sections 1.10(d) and 5.2(c)(i), and such Sale Procedures Order shall have become a Final Order.

**8.12. *Sale Order.***

(a) The Bankruptcy Court shall have entered the Sale Order in form and substance satisfactory to Buyer in its sole discretion, containing all of the findings and provisions set forth in Section 1.10, and such Sale Order shall have become a Final Order.

(b) Buyer shall be the Successful Bidder at any auction conducted in connection with the sale of the Assets, or if no auction is conducted, the Agreement shall have been approved without any competing qualified bids being submitted. "**Successful Bidder**" means the bidder whose bid is determined by the Bankruptcy Court to be the highest or otherwise best offer for the Assets.

**8.13. *Workforce in Force.***

(a) Each Owner shall have executed and delivered to Buyer an Employment Agreement, and each such Employment Agreement shall be in full force and effect as of the Closing Date. No Owner shall have indicated an intention to terminate his or her employment with Buyer or to cease practicing medicine at the Practice locations. Each Owner shall have obtained and maintained all licenses, certifications, and credentials necessary to practice medicine in the Commonwealth of Pennsylvania and to participate in Medicare, Medicaid, and other required third-party payor programs. If any Owner fails to satisfy the requirements of this Section 8.13 prior to the Closing Date or if Buyer shall have failed to duly credential an Owner with the applicable third party payors Buyer may, in its sole discretion, (i) waive such condition and proceed to Closing with the remaining Owners that are credentialed and delay employment of

the uncredentialed Owner until Buyer has secured the necessary credentialing.

**9.** **Covenant Not to Compete**. Except as provided on Schedule 9, each of the Seller and Owners hereby covenants that at all times from the Closing Date until the second (2nd) anniversary of the Closing, Seller and Owners and their respective Affiliates shall not (i) engage in the practice of medicine within the Restricted Area (as defined below) other than on behalf of Buyer or an affiliate of Buyer, or (ii) have any Financial Relationship with any entity (other than Buyer or an affiliate of Buyer) which owns or operates a health care provider providing, within the Restricted Area, services comparable to any of the services offered by Seller immediately prior to the Closing. The term "**Financial Relationship**" means any type of direct or indirect ownership, debt, or contractual relationship (including, without limitation, a contractual relationship for management services or consulting services). The term "**Restricted Area**" means the area within a twenty-five (25) mile radius of any location of Buyer or an affiliate of Buyer at which a Clinician regularly provided services. This restrictive covenant shall not apply to an Owner in the event that Buyer terminates the Owner's employment without cause or the Owner terminates his/her employment for cause.

**9.1.** ***Breach/Scope of Covenant Not to Compete.*** In the event of a breach of this Section 9, each of the Seller and the Owners recognize that monetary damages may be inadequate to compensate Buyer and Buyer shall be entitled, without the posting of a bond or similar security, to seek an injunction restraining such breach, with the costs (including attorneys' fees) of securing such injunction, to be borne by Seller or any Owner, as the case may be. Nothing contained herein shall be construed as prohibiting Buyer from pursuing any other remedy available to it for such breach or threatened breach. All parties hereto hereby acknowledge the necessity of protection against the competition of Seller and Owners and that the nature and scope of such protection has been carefully considered by the parties. Each of the Seller and Owners further acknowledge and agree that the covenants and provisions of this Section 9 form part of the consideration under this Agreement and are among the inducements for Buyer entering into and consummating the transactions contemplated herein. The period provided and the Restricted Area covered are expressly represented and agreed to be fair, reasonable and necessary. The consideration provided for herein is deemed to be sufficient and adequate to compensate for agreeing to the restrictions contained in this Section 9. If, however, any court determines that the foregoing restrictions are not reasonable, such restrictions shall be modified, rewritten or interpreted to include as much of their nature and scope as will render them enforceable.

**10.** **Additional Agreements.**

**10.1.** ***Allocation of Purchase Price.*** The Purchase Price shall be allocated among the various classes of Assets in accordance with Schedule 10.1. The parties agree that any tax returns or other tax information they may file or cause to be filed with any Governmental Body shall be prepared and filed consistently with such agreed upon allocation. In this regard, the parties agree that, to the extent required, they will each properly prepare and timely file Form 8594 in accordance with Section 1060 of the Code.

**10.2.** ***Termination Prior to Closing.*** Notwithstanding anything herein to the contrary, this Agreement may be terminated at any time: (i) on or prior to the Closing Date by mutual consent of Seller and Buyer; (ii) automatically and without any action or notice by Seller

to Buyer, or Buyer to Seller, immediately upon (X) approval by the Bankruptcy Court of an Alternate Transaction, unless Buyer is designated a "back-up bidder" under the Sale Order or (Y) the consummation of an Alternate Transaction; (iii) by written notice from Buyer to Seller if: (X) the Bankruptcy Court does not enter the Sale Procedure Order by the Sale Procedures Order Deadline; (Y) the Bankruptcy Court does not enter the Sale Order by the Sale Order Deadline; or (Z) following entry of the Sale Order or the Sale Procedures Order, either the Sale Order or the Sale Procedures Order is stayed, reversed, modified, vacated or amended in any material respect without the prior written consent of Buyer (such consent not to be unreasonably withheld), and such stay, reversal, modification, vacation or amendment is not eliminated within fourteen (14) days of any such stay, reversal, modification, vacation or amendment; (iv) by Buyer by written notice to Seller if the DIP Credit Agreement matures or is in default (unless otherwise extended or waived by the DIP Lender); (v) by Buyer by written notice to Seller if the Seller's bankruptcy case is converted to a case under chapter 7 of the Bankruptcy Code or a trustee or examiner is appointed in the Seller's bankruptcy case; (vi) by Buyer by written notice to Seller if Seller files a Chapter 11 plan without the consent of Buyer; (vii) by Seller by written notice to Buyer if any event occurs or condition exists which has or will cause Buyer to be unable to satisfy one or more conditions to the obligations of Seller to consummate the transactions contemplated by this Agreement as set forth in Section 7; (viii) by Buyer by written notice to Seller if any event occurs or condition exists which has or will cause Seller to be unable to satisfy one or more conditions to the obligations of Buyer to consummate the transactions contemplated by this Agreement as set forth in Section 8, Section 1.1 or Section 2.3; (ix) by Buyer by written notice if Seller has been unable to satisfy one or more of its pre-closing obligations as set forth in Section 1.1; (x) by Buyer if Seller is unable to obtain the Landlord Consents on terms satisfactory to Buyer as set forth in Section 8.4 by the Closing Date; (xi) by Buyer or Seller if the Closing Date shall not have taken place on or before January 1, 2027 (unless such date is extended by mutual written agreement of Buyer and Seller); or (xii) by Buyer pursuant to Section 12.1 hereof.

**10.3.** ***Post-Closing Access to Information*** **.** Seller and Buyer acknowledge that subsequent to the Effective Time each party may need access to information or documents in the control or possession of the other party for the purposes of concluding the transactions herein contemplated, audits, compliance with governmental requirements and regulations, and the prosecution or defense of third-party claims. Accordingly, Seller and Buyer agree that for a period of six (6) years after the Closing Date each will make reasonably available to the other's Representatives and/or Governmental Bodies upon written request and at the expense of the requesting party such documents and information as may be available relating to the Practice for periods prior and subsequent to the Effective Time to the extent necessary to facilitate concluding the Contemplated Transactions, compliance with Legal Requirements, and the prosecution or defense of Proceedings.

**10.4.** ***Preservation and Access to Records After the Closing*****.** After the Effective Time, Buyer shall, in the ordinary course of business and as required by law, keep and preserve in their original form all medical and other records of the Practice existing as of the Effective Time, and which constitute a part of the Assets delivered to Buyer at the Closing Date in accordance with all applicable laws. For purposes of this Agreement, the term "records" includes all documents, electronic data and other compilations of information in any form. Buyer acknowledges that as a result of entering into this Agreement and operating the Practice it will gain access to patient and

other information which is subject to rules and regulations regarding confidentiality. Buyer agrees to abide by any such rules and regulations relating to the confidential information it acquires. Buyer agrees to maintain the patient records delivered to Buyer at the Closing Date at Buyer's office locations after the Effective Time in accordance with applicable law (including, if applicable, Section 1861(v)(i)(I) of the Social Security Act (42 U.S.C. §1395(v)(1)(i)), the privacy requirements of the Administrative Simplification subtitle of HIPAA and applicable state requirements with respect to medical privacy and requirements of relevant insurance carriers, all in a manner consistent with the maintenance of patient records generated at the Practice after the Effective Time. Upon reasonable notice, during normal business hours, at the sole cost and expense of Seller and upon Buyer's receipt of appropriate consents and authorizations, Buyer will afford to the Representatives of Seller full and complete access to, and copies of, the records transferred to Buyer at the Closing Date (including, without limitation, access to patient records in respect of patients treated by Seller at the Practice). Upon reasonable notice, during normal business hours and at the sole cost and expense of Seller, Buyer shall also make its Representatives available to Seller at reasonable times and places after the Effective Time. In addition, Seller shall be entitled, at Seller's sole risk, to remove from the Practice copies of any such patient records, but only for purposes of pending litigation relating to the operation of the Practice prior to the Effective Time and involving a patient to whom such records refer, as certified in writing prior to removal by counsel retained by Seller in connection with such litigation and only upon Buyer's receipt of appropriate consents and authorizations. Any patient record so removed from the Practice shall be promptly returned to Buyer following its use by Seller. Any access to the Practice, its records or Buyer's personnel granted to Seller in this Agreement shall be upon the condition that any such access does not materially interfere with the business operations of Buyer.

**10.5.** ***Reproduction of Documents.*** This Agreement and all documents relating hereto, including, without limitation, (a) consents, waivers and modifications which may hereafter be executed, (b) the documents delivered at the Closing Date, and (c) financial statements, certificates and other information previously or hereafter furnished to Seller or to Buyer, may, subject to the provisions of Section 12.4 hereof, be reproduced by Seller and by Buyer by any photographic, photostatic, microfilm, micro-card, miniature photographic or other similar process and Seller and Buyer may destroy any original documents so reproduced. Seller and Buyer agree and stipulate that any such reproduction shall be admissible in evidence as the original itself in any Proceeding (whether or not the original is in existence and whether or not such reproduction was made by the Seller or Buyer in the ordinary course of business) and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

**10.6.** ***Cooperation on Tax Matters.*** Following the Closing Date, the parties shall cooperate fully with each other and shall make available to the other, as reasonably requested and at the expense of the requesting party, and to any taxing authority, all information, records or documents relating to tax liabilities or potential tax liabilities of Seller for all periods on or prior to the Effective Time and any information which may be relevant to determining the amount payable under this Agreement, and shall preserve all such information, records and documents (to the extent a part of the Assets delivered to Buyer at the Closing Date) at least until the expiration of any applicable statute of limitations or extensions thereof.

**10.7.** ***Misdirected Payments, Etc.*** Seller and Buyer covenant and agree to remit, with reasonable promptness, to the other any payments received, which payments are on or in

respect of accounts or notes receivable owned by (or are otherwise payable to) the other. In addition, and without limitation, in the event of a determination by any governmental or third-party payer that payments to the Seller or the Practice resulted in an overpayment or other determination that funds previously paid by any program or plan to the Seller or the Practice must be repaid, Seller shall be responsible for repayment of said monies (or defense of such actions) if such overpayment or other repayment determination was for services rendered by Seller.

**10.8.** ***Employee Matters.***

(a) Certain qualified non-clinician employees of Seller as determined by Buyer in its sole discretion, who are actively employed and in good standing as of the Closing of the Transactions shall be terminated by the Seller as of the Closing and will be considered for employment with Buyer, commensurate with Buyer's salary and benefits with consideration to their training and experience and subject to Buyer's due diligence review, employment policies, and operational needs as well as any pandemic or acts of God outside Buyer's control.

(b) Nothing herein shall be deemed to affect or limit in any way the normal management prerogatives of Buyer with respect to the non-clinician employees of Seller (including, without limitation, the right of Buyer to establish and/or modify the terms and conditions of employment of any such employee), alter any employment-at-will relationship between Buyer and any such employees, or create or grant to any such employees third-party beneficiary rights or claims of any kind or nature.

(c) In respect of the non-clinician employees of the Seller employed by Buyer, Buyer shall provide such employees with employee benefits consistent with the benefits generally offered to employees of Buyer, in the same geographic area as the Seller. On or prior to the Closing Date, Seller shall pay all employees for their actual accumulated and unused vacation and holiday pay to the Closing Date, to the extent accrued and to the extent applicable pursuant to Seller's ordinary business practices and policies or Legal Requirements applicable to Seller.

**10.9.** ***Payment of All Taxes Resulting From Sale of Assets by Seller*****.** Seller shall pay in a timely manner all taxes resulting from or payable in connection with the sale of the Assets pursuant to this Agreement, regardless of the person or entity on whom such taxes are imposed by Legal Requirements which amount shall be added to the Wind-Down Amount provided, further, that in no event shall Wind-Down Amount exceed the amount set forth in Section 1.5.

**10.10.** ***Payment of Other Retained Liabilities*****.** In addition to payment of taxes pursuant to <u>Section 10.9</u>, Seller shall pay, or make adequate provision for the payment, in full of all Excluded Liabilities the failure of which to be paid or provided for might reasonably be determined to impair Buyer's use or enjoyment of the Assets or the Transferring Clinicians' practice of medicine; provided, however, that Seller shall be entitled to contest in good faith any liability by appropriate Proceedings.

**10.11.** ***Collection of Accounts Receivable*****.** Seller shall retain title to all accounts receivable for services rendered by Seller prior to the Effective Time (the "**Pre-Closing Accounts Receivable**"). Seller shall maintain Seller's current billing and collections agreement with Athena, or enter into a separate billing and collections arrangement, to enable Seller to bill and collect the

Pre-Closing Accounts Receivable. Seller shall remit to Buyer all amounts actually collected on the Pre-Closing Accounts Receivable within fifteen (15) days after the end of each calendar month in which such amounts are received. Seller shall provide Buyer with a monthly accounting statement summarizing collections received, amounts remitted, and the outstanding balance of Pre-Closing Accounts Receivable. Seller's obligation to collect Pre-Closing Accounts Receivable shall continue for a period not to exceed twelve (12) months following the Closing Date (the "**Collection Period**"). Any refunds, recoupments, or adjustments required by any payor (including Medicare, Medicaid, or any other Governmental Body or third-party payor) with respect to services rendered prior to the Effective Time shall be the sole responsibility of Seller, and Seller shall indemnify Buyer for any such amounts paid or offset by Buyer.

**10.12.** ***Dissolution following Closing*.** Seller agrees that immediately following the Closing Date it will begin to wind down its affairs and prepare such filings as are necessary to dissolve Seller, which dissolution shall occur no later than fifteen (15) months following the Closing or another date as mutually agreed to by the Parties.

## 11. Indemnification.

**11.1.** ***Indemnification by Buyer***. Subject to the limitations set forth in Section 11.3 hereof, Buyer shall defend, indemnify and hold harmless Seller, the Owners and their respective Affiliates, and its and their respective officers, employees, agents or independent contractors (collectively, "**Seller Indemnified Parties**"), from and against any and all losses, liabilities, damages, costs (including, without limitation, court costs and costs of appeal) and expenses (including, without limitation, reasonable attorneys' fees and fees of expert consultants and witnesses) ("**Losses**") that such Seller Indemnified Party incurs as a result of, or with respect to (i) any misrepresentation or breach of warranty by Buyer under this Agreement, (ii) any breach by Buyer of, or any failure by Buyer to perform, any covenant or agreement required to be performed by Buyer under this Agreement, or (iii) any claim with respect to the Assumed Liabilities or Assets that arises as a result of any action following the Effective Time.

**11.2.** ***Indemnification by Seller*.** Seller shall defend, indemnify and hold harmless Buyer and its Affiliates, and its and their respective officers, employees, agents, or independent contractors (collectively, "**Buyer Indemnified Parties**"), from and against any and all Losses that such Buyer Indemnified Party incurs as a result of, or with respect to (i) any misrepresentation or breach of warranty by Seller or the Owners under this Agreement, (ii) any breach by Seller or the Owners of, or any failure by Seller or the Owners to perform, any covenant or agreement required to be performed by Seller or the Owners under this Agreement, (iii) any of the Excluded Liabilities or Excluded Assets, (iv) any malpractice or other claim made by a third party with respect to the operation of the Practice, the Assets or Assumed Liabilities prior to the Effective Time, (v) Seller's or any Owner's failure to repay any portion of the Purchase Price pursuant to Section 1.6, (vi) any HIPAA violation, data breach, or unauthorized disclosure of patient information arising from or related to the operation of the Practice prior to the Effective Time, (vii) any violation of the Stark Law, Anti-Kickback Statute, False Claims Act, or other Health Care Laws arising from or related to the operation of the Practice prior to the Effective Time, or (viii) any liability arising from the employment or termination of any employee of Seller prior to the Effective Time, including any claims under WARN or similar state laws.

**11.3. *Limitations*.** No party shall be liable for any indemnification pursuant to Section 11.1(i) or Section 11.2(i), as applicable, for any claims for misrepresentations and breaches of warranty which are the basis upon which any other party shall have failed to consummate the transactions described herein pursuant to Section 7.1 or Section 8.1, as applicable, or which are based upon misrepresentations and breaches of warranty which have been waived pursuant to the initial paragraph of Section 7 or Section 8, as applicable.

**11.4. *Notice and Control of Litigation*.** If any claim or liability is asserted in writing by a third party against a party entitled to indemnification under this Section 11 (the "**Indemnified Party**") which would give rise to a claim under this Section 11, the Indemnified Party shall notify the person giving the indemnity (the "**Indemnifying Party**") in writing of the same within fifteen (15) days of receipt of such written assertion of a claim or liability. The Indemnifying Party shall have the right to defend a claim and control the defense, settlement, and prosecution of any litigation. If the Indemnifying Party, within ten (10) days after notice of such claim, fails to defend such claim, the Indemnified Party shall (upon further notice to the Indemnifying Party) have the right to undertake the defense, compromise, or settlement of such claim on behalf of and for the account and at the risk of the Indemnifying Party, subject to the right of the Indemnifying Party to assume the defense of such claim at any time prior to settlement, compromise, or final determination thereof. Anything in this Section 11.4 notwithstanding, (i) if there is a reasonable probability that a claim may materially and adversely affect the Indemnified Party other than as a result of money damages or other money payments, the Indemnified Party shall have the right, at its own cost and expense, to defend, compromise, and settle such claim, and (ii) the Indemnifying Party shall not, without the written consent of the Indemnified Party, settle or compromise any claim or consent to the entry of any judgment which does not include as an unconditional term thereof the giving by the claimant to the Indemnified Party of a release from all liability in respect of such claim. The foregoing rights and agreements shall be limited to the extent of any requirement of any third-party insurer or indemnitor. All parties agree to cooperate fully as necessary in the defense of such matters. Should the Indemnified Party fail to notify the Indemnifying Party in the time required above, the indemnity with respect to the subject matter of the required notice shall be limited to the damages that would have resulted absent the Indemnified Party's failure to notify the Indemnifying Party in the time required above after taking into account such actions as could have been taken by the Indemnifying Party had it received timely notice from the Indemnified Party.

**11.5. *Notice of Claim*.** If an Indemnified Party becomes aware of any breach of the representations or warranties of the Indemnifying Party hereunder or any other basis for indemnification under this Section 11, the Indemnified Party shall notify the Indemnifying Party in writing of the same within ten (10) days after becoming aware of such breach or claim, specifying in detail the circumstances and facts which give rise to a claim under this Section 11. Should the Indemnified Party fail to notify the Indemnifying Party within the time frame required above, the indemnity with respect to the subject matter of the required notice shall be limited to the damages that would have nonetheless resulted absent the Indemnified Party's failure to notify the Indemnifying Party in the time required above after taking into account such actions as could have been taken by the Indemnifying Party had it received timely notice from the Indemnified Party.

**11.6. *Disputes as to Indemnification Claims*.** Upon written notice by an

Indemnified Party of any Losses believed to be subject to the indemnification provisions of Section 11.1 or 11.2, the parties shall in good faith use commercially reasonable efforts to resolve such claim or claims (each a "**Claim**") within thirty (30) days of such notice (the "**Resolution Period**"). If the parties are not successful in resolving any Claim by the end of the Resolution Period, then the Claim shall be settled by arbitration administered by the American Health Lawyers Association ("**AHLA**") under its then-current commercial arbitration rules. The arbitration shall be heard by a single arbitrator selected by AHLA from the National Panel of Commercial Arbitrators and all arbitration proceedings that cannot be conducted by telephone shall be conducted solely within Lehigh County, Pennsylvania. The arbitrator shall have the authority to award the substantially prevailing party the reasonable attorneys' fees incurred by that party in connection with the arbitration. Each party shall otherwise pay their own attorneys' fees in connection with the arbitration and shall equally bear the costs of AHLA which shall expressly include the fees of the arbitrator so appointed. Judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof, and the party entering judgment on the award shall be entitled to also recover any and all attorneys' fees and court costs incurred in connection with entering judgment on the award of the arbitrator. The decision of the arbitrator shall be binding arbitration decision (the "**Final Arbitration Decision**").

**11.7.** ***Exclusive Remedy.*** The parties acknowledge and agree that, after the Closing, the indemnification provisions in this Section 11 shall be the sole and exclusive remedy of the parties and their Affiliates with respect to any claim related to or arising from this Agreement, the negotiation and execution of this Agreement, the performance by the parties of their respective obligations hereunder, and the transactions contemplated by this Agreement. The parties may not avoid the limitations on liability, recovery and recourse set forth in this Section 11 by seeking damages for breach of contract, tort or pursuant to any other theory or liability. Nothing in this Section 11.7 shall prevent or prohibit a party from seeking and/or obtaining specific performance in accordance with Section 12.7.

**12. Miscellaneous.**

**12.1.** ***Schedules and Other Instruments.*** Each Schedule and Exhibit to this Agreement shall be considered a part hereof as if set forth herein in full. Seller acknowledges that it has not provided complete Disclosure Schedules to Buyer and shall deliver complete Disclosure Schedules and all supporting documentation to Buyer within seven (7) days (or such longer period as is agreed by the parties hereto in writing) after the Effective Date which, for the avoidance of doubt, shall include any updates to the Disclosure Schedules that are being delivered to Buyer on the Effective Date. Buyer shall have thirty (30) days following receipt of the complete Disclosure Schedules (the "**Schedule Review Period**") to review such Disclosure Schedules. If Buyer determines, in its sole and absolute discretion, that any Disclosure Schedule or the information contained therein is not acceptable to Buyer, Buyer may terminate this Agreement by delivering written notice to Seller prior to the expiration of the Schedule Review Period, without any liability to Buyer and without prejudice to any other rights or remedies available to Buyer. From the Effective Date until the Closing Date, Seller may update its Schedules solely to reflect changes in facts or circumstances occurring after the Effective Date, subject to Buyer's prior written approval, which approval may be withheld in Buyer's sole discretion. Buyer may update its Schedules at any time prior to the Closing Date. It shall be a condition precedent to Buyer's obligations

hereunder that each of the Schedules, Exhibits, and related documents, instruments, books, and records shall be in form and substance satisfactory to Buyer in its sole discretion. If at any time prior to the end of the Schedule Review Period, Buyer determines that it should not consummate the Contemplated Transactions because of any information contained in any Schedule, Exhibit, or other instrument delivered to Buyer after the Effective Date, Buyer may terminate this Agreement by delivering written notice to Seller, without any liability to Buyer.

**12.2.** ***Additional Assurances.*** The provisions of this Agreement shall be self-operative and shall not require further agreement by the parties except as may be herein specifically provided to the contrary; provided, however, at the request of a party, the other party or parties shall execute such additional instruments and take such additional actions as the requesting party may deem necessary to effectuate this Agreement. In addition, and from time to time after Closing, Seller shall execute and deliver such other instruments of conveyance and transfer, and take such other actions as Buyer reasonably may request, more effectively to convey and transfer full right, title, and interest to, vest in, and place Buyer in legal and actual possession of, any and all of the Practice and the Assets. Seller shall also furnish Buyer with such information and documents in its possession or under its control, or which Seller can execute or cause to be executed, as will enable Buyer to prosecute any and all petitions, applications, claims, and demands relating to or constituting a part of the Practice or the Assets. Additionally, Seller shall cooperate and use commercially reasonable efforts to have the Owners, directors, officers, and employees cooperate with Buyer on and after Closing in furnishing information, evidence, testimony, and other assistance in connection with any action, proceeding, arrangement, or dispute of any nature with respect to matters pertaining to all periods prior to the Effective Time in respect of the items subject to this Agreement.

**12.3.** ***Expenses.*** Except as otherwise provided in this Agreement including, but not limited to, the indemnification provisions of Section 11, each party to this Agreement will bear its respective fees and expenses incurred in connection with the preparation, negotiation, execution and performance of this Agreement and the Contemplated Transactions, including all fees and expense of its Representatives. If this Agreement is terminated, the obligation of each party to pay its own fees and expenses will be subject to any rights of such party arising from a breach of this Agreement by another party.

**12.4.** ***Confidentiality.*** It is understood by the parties hereto that the information, documents, and instruments delivered to Buyer by Seller and its agents and the information, documents, and instruments delivered to Seller by Buyer and its agents are of a confidential and proprietary nature (the "**Confidential Information**"). Each of the parties hereto agrees that both prior and subsequent to the Effective Time it will maintain the confidentiality of all such Confidential Information delivered to it by each of the other parties hereto or their Representatives in connection with the negotiation of this Agreement or in compliance with the terms, conditions, and covenants hereof and will only disclose such information, documents, and instruments to its Representatives and applicable Governmental Bodies in connection with any Legal Requirement, Governmental Authorization or Proceeding. Each of the parties hereto further agrees that if the Contemplated Transactions are not consummated, it will return all such Confidential Information and all copies thereof in its possession to the other parties to this Agreement. Each of the parties hereto recognizes that any breach of this Section 12.4 would result in irreparable harm to the other party to this Agreement and its Affiliates and that, therefore, either Seller or Buyer shall be entitled

to an injunction to prohibit any such breach or anticipated breach, without the necessity of posting a bond, cash, or otherwise, in addition to all of its other legal and equitable remedies. Nothing in this Section 12.4, however, shall prohibit the use of such Confidential Information for such filings with respect to Governmental Authorization as in the opinion of Seller's counsel or Buyer's counsel are required by Legal Requirements or required in connection with any Proceeding.

**12.5.** ***Public Announcements.*** Any public announcement, press release or similar publicity with respect to this Agreement or the Contemplated Transactions will be issued, if at all, at such time and in such manner as mutually agreed upon by the parties. Except with the prior consent of the other party hereto, none of the parties to this Agreement nor any of their Representatives or Affiliates shall disclose to any person or entity (i) the fact that any Confidential Information of Seller or the Owners has been disclosed to Buyer or its Representatives, that Buyer or its Representatives have inspected any portion of the Confidential Information of Seller or the Owners, (ii) that any Confidential Information of Buyer has been disclosed to Seller, the Owners or their Representatives or that Seller, the Owners or their Representatives have inspected any portion of the Confidential Information of Buyer or (iii) any information about the Contemplated Transactions, including the status of such discussions or negotiations, the execution of any documents (including this Agreement) or any of the terms of the Contemplated Transactions or the related documents (including this Agreement). Each party will consult with the other party concerning the means by which Seller's employees, customers, suppliers and others having dealings with Seller will be informed of the Contemplated Transactions, and each party will have the right to be present for any such communication.

**12.6.** ***Notices.*** Any notices and other communications to be given hereunder shall be in writing and shall be deemed to have been duly given when delivered by hand, when received by receipted overnight delivery, or five (5) days after such notice is mailed, by registered or certified mail, postage prepaid, return receipt requested, addressed to such party as follows or to such other addresses as a party hereto may from time to time give written notice to the other party:

If to Buyer, then to:

Lehigh Valley Health Network
One City Center
707 Hamilton Street — 7th Floor
P.O. Box 1806
Allentown, Pennsylvania 18105
Attn: President

and with a copy to:

Attn: Chief Legal Officer
Lehigh Valley Health Network
One City Center
707 Hamilton Street — 7th Floor
P.O. Box 1806
Allentown, Pennsylvania 18105

and with a copy to:

Kimberly Rai
Holland & Knight LLP
787 Seventh Avenue, 31st Floor
New York, New York 10019

and

Domenic E. Pacitti
Klehr Harrison Harvey Branzburg LLP
919 N. Market Street, Suite 1000
Wilmington, DE 19801

If to Seller or the Owners, then to:

Pottstown Medical Specialists, Inc.
1610 Medical Drive Suite 101
Pottstown, PA 19464
Attn: Tim Rimmer, Interim CEO and Wade Brosius, CMO

An H. Pham, M.D.
110 Chinaberry Lane
Collegeville PA 19426

Birgit Wiswe, M.D.
1773 Morgan Lane,
Collegeville, PA 19426

Kenneth C. Bingener, D.O.
91 Lenape Road
Barto, PA 19504

Paul P. Doghramji, M.D.
2076 St Andrews Drive
Berwyn, PA 19312

Wade A. Brosius, D.O.
29 Victory Way
Limerick, PA 19468

William G. Cano, M.D.
209 Nottingham Dr
Spring City, PA 19475

and with a copy to:

Susan B. Orr
Dilworth Paxson LLP
1650 Market Street, Suite 1200
Philadelphia, PA 19103

**12.7. *Enforcement of Agreement.*** Each party acknowledges and agrees that the other parties may be irreparably damaged if any of the provisions of this Agreement are not performed in accordance with their specific terms and that any breach of this Agreement by a party may not be adequately compensated in all cases by monetary damages alone. Accordingly, in addition to any other right or remedy to which a party may be entitled, at law or in equity, each party shall be entitled to enforce any provision of this Agreement by a decree of specific performance and to temporary, preliminary and permanent injunctive relief to prevent breaches or threatened breaches of any of the provisions of this Agreement, without posting any bond or other undertaking.

**12.8. *Waiver; Remedies Cumulative.*** The rights and remedies of the parties to this Agreement are cumulative and not alternative. Neither any failure nor any delay by any party in exercising any right, power or privilege under this Agreement or any of the documents referred to in this Agreement will operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege. To the maximum extent permitted by applicable law, (i) no claim or right arising out of this Agreement or any of the documents referred to in this Agreement can be discharged by one party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other party; (ii) no waiver that may be given by a party will be applicable except in the specific instance for which it is given; and (iii) no notice to or demand on one party will be deemed to be a waiver of any obligation of that party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the documents referred to in this Agreement.

**12.9. *Survival***. All of the representations, warranties, covenants, and agreements made by the parties in this Agreement or pursuant hereto in any certificate, instrument, or document shall survive the consummation of the transactions described herein, and may be fully and completely relied upon by Seller and Buyer, as the case may be, notwithstanding any investigation heretofore or hereafter made by any of them or on behalf of any of them, and shall not be deemed merged into any instruments or agreements delivered at the Closing or thereafter. Notwithstanding anything in this Section 12.9 which may be to the contrary, any claim, demand, or cause of action with respect to a breach of any representation or warranty made in this Agreement (other than representations or warranties contained in Sections 3.1, 3.2, 3.3, 3.10, 4.1 and 4.2 which shall survive indefinitely, and the representations or warranties contained in Sections 3.7, 3.8, 3.9, 3.12, 3.13, 3.14, 3.15, 3.16 and 3.17, which shall survive until the longer of five (5) years or ninety (90) days after the expiration of the applicable statute of limitations relating to the underlying claim, including extensions and waivers), must be made or brought, if at all, within two (2) years after the Closing. For the avoidance of doubt, this Section 12.9 shall not affect any rights to bring claims after two (2) years based on (x) any covenant or agreement of the parties which contemplates performance after the Closing, (y) the obligations of Buyer under Section 11.1(ii)11.1 or 11.1(iii) or (z) the obligations of Seller under Section 11.2(ii), 11.2(iii), 11.2(iv) or

11.2(v).

**12.10.** ***Waiver of Jury Trial.*** EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHTS IT MAY HAVE TO DEMAND THAT ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT OR THE RELATIONSHIPS OF THE PARTIES HERETO BE TRIED BY JURY. THIS WAIVER EXTENDS TO ANY AND ALL RIGHTS TO DEMAND A TRIAL BY JURY ARISING FROM ANY SOURCE INCLUDING, BUT NOT LIMITED TO, THE CONSTITUTION OF THE UNITED STATES OR ANY STATE THEREIN, COMMON LAW OR ANY APPLICABLE STATUTE OR REGULATIONS. EACH PARTY HERETO ACKNOWLEDGES THAT IT IS KNOWINGLY AND VOLUNTARILY WAIVING ITS RIGHT TO DEMAND TRIAL BY JURY.

**12.11.** ***Entire Agreement and Modification.*** This Agreement supersedes all prior agreements, whether written or oral, between the parties with respect to its subject matter (including any letter of intent and any confidentiality agreement between Buyer and Seller and the Owners) and constitutes (along with the Schedules, Exhibits and other documents delivered pursuant to this Agreement) a complete and exclusive statement of the terms of the agreement among the parties with respect to its subject matter. This Agreement may not be amended, supplemented, or otherwise modified except by a written agreement executed by the party to be charged with the amendment.

**12.12.** ***Assignment, Successors and Third-Party Rights.*** No party may assign any of its rights or delegate any of its obligations under this Agreement without the prior written consent of the other parties, except that Buyer may assign any of its rights and delegate any of its obligations under this Agreement to any Affiliate of Buyer. Subject to the preceding sentence, this Agreement will apply to, be binding in all respects upon and inure to the benefit of the successors and permitted assigns of the parties. Nothing expressed or referred to in this Agreement will be construed to give any person or entity other than the parties to this Agreement any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement, except such rights as shall inure to a successor or permitted assignee pursuant to this Section.

**12.13.** ***Severability.*** If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

**12.14.** ***Construction.*** The headings of Sections in this Agreement are provided for convenience only and will not affect its construction or interpretation.

**12.15.** ***Time of Essence.*** With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

**12.16.** ***Governing Law.*** This Agreement will be governed by and construed under the laws of the Commonwealth of Pennsylvania, without regard to conflicts-of-laws principles that

would require the application of any other law.

**12.17.** ***Execution of Agreement.*** This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement. The exchange of copies of this Agreement and of signature pages by facsimile or other electronic transmission shall constitute effective execution and delivery of this Agreement as to the parties and may be used in lieu of the original Agreement for all purposes. Signatures of the parties transmitted by facsimile or other electronic transmission shall be deemed to be their original signatures for all purposes.

**12.18.** ***Knowledge.*** Knowledge, when used to qualify any representation or warranty, means that such party has no actual knowledge after due inquiry that such representation or warranty is not true and correct to the same extent as provided in the applicable representation or warranty. For the purpose of this definition, "**Seller's Knowledge**" means the actual knowledge of (i) the Seller's President, or (ii) the Seller's Chief Financial Officer, or (iii) the Owners. The "**Buyer's Knowledge**" means the actual knowledge of the Buyer's (i) President; (ii) Chief Financial Officer; or (iii) Chief Legal Officer.

**12.19.** ***Owners' Obligations.*** The liability of the Owners hereunder shall be joint and several with Seller. Where in this Agreement Seller makes a representation or warranty to Buyer, the Owners jointly and severally make such representation and warranty. Where in this Agreement provision is made for any action to be taken or not taken by Seller, the Owners undertake to cause Seller to take or not take such action, as the case may be. Without limiting the generality of the foregoing, the Owners shall be jointly and severally liable with Seller for the indemnities set forth in Section 11.2.

**12.20.** ***Affiliates.*** As used in this Agreement, the term "**Affiliate**" means, as to the person or entity in question, any person or entity that directly or indirectly controls, is controlled by or is under common control with, the person or entity in question and the term "control" means possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person or entity whether through ownership of voting securities, by contract or otherwise.

**12.21.** ***Accounting Date.*** The Contemplated Transactions shall be effective for accounting purposes as of 12:01 a.m. Allentown, Pennsylvania time on the Closing Date.

**12.22.** ***Risk of Loss.*** Notwithstanding any other provision hereof to the contrary, the risk of loss in respect of casualty to the Assets shall be borne by Seller prior to the Closing Date and by Buyer thereafter.

**[Signature pages follows]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly signed, all as of the date first above written.

**BUYER:**
**Thomas Jefferson University**

Baligh Yehia (Aug 28, 2026 18:29:37 EDT)
By:__________________________________
Name:
Title:

**SELLER:**
**Pottstown Medical Specialists, Inc.**
By: ______________________________
Name:
Title:

**OWNERS:**

____________________________________ ____________________________________

____________________________________ ____________________________________

____________________________________ ____________________________________

____________________________________

____________________________________

Docusign Envelope ID: 811CF3B2-B61E-8928-8125-2EE427AC9499

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly signed, all as of the date first above written.

**BUYER:**
**Thomas Jefferson University**

By:________________________________
Name:
Title:

**SELLER:**
**Pottstown Medical Specialists, Inc.**

By: Signed by: Timothy B. Rimmer 274958BC8E6240D...
Name: Timothy B. Rimmer
Title: Interim Chief Executive Officer

**OWNERS:**

DocuSigned by: An Pham F5D976F5646A4CA...

An H. Pham, M.D.

Signed by: Ken Bingener AA10F89CFBB5472...

Kenneth C. Bingener, D.O.

DocuSigned by: 049C6D9D8EA643F...

Wade A. Brosius, D.O.

DocuSigned by: William Cano A9DA8108719B417...

William G. Cano, M.D.

Signed by: C6D74DB988C44EB...

Birgit Wiswe, M.D.

DocuSigned by: Paul Doghramji 3B890E2FE0CC401...

Paul P. Doghramji, M.D.

# SCHEDULES TO THE

# ASSET PURCHASE AGREEMENT

# BY AND AMONG

# THOMAS JEFFERSON UNIVERSITY

# AND

# POTTSTOWN MEDICAL SPECIALISTS, INC.

# AND

# ITS OWNERS

---

**September 29, 2026**

**Schedule 1.1(a)**

**Assets**

*Initial list of tangible assets to be updated based on Buyer's forthcoming diligence.*

**1.1(g)**

**Assumed Contracts**

A. All lease agreements related to the properties located below:

1. 1610 Medical Drive Suite 101, Pottstown, Montgomery County, PA 19464
2. 1566 Medical Drive Office Building Suite 201, Lower Pottsgrove Township, PA 19464
3. 223 Shoemaker Road Suite 105, Pottstown, PA 19464
4. 555 2nd Avenue Building C 450, Collegeville, PA 19426
5. 307 South Lewis Rd, Royersford, PA 19464
6. 1555 Medical Drive, Pottstown, PA, 19464
7. 23 N. Walnut Street, Boyertown, PA 19512
8. 1601 Medical Drive, Pottstown, PA 19464

B. Kriebel Security, Inc. Security Agreements for each of the following locations:

1. 1610 Medical Drive Suite 101, Pottstown, Montgomery County, PA 19464
2. 1566 Medical Drive Office Building Suite 201, Lower Pottsgrove Township, PA 19464
3. 223 Shoemaker Road Suite 105, Pottstown, PA 19464
4. 555 2nd Avenue Building C 450, Collegeville, PA 19426
5. 307 South Lewis Rd, Royersford, PA 19464
6. 1555 Medical Drive, Pottstown, PA, 19464
7. 23 N. Walnut Street, Boyertown, PA 19512
8. 1601 Medical Drive, Pottstown, PA 19464

C. Medical Service Agreement: Owen J. Roberts School System

D. Medical Service Agreement: The Hill School

E. Medical Director Agreement: Ursinus College – to be entered into

F. Iron Mountain

1. Records Management & Services Agreement (2002)

2. Customer Agreement (2005)

## Schedule 2.3 (b)

## Employment Agreements of Transferring Clinicians

1. Bankole, M.D.
2. Battista, C.R.N.P.
3. Bertrand, CRNP
4. Bingener, D.O.
5. Brosius, D.O.
6. Bussmann, PA-C
7. Cano, D.O.
8. Churach, C.R.N.P.
9. Doghramji, M.D.
10. Dorsey, C.R.N.P.
11. Ferguson, M.D.
12. Gieringer, PA-C
13. Gill, M.D.
14. Harrison, D.O.
15. Hoffman, P.A.
16. Hull, C.R.N.P.
17. Javardian, P.A.
18. Karnam, M.D.
19. Kim, D.O.
20. King, C.R.N.P.
21. Mehta, D.O.
22. Petruso, D.O.
23. Pham, M.D.
24. Rodriguez, C.R.N.P.
25. Sultana, M.D.
26. Weimer-Fitzpatrick, M.D.
27. Wiswe, M.D.
28. Ziegler, P.A.

## Schedule 2.3(d)

## Secured Debtors of Seller

Fulton Bank, N.A.

Business Loan Agreement

Promissory Note

Commercial Guaranty Agreements with each of the following:

Paul Doghramji
Ann Pham
Birgit Wiswe
Keith Harrison
William Cano
Wade Broscious
Peter Blackstone
Kenneth Bingener

Meridian Bank

Business Loan Agreement

Promissory Note

Corporate Resolution to Borrow Money/Grant Collateral

Commercial Guaranty Agreements with each of the following:

Paul P. Doghramji, Sr.
An H. Pham
Birgit M. Wiswe
Keith W. Harrison
William G. Cano
Wade A. Broscious
Sebahath H. Jaleel
Kenneth C. Bingener
Pottstown Medical Specialists, Inc.

Seller will provide all required pay off letters in accordance with the Agreement.

**Schedule 2.3(e)**

**Indebtedness of Seller under Federal or State Loans/Grants**

Paid in full Paycheck Protection Program Promissory Note, certified on August 19, 2021.

**Schedule 3.3**

**Capitalization**

| **Shareholder** | **Ownership Percentage** |
|---|---|
| An H. Pham, M.D. | 14.2857% |
| Birgit Wiswe, M.D. | 14.2857% |
| Kenneth C. Bingener, D.O. | 14.2857% |
| Paul P. Doghramji, M.D. | 14.2857% |
| Sabahath Jaleel, M.D. | 14.2857% |
| Wade A. Brosius, D.O. | 14.2857% |
| William G. Cano, M.D. | 14.2857% |

**Schedule 3.4**

**Financial Statements**

See attached.

**Schedule 3.5(c)**

**Certain Post-Statement Date Results**

*See the attached Executed Bill of Sale for the Trailer.*

**Schedule 3.12(a)**

**Real Property Leases for Offices Owned in part by the Owners**

The landlord for the property located at 555 2nd Avenue Building C 450, Collegeville, PA 19426 is MTB Associates, LLC which is owned 50% by Birgit Wiswe, M.D. and 50% by her spouse.

The landlord for the property located at 1555 Medical Drive, Pottstown, PA, 19464, is Brookside Professional Building, L.P. Paul Doghramji, M.D. is a one third limited partner in the LP and a one third partner in Brookside Professional Building, GP.

## Schedule 3.15

## Legal Requirements; Proceedings

1. A Non-Spoliation Demand and Litigation Hold Notice on behalf of Dr. Sabahath Jaleel dated July 30, 2026 was sent to Seller. Her attorney alleges a violation of the Pennsylvania Wage and Payment Law for failure to remit wages and breach of contract claim for failure to maintain the standard of care.

2. Rajiv Dhawan, M.D. Loss Date: 08/01/2018, Allegation is improper cardiac clearance for surgery. Expense paid to date: $82,919.08, Expense recovered: $94.22, Total Incurred: $130,005.00. Seller expects the claim to be covered by insurance.

3. PMSI, Loss date: 08/01/2018, Vicarious liability related to improper cardiac clearance for surgery. Total incurred: $5,005.00. Seller expects the claim to be covered by insurance.

**Schedule 3.16**

**Employee Benefit Plans**

Medical Health Plan: Highmark PPO

Health Savings Account

Dental

Vision

Employee Assistance Program

401(k) Retirement Benefits

Life, Accidental Death & Dismemberment

Voluntary

- Disability
- Critical Care
- Hospital Indemnity
- Accident

**Schedule 3.17(a)**

**Employee List**

*See attached list of employees, their current position, current compensation, date of hire, any change of compensation and accrued but unused vacation.*

***Schedule 3.17 (d)***

***Threatened Claim***

*See Dr. Jaleel's threatened claim on Schedule 3.15.*

**Schedule 3.18**

**Contracts**

Athena - Advisory Services Managed Services

Athena – Master Services Agreement

Athena - Coding Services Addendum

Altera Digital Health, Inc - Touchworks Extension and Add On Amendment

Altera CCM Service Agreement

Allscripts

C & S Agreement

Fairway Management Services, Inc.

Heffler, Radetich & Saitta, LLP

Iron Mountain:

Records Management & Services Agreement (2002)

Customer Agreement (2005)

Medical Service Agreement - OJR School District

Medical Service Agreement – The Hill School

Kriebel Security, Inc.: One contact per office location

2. 1610 Medical Drive Suite 101, Pottstown, Montgomery County, PA 19464
3. 1566 Medical Drive Office Building Suite 201, Lower Pottsgrove Township, PA 19464
4. 223 Shoemaker Road Suite 105, Pottstown, PA 19464
5. 555 2nd Avenue Building C 450, Collegeville, PA 19426
6. 307 South Lewis Rd, Royersford, PA 19464
7. 1555 Medical Drive, Pottstown, PA, 19464
8. 23 N. Walnut Street, Boyertown, PA 19512

9. 1601 Medical Drive, Pottstown, PA 19464

LEAF Capital Funding

The lease agreements related to the properties located below:

- 1610 Medical Drive Suite 101, Pottstown, Montgomery County, PA 19464
- 1566 Medical Drive Office Building Suite 201, Lower Pottsgrove Township, PA 19464
- 223 Shoemaker Road Suite 105, Pottstown, PA 19464
- 555 2nd Avenue Building C 450, Collegeville, PA 19426
- 307 South Lewis Rd, Royersford, PA 19464
- 1555 Medical Drive, Pottstown, PA, 19464
- 23 N. Walnut Street, Boyertown, PA 19512
- 1601 Medical Drive, Pottstown, PA  19464

Peter Blackstone Buy Out Agreement, which is an unsecured creditor

Keith Harrison Buy Out Agreement, which is an unsecured creditor

Quadient Finance USA, Inc - Postage Meter Lease

Respironics Sleep VIP Program Enrollment Agreement, by and between Philips Respironics and Pottstown Medical Specialists, Inc.

Standard Preventative Maintenance Service Agreement for Morgan Scientific Pulmonary Function Equipment, by and between Respitech Medical, Inc. and Pottstown Medical

The Logic Group

Topcon Screen Agreement, by and between Topcon Healthcare Solutions, Inc. and PMSI

**Schedule 3.19**

**Insurance**

1. Property & General Liability: Erie Insurance

   Covered Locations:

   - Royersford
   - Boyertown
   - Collegeville
   - Multiple Pottstown medical office locations

   Key Property Coverages:

   - Business Personal Property (medical equipment, furniture, computers, office contents)
   - Blanket Property Limit: $2,894,700
   - Business Income & Extra Expense Coverage
   - Replacement Cost Valuation
   - Property Deductible: $2,500

   General Liability Limits:

   - $2,000,000 Each Occurrence
   - $4,000,000 General Aggregate
   - $4,000,000 Products/Completed Operations Aggregate
   - $2,000,000 Personal & Advertising Injury
   - $2,000,000 Damage to Premises Rented to You

   Additional Coverage:

   - Employee Dishonesty: $500,000
   - Terrorism Coverage Included
   - Various landlord and leasing-related additional insured endorsements

2. Workers Compensation & Employer Liability: Erie Insurance

   Employers Liability Limits:

   - $500,000 Each Accident
   - $500,000 Disease Policy Limit
   - $500,000 Disease Each Employee

   Coverage Applies:

   - Pennsylvania operations

- Other states coverage included as needed (subject to policy provisions)

3. Cyber Liability & Cyber Crime: State National/CFC

Cyber Liability

Policy Limit: $2,000,000 Aggregate
Deductible: Generally, $10,000 per claim

Provides immediate resources and reimbursement following a cyber event, including:

- Breach response management
- Computer forensic investigations
- Legal and privacy counsel
- Patient/customer notification expenses
- Credit monitoring services
- Public relations and crisis management expenses

Cyber Crime / Financial Fraud

Protects against theft of company funds resulting from cybercrime.

Coverage includes:

- Funds transfer fraud
- Social engineering fraud
- Cyber extortion / ransomware payments
- Telephone toll fraud
- Electronic theft of money and securities

Limit: Up to $250,000 per coverage section

4. Directors & Officers/Employment Practices Liability: Lexington Insurance Company (AIG)

Directors & Officers (D&O) Coverage:

Protects executives, officers, board members, and the organization against claims alleging:

- Mismanagement
- Breach of fiduciary duty
- Governance-related decisions
- Regulatory investigations
- Certain shareholder or stakeholder claims

Employment Practices Liability (EPL):

Protects against claims alleging:

- Wrongful termination
- Discrimination
- Harassment
- Retaliation
- Other employment-related allegations

Additional Features:

- Crisis management expense coverage
- Workplace violence expense coverage
- Training cost reimbursement
- Wage and hour defense cost coverage (subject to policy provisions)
- Employee privacy and biometric information defense coverage

Primary Risks Addressed:

- Employment lawsuits
- Executive liability exposures
- Regulatory investigations
- Board governance claims
- Management decision-related litigation

5. Commercial Automobile: Erie Insurance

Covered Vehicles: One owned vehicle, plus hired and non-owned auto exposure.

Liability Coverage

- Automobile Liability: $1,000,000 Combined Single Limit per Accident
- Hired Auto Liability: $1,000,000 per Accident
- Non-Owned Auto Liability: $1,000,000 per Accident

Medical & Injury Coverages

- First Party Medical Benefits: $5,000
- Uninsured Motorist Coverage: $1,000,000
- Underinsured Motorist Coverage: $1,000,000

Physical Damage Coverage

- Comprehensive Coverage: $500 Deductible
- Collision Coverage: $500 Deductible

Primary Risks Addressed

- Automobile accidents involving company vehicles
- Employee use of personal vehicles on company business
- Rental vehicle liability exposures
- Damage to company-owned vehicles
- Injuries caused by uninsured or underinsured motorists

6. Business Catastrophe Liability (Umbrella): Erie Insurance

Limits

- $3,000,000 Each Occurrence
- $3,000,000 Aggregate Limit

Underlying Policies Supported

General Liability

- $2,000,000 Each Occurrence
- $4,000,000 General Aggregate

Commercial Auto

- $1,000,000 Liability Limit

Employers Liability

- $500,000 Each Accident
- $500,000 Disease Policy Limit

- $500,000 Disease Each Employee

The umbrella policy protects the organization against catastrophic claims that exceed primary insurance limits, including:

- Major bodily injury claims
- Serious automobile accidents
- Catastrophic employment injury lawsuits
- Large premises liability claims
- Significant litigation involving multiple injured parties

Primary Risks Addressed

- Catastrophic liability losses
- Excess jury verdicts
- Large settlement demands
- Severe injury or property damage claims
- Multi-claim or high-profile litigation exposures

7. Professional Liability Insurance:  Curi

Basic Coverage: $500,000/$1,500,000

Mcare: $500,000/$1,500,000

Coverage for all physicians. and PMSI

Coverage for PA/CRNP: $1,000,000/$3,000,000

**Schedule 3.20**

**Intellectual Property**

DBAs:

- Sleep Wellness Center of Pottstown

Domains:

- https://pmsiforlife.com/

**Schedule 3.25**

**Cure Costs**

| | Assumed Contracts | Cure Amount |
|---|---|---|
| A. | Lease Agreements Relating to the Following Locations: | |
| | **1.** 1610 Medical Drive Suite 101, Pottstown, Montgomery County, PA 19464 | $0 |
| | **2.** 1566 Medical Drive Office Building Suite 201, Lower Pottsgrove Township, PA 19464 | $0 |
| | **3.** 223 Shoemaker Road Suite 105, Pottstown, PA 19464 | $0 |
| | **4.** 555 2nd Avenue Building C 450, Collegeville, PA 19426 | $0 |
| | **5.** 307 South Lewis Rd, Royersford, PA 19464 | $0 |
| | **6.** 1555 Medical Drive, Pottstown, PA, 19464 | $0 |
| | **7.** 23 N. Walnut Street, Boyertown, PA 19512 | $0 |
| | **8.** 1601 Medical Drive, Pottstown, PA | $0 |
| | | |
| | | |
| B. | Iron Mountain Records Management and Service Agreement dated February 15, 2002 and Customer Agreement dated March 1, 2005 (Acc. No. PC041) | $68,493.99 |
| | | |
| | | |
| C. | Kriebel Security Inc. Agreements for the Following Locations: | |
| | 1. 1555 Medical Drive, Pottstown, PA | $1,395.00 |
| | 2. 555 2nd Avenue Bldg C450, Collegeville, PA | $180.00 |
| | 3. 1566 Medical Drive, Suite 201, Lower Pottsgrove Township, PA | $180.00 |
| | 4. 223 Shoemaker Rd, Suite 105, Pottstown, PA | $330.00 |
| | 5. 1601 Medical Drive, Pottstown, PA | $360.00 |
| | 6. 307 South Lewis Rd, Royersford, PA | $228.00 |
| | 7. 23 N. Walnut Street, Boyertown, PA 19512 | $0 |
| | 8. 1610 Medical Drive Suite 101, Pottstown, Montgomery County, PA 19464 | $0 |

## **Schedule 9**

## **Covenant Not to Compete**

William G. Cano, M.D. owns 0.5 Units of Reading Ambulatory Surgery Center, LP, a Pennsylvania limited partnership, representing a 0.1% interest.

**Schedule 10.1**

**Purchase Price Allocation**

*[Tim to discuss with Jefferson.]*