**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **POTTSTOWN MEDICAL SPECIALISTS, INC.,**[1] | : | **Case No. 26-13621 (DJB)** |
| | : | |
| **Debtor.** | : | |

**SUPPLEMENTAL DECLARATION OF TIMOTHY B. RIMMER IN SUPPORT OF MOTION OF DEBTOR FOR ENTRY OF AN ORDER (A) APPROVING THE SALE OF THE ACQUIRED ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (C) GRANTING RELATED RELIEF**

I, Timothy B. Rimmer, declare and affirm pursuant to 28 U.S.C. §1746 that the following information is true and correct to the best of my knowledge, information and belief:

1. I am the Interim Chief Executive Officer of Pottstown Medical Specialists, Inc. (the "Debtor"), a Pennsylvania corporation, a debtor and debtor-in-possession in the above-captioned Chapter 11 case. I have served in this role since May 2026. In this capacity, I am generally familiar with the Debtor's day-to-day operations, organization, financial affairs, and books and records.

2. On August 30, 2026 (the "Petition Date"), the Debtor filed a voluntary bankruptcy petition with the United States Bankruptcy Court for the Eastern District of Pennsylvania under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et. seq. (the "Bankruptcy Code").

3. The Debtor is operating its business and managing its property as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

[1] The last four digits of the Debtor's federal tax identification number are (7171). The Debtor has an address at 351 W. Schuylkill Road, Coventry Square Suite 13, Pottstown, PA 19465-7438.

4. On September 3, 2026, the Debtor filed a *Motion for Entry of Orders (I) (A) Approving Sale Procedures for the Sale of the Acquired Assets; (B) Scheduling Auction and Hearing to Consider Approval of Sale; (C) Approving Procedures Related to Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (D) Approving Form and Manner of Notices Thereof; (E) Approving Breakup Fee and Expense Reimbursement; and (II) (A) Approving the Sale of the Acquired Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* [D.I. 50] (the "Sale Motion").

5. In connection with the Sale Motion, I executed and submitted the Declaration of Timothy B. Rimmer in Support of the Sale Motion [D.I. 50-3] and, at the September 29, 2026 Bankruptcy Court hearing on the Sale Motion for approval of the proposed sale procedures, testified on behalf of the Debtor in support of the Sale Motion.

6. On September 30, 2026, the Bankruptcy Court entered the *Order (A) Approving Procedures in Connection with Sale of Acquired Assets; (B) Scheduling Auction and Hearing to Consider Approval of Sale; (C) Approving Procedures Related to Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (D) Approving Form and Manner of Notices Thereof; (E) Approving Breakup Fee and Expense Reimbursement; and (F) Granting Related Relief* [D.I. 127] (the "Sale Procedures Order").[2]

7. I submit this Supplemental Declaration in further support of the Sale Motion and specifically in support of the entry of an *Order (A) Approving the Sale of the Acquired Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related*

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Sale Procedures Order, or the Sale Motion, as applicable.

*Relief*.

8. I reviewed the Sale Motion prior to its filing with the Court was intimately involved in the negotiating of the Asset Purchase Agreement and, in support of the Sale Motion, rely on, and incorporate by reference, the *Declaration of Timothy B. Rimmer in Support of the Chapter 11 Petition and First Day Motions* (the "First Day Declaration") [D.I. 14].

**Pre-Bankruptcy Sale Efforts**

9. As detailed in the First Day Declaration and the First Day Motion to authorize DIP financing, the Debtor has been struggling with liquidity constraints.

10. Prior to the Petition Date, the Debtor contacted a number of prospects, with three (3) prospects executing non-disclosure agreements ("NDAs"), and obtaining certain confidential information to determine if a sale transaction could be effectuated.

11. As these discussions developed, it became clear that an out of court transaction was not viable due in part to the Debtor's legacy liabilities, lack of liquidity to fund normal operations, and the lack of appetite from prospective buyers to acquire the assets outside of a court approved process free and clear of liens, claims, encumbrances and other interests. Thus, the Debtor pivoted to marketing an in-court sale process.

12. To alleviate the Debtor's liquidity constraints, the Debtor requested each prospect that expressed an interest in purchasing the Practice, to consider providing post-petition financing in order to fund operations and the sale process, which would be subject to higher and better offers.

13. Only one prospect, Thomas Jefferson University, a Pennsylvania nonprofit corporation, on behalf of itself and its controlled affiliates (defined as (i) the "DIP Lender" in the context of the DIP Credit Agreement, (ii) the "Buyer" in the context of the Asset Purchase Agreement, and (iii) the "Stalking Horse Purchaser" in the Sale Motion), stepped up to the plate

and on August 30, 2026, (a) executed the DIP Credit Agreement with the Debtor that provided the necessary financing to allow the Debtor to pay its operating expenses and fund a 363 Sale Process under this Chapter 11 Case, and (b) executed the Asset Purchase Agreement with the Debtor to purchase the Acquired Assets subject to the Debtor seeking the entry of the Sale Procedures Order by the Sale Procedures Order Deadline (as these terms are defined in the Asset Purchase Agreement).

14. After consulting with its advisors and taking into account various factors, including the Debtor's liquidity position, the Debtor decided to commence this Chapter 11 Case to obtain the authority to designate the Buyer as the Stalking Horse Purchaser and to proceed with the approval of the Asset Purchase Agreement and Sale of the Acquired Assets free and clear of liens, claims, encumbrances, and other interests, subject to higher and better offers, if any.

15. The Debtor and the Stalking Horse Purchaser negotiated the Asset Purchase Agreement at arm's length and in good faith, without collusion.

**The Sale Motion and Approval of the Sale Procedures**

16. As detailed in the Sale Motion, the Asset Purchase Agreement represents the highest or otherwise best offer for the Acquired Assets that the Debtor has received to date and afforded the Debtor and its estate, a minimum bid with which to begin an Auction, as needed, with respect to the Acquired Assets.

17. As a result, the Buyer is entitled to the Bid Protections contained in the Asset Purchase Agreement, including the Breakup Fee and Expense Reimbursement, and for which the Debtor sought and received Bankruptcy Court approval. *See* Sale Procedures Order [D.I. 127].

18. In accordance with the Sale Procedures Order, the Bankruptcy Court determined that the Bid Protections, including the Breakup Fee and Expense Reimbursement, were:

(1) commensurate to the real and substantial benefits conferred upon the Debtor's estate by the Stalking Horse Purchaser; (2) reasonable and appropriate in light of the size and nature of the proposed Sale contemplated by the Asset Purchase Agreement, the commitments that have been made by the Stalking Horse Purchaser, and the efforts that have been and will be expended by the Stalking Horse Purchaser; and (3) necessary to induce the Stalking Horse Purchaser to continue to pursue such sale in accordance with the terms of, and continue to be bound by, the Asset Purchase Agreement.

19. In accordance with the Sale Procedures Order, the Bankruptcy Court determined that the Bid Protections, including the Breakup Fee and Expense Reimbursement, were fair and reasonable in light of the circumstances because, in the event the Bid Protections are triggered, the "Stalking Horse bid" will have promoted more competitive bidding, and thereby increased the chances that the Debtor will receive the highest or otherwise best offer for the Acquired Assets, to the benefit of the Debtor's creditors.

20. As detailed in the Sale Motion in order to facilitate the 363 Sale Process (as defined below), the Debtor developed the terms of the Sale Procedures and the Sale timeline which the Debtor established were reasonable and will assist the Debtor in reaching a resolution of this Chapter 11 Case in advance of any liquidity shortfall.

21. The Debtor designed the Sale Procedures to ensure that the bidding process was fair and, by facilitating a competitive bidding process in which all potential bidders were encouraged to participate and submit competing bids (while giving Potential Bidders flexibility in structuring their Bids), and designed to yield the maximum value for the Debtor's estate and stakeholders.

22. In particular, the Sale Procedures contemplated an open auction process with

minimal barriers to entry and provide prospective purchasers with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid. At the same time, the Sale Procedures provided the Debtor with the opportunity to consider any competing Bids and to select, in its reasonable business judgment, the highest and best offers for the Acquired Assets.

23. With the assistance of its advisors, the Debtor developed a reasonable Sale timeline for a potential sale of the Acquired Assets consistent with the realities of the Debtor's post-petition liquidity. In developing the Sale timeline, the Debtor and its advisors took various factors into account, including, but not limited to, the Debtor's most recent liquidity forecasts, the time needed to market the Acquired Assets, and the time Potential Bidders would need to complete diligence and submit Bids. As contemplated, the court-approved Sale Procedures and associated Sale process timeline provided the Debtor with ample time to run a sale process.

24. In accordance with the Sale Procedures Order, the Bankruptcy Court determined that the Sale Procedures and Sale timeline were a sound exercise of the Debtor's business judgment.

**<u>The Chapter 11 Marketing Process</u>**

25. Pursuant to the Sale Procedures Order, on September 30, 2026, the Debtor caused the true and correct copies of the following documents to be served on all parties on the Debtor's Master Service List, consisting of the 2002 parties, the Debtor's 20 largest creditors, governmental service parties, the United States Trustee's office and certain interested parties (by e-mail (where available) or first-class mail: (a) the Sale Procedures Order [D.I. 127], (b) the Sale Procedures [D.I. 128], Notice of Bid Deadline, Auction, and Sale Hearing in Connection with the Sale of Substantially All of the Debtor's Assets (the "<u>Sale Notice</u>") [D.I. 129], and (c) Notice of Potential

Assumption, Sale and Assignment of Certain Unexpired Leases and Executory Contracts and Sale Hearing (the "Assignment Notice") [D.I. 130]. *See* Certificate of Service [D.I. 141].

26. Pursuant to the Sale Procedures Order, on September 30, 2026, the Debtor also caused true and correct copies of the following documents to be served on the Debtor's matrix, consisting of all creditors and counter-parties to executory contracts and unexpired leases, as well as all known potential bidders (by e-mail (where available) or first-class mail: (a) Sale Procedures Order and (b) Sale Notice. *See* Certificate of Service [D.I. 144].

27. Pursuant to the Sale Procedures Order, on September 30, 2026, the Debtor also caused true and correct copies of the following documents to be served on the counter-parties to executory contracts and unexpired leases identified in the Assignment Notice by first-class mail: (a) Sale Procedures Order, (b) Sale Notice and (c) Assignment Notice. *See* Certificate of Service [D.I. 145].

28. The Debtor prepared the Assignment Notice following (a) the receipt of the Stalking Horse Bidder's identification of the proposed unexpired leases and executory contracts for assumption and assignment and (b) a review of the Debtor's books and records to establish proposed Cure Amounts for such leases and contracts.

29. Additionally, following the entry of the Sale Procedures Order, I and/or Debtor's counsel contacted by phone and/or e-mail all known interested parties, including the parties that signed NDAs prior to the Chapter 11 Case, as well as interested parties who did not sign NDAs, consisting of multiple health systems, physician groups, an accountable care organization and a health management company, to assess interest in the chapter 11 sale process (the "363 Sale Process") and provide the Sale Procedures Order, the Sale Procedures and the related notices where requested.

30. Also following the entry of the Sale Procedures Order, I was contacted by three new interested parties expressing an interest in the Acquired Assets and the 363 Sale Process, consisting of (a) a new interested physician-owned medical practice, (b) a new interested health system/physician group and (c) a new interested private equity fund (collectively, the "New Potential Bidders").

31. Debtor's counsel and I immediately engaged in detailed discussions with each of the New Potential Bidders and their representatives, including multiple phone calls, e-mails and service of the Sale Procedures Order (including the executed Asset Purchase Agreement attached as Exhibit "A" thereto), the Final DIP Order (including the executed DIP Credit Agreement attached as Exhibit "A" thereto), the Sale Notice and the Assignment Notice. Each of the New Potential Bidders was invited to sign an NDA to gain access to the Debtor's due diligence portal. The interested private equity fund signed and returned its NDA and gained access to the Debtor's due diligence portal.

32. Prior to the Bid Deadline, each of the three entities who had signed NDAs prior to the Chapter 11 Case confirmed that it had decided not to submit a bid.

33. On October 15, 2026, the new physician-owned medical practice responded to Debtor's counsel's inquiry regarding the status of its potential bid and confirmed that it had decided not to submit a bid. It acknowledged that the sale transaction is well suited to the Buyer, and the cash requirement and structure was not a fit for its model as a physician-owned group.

34. On October 22, 2026, the new interested health system/physician group responded to Debtor's counsel's inquiry regarding the status of its potential bid and confirmed that it had decided not to submit a bid.

35. On October 22, 2026, the private equity fund responded to Debtor's counsel's

inquiry regarding the status of its potential bid and confirmed that it had decided not to submit a bid. The managing partner for the private equity fund indicated that the fund's decision was driven by, *inter alia*, the "reasonably competitive bid on the table."

36. Notwithstanding the Debtor's efforts, except for the Qualified Bid of the Stalking Horse Purchaser, Thomas Jefferson University, the Debtor received no other Qualified Bid for the Acquired Assets by the Bid Deadline.

37. On October 22, 2026, following the expiration of the Bid Deadline, I conferred with the Debtor's directors and Debtor's counsel regarding the 363 Sale Process. With no other Qualified Bid having been received, the Debtor designated the Stalking Horse Purchaser, Thomas Jefferson University, as the Successful Bidder for the Acquired Assets and authorized the cancellation of the schedule Auction for the Acquired Assets.

38. On October 22, 2026, the Debtor filed its *Notice of Cancellation of Auction and Designation of Thomas Jefferson University as the Successful Bidder of the Acquired Assets* [D.I. 155]. The Debtor caused service of this notice to be made upon the Master Service List and all potential interested parties who signed an NDA, as well as the New Potential Bidders. *See* Certificate of Service [D.I. 160].

39. On October 22, 2026, in accordance with the revised information provided to the Debtor by the Stalking Horse Purchaser, the Debtor filed an *Amended Notice of Potential Assumption, Sale and Assignment of Certain Unexpired Leases and Executory Contracts and Sale Hearing* [D.I. 156] (the "Amended Assignment Notice") to reflect the removal of two unexpired leases and one contract from the list attached as Exhibit "A" to the Amended Assignment Notice. The Debtor caused service of the Amended Assignment Notice to be made upon the Master Service List and the counter-parties to executory contracts and unexpired leases identified in the

Assignment Notice. *See* Certificate of Service [D.I. 161].

40. As of October 27, 2026, there were no objections filed to the Sale and only one limited objection to the Assignment Notice filed by Boyertown Medical Services, L.P. (the "Boyertown Landlord") with respect the unexpired lease (the "Boyertown Lease") for the premises located at 23 N. Walnut Street, Boyertown, PA 19512 (the "Boyertown Premises") and, specifically, the proposed Cure Amount of $0.00 (the "Limited Objection") [D.I. 153].

41. In the Limited Objection, the Boyertown Landlord confirmed that the Debtor was current on its rent obligations under the Boyertown Lease, but indicated that the proposed Cure Amount is approximately $32,028.00, reflecting the cost to replace two (2) HVAC units at the Boyertown Premises, which the Debtor was obligated to fund in accordance with the terms of the Boyertown Lease.

42. As of the instant filing, the replacement HVAC units have been installed and are functioning at the Boyertown Premises, and the Debtor has received two invoices from the Boyertown Landlord (a) Gehringer Mechanical invoice no. 184155425 dated October 16, 2026 for $16,014.00 and (b) Gehringer Mechanical invoice no. 184323644 dated October 23, 2026 for $16,014.00, totaling $32,028.00 (the "HVAC Invoices").

43. The Debtor shall remit payment of $32,038.00 to Gehringer Mechanical on account of the HVAC Invoices during the week of November 2, 2026. Counsel for the Boyertown Landlord has been advised of the timing of the Debtor's payment of the HVAC Invoices and has agreed to withdraw the Limited Objection as moot prior to the October 30, 2026 Sale Hearing.

44. I was involved in the negotiations of the Asset Purchase Agreement with the Stalking Horse Purchaser as the Debtor's Interim Chief Executive Officer and also involved in the marketing of the Assets. The Asset Purchase Agreement is the culmination of substantial diligence

and rigorous arms-length negotiations, all conducted in good faith and without coercion or collusion. Based on my knowledge of the pre-petition and post-petition marketing process and the Debtor's present circumstances, I believe that the Asset Purchase Agreement represents the highest and best offer for the Assets and the Stalking Horse Purchaser has the financial wherewithal to close the Sale and assume the obligations under the Assigned Contracts.

45. The facts and averments set forth in the Sale Motion are true and correct and I offer these facts and averments in support of the further relief sought in the Sale Motion.

46. I declare under penalty of perjury that the foregoing is true and correct.

/s/ *Timothy B. Rimmer*__________
Timothy B. Rimmer, Interim CEO